RAB:DDB
F.#2010R01746

**M11-043**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    -against-

SASSINE RAZZOUK,

       Defendant.

- - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

<u>TO BE FILED UNDER SEAL</u>

AFFIDAVIT IN SUPPORT OF
<u>ARREST WARRANT</u>

(18 U.S.C. § 666(a)(1)(B))

       EVAN CAMPANELLA, being duly sworn, deposes and says that he is a Special Agent with the United States Immigration and Customs Enforcement ("ICE"), duly appointed according to law and acting as such.

       Upon information and belief, there is probable cause to believe that from in or about and between January 2008 and December 2010, within the Eastern District of New York and elsewhere, the defendant SASSINE RAZZOUK, being an agent of an organization that received in excess of $10,000 in any one-year period under a Federal program involving a grant, subsidy or other form of Federal assistance, did knowingly, intentionally and corruptly solicit, demand, accept and agree to accept something of value, to wit: United States currency, with the intent to be influenced and rewarded in connection with business and a series of transactions of such organization involving $5,000 or more.

(Title 18, United States Code, Section 666(a)(1)(B))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.    I have been a Special Agent with ICE since May 2007.  I am currently assigned to ICE's El Dorado Task Force, which investigates money laundering.

2.    The facts set forth in this affidavit are based upon my own investigation, a review of documents, witness interviews, and information I have learned from other agencies, including the Internal Revenue Service ("IRS") and the Office of the Inspector General of the Port Authority of New York and New Jersey.

I.    The Defendant, Con Ed and the Contractor

3.    Consolidated Edison of New York, Inc. ("Con Ed") is a New York-based corporation that provides electric, gas and steam utility services in New York City and Westchester County. As a provider of such utility services, Con Ed is responsible for the construction, maintenance and repair of its electric, gas and steam systems.  As a part of its electric system, Con Ed constructs and maintains various facilities, including generating stations, and transmission and distribution substations.  Con Ed

---

[1]    Because the purpose of this affidavit is only to state the probable cause to arrest, I have not described all the relevant facts, circumstances and conversations of which I am aware related to this investigation.  All conversations and statements reported in this affidavit, unless directly quoted, are described in substance and in part.

3

received federal funding in excess of $10,000 for each year from
2008 through 2010.

    4.   The defendant SASSINE RAZZOUK has been employed at
Con Ed since 1984.  He has been a Section Manager in Con Ed's
Electrical/Control Systems Design section since 2003.  In this
position, RAZZOUK oversaw the design of electrical control
systems within Con Ed's generating stations and substations,
which included the preparation of project specifications, the
review of bids and technical proposals, the awarding of contracts
to design/engineering contractors and the approval of payments to
these contractors.[2]

    5.   In awarding contracts for the design of the
electrical controls systems for its electrical facilities, Con Ed
made selections from a pre-qualified group of contractors.
Specific contracts were then awarded based on the technical
qualifications of the contractor to perform the specific project
requirements and the contractor's bid amount.  In accordance with
Con Ed procurement procedures, among the contractors who met the

_____

    [2]  A confidential source ("CS") who has been employed at Con Ed
for the last thirty years, and from April 2009 through the
present served as a director in the internal auditing unit,
provided me with much of the information contained herein
regarding Con Ed and RAZZOUK's employment at Con Ed.  The CS's
duties include conducting internal audits and investigations of
Con Ed's operations, which include the contracts overseen by the
defendant SASSINE RAZZOUK.

4

project's technical requirements, the contracts were awarded
based on the lowest qualified bid, submitted under a sealed
bidding process. The defendant SASSINE RAZZOUK had substantial
oversight responsibilities over the procurement process for these
projects.

6.   Rudell & Associates, Inc. ("Rudell") is an
engineering/design firm whose main offices are located in Queens,
New York. The president and Chief Executive Officer of Rudell is
an individual who will be referred to herein as "John Doe."
Since at least 2001, Rudell has performed design/engineering work
under contracts with Con Ed, including the creation of plans and
designs for new electrical control systems, as well as drafting
new diagrams and schematics to maintain existing Con Ed
electrical control systems.

7.   Since at least January 2008, Rudell has been
awarded Con Ed contracts in which it provided engineering and
design services for electrical power systems that were managed
and overseen by the defendant SASSINE RAZZOUK. In supervising
these projects, RAZZOUK managed the development of the scope of
each project, prepared the requests for bids, reviewed the
submitted bid proposals, awarded the contracts to Rudell, and
subsequently reviewed and authorized the payments to Rudell under
the contracts.

II.  Payments from Rudell to RAZZOUK

8.  Based on my review of account records, at least $4 million has been deposited into an account controlled by the defendant SASSINE RAZZOUK since January 2008, derived from accounts controlled by John Doe.  During this time period, Rudell received approximately $18 million in payments from Con Ed under contracts managed by RAZZOUK.

9.  Between January 2008 and January 12, 2009, 57 checks were issued from Rudell to a company called MDM Capital, Inc. ("MDM") for approximately $1.4 million.  Records indicate that MDM is a New York State corporation and the defendant SASSINE RAZZOUK is its president.  Bank account records for MDM list its corporate address as RAZZOUK's residence in Staten Island, New York.

10.  On January 14, 2009, I participated in the arrests of eleven Con Ed employees based on federal arrest warrants issued in the Eastern District of New York for receiving bribes from a contractor.  These arrests were publicized by the news media and Con Ed issued a memorandum to its employees reporting the arrests.

11.  The CS informed me that on February 2, 2009, based on Con Ed records, John Doe was one of many contractors who attended a meeting at Con Ed in which the recent arrests of the Con Ed employees were referenced and Con Ed executives reviewed

the legal and ethical rules for conducting business with Con Ed,
including the consequences to contractors if they were caught
violating any of these procedures.  Each contractor was also
provided with a copy of Con Ed's Standards of Business Conduct.

12.   Based on account records, there were no further
payments made directly from Rudell to MDM after the arrests of
the other Con Ed employees.  Instead, beginning a few days after
the Con Ed ethics meeting John Doe attended, rather than
continuing to pay the defendant SASSINE RAZZOUK in checks issued
directly from Rudell to MDM, John Doe attempted to conceal
subsequent payments to RAZZOUK by first issuing checks from
Rudell to Rudicon Power Corp. ("Rudicon"), another company John
Doe controlled, which then issued corresponding checks to MDM.
Records indicate that Rudicon was incorporated in New York State,
listed John Doe as its president, and had the same corporate
address as Rudell in Queens, New York.

13.   Starting on February 9, 2009, when payments from
John Doe to the defendant SASSINE RAZZOUK began being made
through Rudicon, account records indicate that checks issued from
Rudell to Rudicon referenced a specific, current project Rudell
was performing for Con Ed that was supervised by RAZZOUK.  Within
days of the issuance of such checks, subsequent, corresponding
checks from Rudicon to MDM referencing the same Con Ed project
were then issued in the same amount.

14.  For example, a check dated February 24, 2009 in the amount of $67,570 was issued from Rudell to Rudicon.  A subsequent check dated March 5, 2009 for the same amount was then issued from the Rudicon account to MDM.  The memo section of each check referenced the same project relating to the East River Con Ed facility that Rudell had been engaged in with Con Ed, and the Rudicon to MDM check also listed "2/09" in the memo section of the check, noting the month and year of the corresponding check Rudell had issued to Rudicon.

15.  In another example, a check dated December 12, 2009 in the amount of $98,000 was issued from Rudell's account to Rudicon.  A subsequent check dated January 6, 2010 was then issued from Rudicon's account to MDM, for the same amount.  Both of these checks referenced the "PST-Redline" Con Ed project that Rudell had been engaged in with Con Ed.

16.  Between February 9, 2009 and May 2010, approximately 100 checks were issued from Rudell to Rudicon in this fashion that referenced Con Ed projects, totaling approximately $2.6 million.  During this same period, approximately 100 corresponding checks were issued from Rudicon to MDM, totaling almost $2.5 million.  All the checks issued from both Rudell and Rudicon to MDM appear to have been signed by John Doe.

III.  The MDM Account

      17.  Based on MDM records, between January 2008 and December 2010, MDM's sole bank account (the "MDM account") was funded only by payments from Rudell and Rudicon.  As such, it appears that MDM operated only for the purpose of receiving payments from John Doe.  It also appears that MDM had no legitimate business function in that its records indicate that MDM appeared to have no employees, as there were no expenditures for either payroll or payroll taxes, nor any payments to a payroll service to provide these expenditures.

      18.  In fact, MDM account records also indicate that there were no business expenditures made since at least 2008. Instead, all the disbursements from the MDM account appear to be for the defendant SASSINE RAZZOUK's personal expenses, including (i) the purchase of two Mercedes Benz automobiles totaling approximately $75,000, one registered to RAZZOUK and the other to RAZZOUK's wife, (ii) seven checks totaling $2.7 million issued to RAZZOUK, (iii) approximately $115,000 to pay RAZZOUK's American Express credit card payment, (iv) $23,000 to RAZZOUK's daughter, (v) $71,000 to RAZZOUK's mother, (vi) $56,000 to pay property taxes on RAZZOUK's second home in Marlboro, New Jersey, (vii) approximately $65,000 in combined federal, New York State and New York City incomes taxes, (viii) $234,000 in mortgage payments on

RAZZOUK's Staten Island, New York residence, (ix) $200,000 to a company owned by RAZZOUK called Heavenly American Yogurt, and (x) hundreds of thousands of dollars in home construction-related expenses.  The CS informed me that RAZZOUK's annual Con Ed salary was approximately $150,000.

19.  Con Ed records also indicate that MDM was not listed as either a contractor of Con Ed, or a subcontractor of Rudell.

20.  I have been informed by the CS that under Con Ed policies, the defendant SASSINE RAZZOUK was obligated to apprise Con Ed of any potential conflicts of interest he had regarding his employment at Con Ed, which would include notifying Con Ed about any payments received by MDM from Rudell and/or John Doe, as contractors/vendors of Con Ed.  As specified in Con Ed's Standard's of Business Conduct (Section 4.0), which was disseminated to all Con Ed employees both through its corporate handbook and by letter provided every other year, Con Ed employees, among other things, were required to notify Con Ed's General Auditor of (i) any compensation they received other than from Con Ed, (ii) any compensation they received from a vendor of Con Ed, (iii) any ownership/proprietorship interest they had in any outside company, especially if that employee received any gifts, loans and/or compensation from the company, and (iv) any other conduct by the employee that may interfere with that

employee's evaluation of contract bids and specifications, as well as appraisals and inspections of vendor performance.

21. The CS has further informed me that under Con Ed's Standard of Business Conduct (Section 4.0), the defendant SASSINE RAZZOUK was barred from receiving any payments from Rudell or Rudicon given John Doe's contracts with Con Ed, and especially given that RAZZOUK oversaw many of the contracts between Rudell and Con Ed. In addition, the CS has indicated that under Con Ed's Standards of Business Conduct - Values and Guidelines for Contracts (relating to conflicts of interest), John Doe would be prohibited from making any payments to an entity owned and operated by a Con Ed employee, especially one that oversaw many of the contracts between Rudell and Con Ed.

22. The CS has provided me with letters dated August 29, 2007, December 9, 2008 and October 16, 2009, in which the defendant SASSINE RAZZOUK affirmatively represented to Con Ed that he had no conflicts of interest regarding his employment at Con Ed. In these letters, RAZZOUK also failed to notify Con Ed that he had a financial interest in MDM or that MDM was receiving payments from Rudell and Rudicon which he was required to report to Con Ed.

IV. Rudell Projects Managed by RAZZOUK

23. The CS has informed me that based on his review of Con Ed records, he determined that irregularities had taken place regarding several contracts between Rudell and Con Ed since at

least January 2008 that were overseen by the defendant SASSINE
RAZZOUK. The CS noticed a pattern that existed whereby Rudell
was often awarded Con Ed contracts by underbidding, in some cases
grossly, his competitors for these projects, only to have the
contract amounts substantially increased during the project by
the approval of subsequent "change orders" by RAZZOUK.[3] The CS
informed me that it appeared that many of the change orders
RAZZOUK approved for Rudell were for items that were required
under the contract specifications and therefore should not have
been approved. The CS also discovered that RAZZOUK's approval
of a number of contracts and change orders for Rudell occurred
during periods when that authority was delegated to him because
his supervisor was absent.

24. For example, Rudell was awarded a contract (#445-
09-0059)[4] with a bid in the amount of $76,000, but was ultimately
paid $112,318 as a result of change orders the defendant SASSINE
RAZZOUK approved. Records indicate that Rudell was paid
approximately $35,000 extra just to expedite by three weeks the

---

[3] A change order is a request for the contractor to perform
additional work that was unforseen at the time the contract was
awarded. The CS informed me that according to Con Ed records,
officials from Rudell typically participated in pre-bid field
reviews for each project to understand the scope of work prior to
the submission of bids, which are intended to familiarize bidders
with the project specifications and mitigate the need for change
orders once the project commences.

[4] Refers to the Con Ed contract number.

installation of the same electrical breakers as specified in the original contract.

25.  In another example, Rudell won the bid on a contract (#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) for $41,000, but was ultimately paid almost $75,000 through change orders submitted that were approved by the defendant SASSINE RAZZOUK.  Records indicate that the change orders were approved to reflect the existence of interlocking disconnect switches, an item that was listed in the original contract specifications.

26.  On a current Con Ed contract (#445-09-082), Rudell won the bid for $201,300, which was approximately $25,000 lower than the next highest bid.  To date, through change orders, Rudell has already been approved for payments totaling $234,000 for this ongoing project.  The change orders approved by the defendant SASSINE RAZZOUK charged Con Ed for drawings that appear to have been included in the specifications in the original contract.

27.  Con Ed awarded Rudell a contract (#445-09-00084) based on Rudell's bid of $306,000 that was approximately $175,000 lower then the next lowest bid.  During the course of the project, the defendant SASSINE RAZZOUK subsequently approved two change orders that raised the total contract amount by approximately $170,000, to provide additional drawings that

appear to be part of the specifications under the initial
contract.

28. Rudell won another Con Ed contract (#445-10-00081)
by vastly underbidding its five competitors with a bid of
$87,300. While the project is ongoing, the defendant SASSINE
RAZZOUK has already approved a change order submitted by John Doe
for $70,000 which was for drawings that appear to be required
under the initial contract specifications.

29. Con Ed awarded Rudell a contract (#445-10-00084)
based on Rudell's bid of $187,000, which was well below the bids
of the other four contractors who submitted bids. The defendant
SASSINE RAZZOUK then approved two change orders submitted by
Rudell during the project for drawings that appeared to be items
already part of the initial contract specifications, which raised
the total contract amount by approximately $375,000.

30. Another project reviewed by the CS (#445-10-112)
was awarded to Rudell for $280,000. Three weeks after the
initial award was made, the defendant SASSINE RAZZOUK approved a
change order for $190,000, for drawings that were required under
the original contract specifications, bringing the total contract
value to $470,000. The CS informed me that the next lowest
bidder for this project had submitted a bid of $480,000.

31. Under Con Ed contract (#445-10-118), Rudell won
the bid for $36,350 but was ultimately paid over $80,000 through

change orders submitted that were approved by the defendant SASSINE RAZZOUK to revise 95 drawings which had already been specified as part of the scope of work in the original contract.

32.   Rudell was awarded another Con Ed contract (#445-10-119) with its bid of $38,360.  Rudell was ultimately paid over $105,000 through change orders approved by the defendant SASSINE RAZZOUK for multiple drawings that appear to have been specified in the original contract.

33.   The CS also informed me that Con Ed records indicate that the defendant SASSINE RAZZOUK approved a "sole source" contract (#445-05-00029) whereby Rudell was awarded a Con Ed project without having to engage in a competitive bidding process.  While the initial contract award value was $81,000, RAZZOUK subsequently approved five change orders that raised the contract amount to $526,000.  RAZZOUK then later approved additional change orders for this project by filing them under a more current Con Ed contract number (#445-07-00017) for an additional $127,000.

34.   The CS informed me that on another sole source contract (#445-09-00089) Rudell was awarded by Con Ed through the defendant SASSINE RAZZOUK, the initial contract amount of $47,000 was increased to almost $470,000 through four change orders that Rudell submitted that were approved by RAZZOUK.

35.   The CS has informed me that the defendant SASSINE
RAZZOUK generally awarded Rudell a perfect technical evaluation
score in all six categories that are evaluated for each of the
contracts for which Rudell submitted bids between January 2008
and December 2010.  For example, Rudell consistently received a
perfect score for "understanding of scope of work" and "proven
quality of work."  According to the CS, RAZZOUK should have
considered that an "action line" had been previously issued
against Rudell for its failure to follow federal Occupational
Safety Health Administration (OSHA), New York City Department of
Buildings and New York State Department of Environmental
Conservation codes and standards with respect to a civil
engineering project, and not assigned Rudell a perfect technical
score.  As a result of the action line, Rudell was suspended from
all work for three months and from civil engineering for six
months.

36.   The CS has informed me that during 2009 and 2010,
Con Ed's Central Engineering department awarded 487 projects to
various engineering firms.  While Rudell was awarded 59
contracts, or 12% of the total number for these projects, the
approximately $18 million paid by Con Ed to Rudell accounted for
approximately 45% of the total contract expenditures for these
projects.  The next highest paid engineering contractor by Con Ed

16

received only 8% of the total Central Engineering project expenditures.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant SASSINE RAZZOUK so that he may be dealt with according to law.

Because of the nature of this application, it is further requested that this application and the related arrest warrant be filed under seal.

EVAN CAMPANELLA
Special Agent, ICE

Sworn to before me on
18th day of January 2011

JUDGE
ORK