United States District Court
Eastern District of New York
------------------------------------------------X
United States of America,

                                        Criminal Docket No. 11-430 (ARR)

                v.

Sassine Razzouk,
                Defendant.
------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW

STEVE ZISSOU, ESQ.
4240 Bell Boulevard, Suite 302
Bayside, New York 11361
718.541.0716

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENTS…………………………………………………1

BACKGROUND……………………………………………………………………4

I.      CON EDISON HAS NOT SUFFERED A LOSS………………………...12

   A. The Con Edison Bidding Process ...........................................................13

   B. The Con Edison Approval Process .........................................................17

II.     THE MANDATORY VICTIM RESTITUTION ACT……………………19

III.    THE FORENSIC ANALYSIS PREPARED BY KPMG…………………23

   A. Con Edison's Record Management System ............................................24

   B. The Restitution Disclosure is Insufficient .............................................24

   C. Specific Examples of the Inadequacy of the Forensic Analysis .............26

   EXAMPLE #1 ...........................................................................................26

   EXAMPLE #2 ...........................................................................................28

   EXAMPLE #3 ...........................................................................................30

   EXAMPLE#4 ............................................................................................31

   EXAMPLE# 5 ...........................................................................................31

   EXAMPLE #6 ...........................................................................................32

EXAMPLE #8 ...................................................................................................34

EXAMPLE #9 ...................................................................................................35

EXAMPLE #10 .................................................................................................36

D. The Forensic Analysis is Fatally Flawed ...................................................37

IV.   THE RESTITUTION CLAIM FOR THE TAX COUNTS ...........................38

V.   THE GOVERNMENT HAS BREACHED THE PLEA AGREEMENT ............41

A. The Applicable Legal Principles ...............................................................44

CONCLUSION ...................................................................................................47

## SUMMARY OF THE ARGUMENTS

The thousands of pages of documents the defense has reviewed in response to the government's request that the Court order restitution in the amount of $9,809,645.72 in favor of Consolidated Edison Company of New York, Inc. ("Con Ed" and "Con Edison") and its insurance carrier National Union Insurance Company ("National Union"), do not support an order of restitution to either Con Edison or National Union. In fact, the records demonstrate that Con Edison did not suffer a loss at all.   The Mandatory Victim Restitution Act ("MVRA") applies only in cases "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Under the MVRA, "restitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct." *United States v. Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013).   Even assuming that a violation of 18 U.S.C. §666(a)(2) is an "offense against property" under the MVRA, the government's restitution request must be denied since Con Edison suffered no compensable pecuniary loss.

Despite the fact that the defendant filed amended tax returns and paid the additional taxes due, the government also seeks restitution in favor of the IRS in the amount of $4,118,288.01. The basis of the request is the disagreement with the methodology used by the accountant that prepared Mr. Razzouk's amended tax returns.

However, at the time that the amended returns were filed – *more than five years ago* – the attorney for the government was informed that the defendant intended to use

1

the forfeited funds to reduce the overall tax that was owed.  And while the government claims that it is "the IRS's position that the defendant may not claim this $6.5 million in forfeiture payments," neither the government or the IRS voiced this or any other objection until October 11, 2017. ecf 53, note 6. The government and the IRS were on notice and failed – until now – to voice a timely objection.  Rather, knowing full well that the defendant had filed amended returns, the government said, and did, nothing, year after year after year, while interest and penalties accrued.

Since the government and the IRS waited more than five years to advance an objection, they have forfeited the right to do so now. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (citation and internal quotation marks omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)). Accordingly, the government's request for an additional payment of $4,118,288.01 should be denied.

A review of the plea agreement executed by the defendant and the government discloses that the government explicitly agreed that "[b]ased on information known to it now, the Office will not oppose a downward adjustment of three levels for acceptance of responsibility under U.S.S.G. § 3El.1." Plea Agreement ¶ 2. The government also

represented to counsel for the defendant that the fact of Mr. Razzouk's substantial assistance would be made clear to the Court at sentence.

Notwithstanding these assurances, the government took a far less generous posture in its sentencing submission to the Court dated October 11, 2017. Instead, the government sought to minimize the substantial assistance to the government that Mr. Razzouk had provided adding that "[a]gents were already investigating Quiambao when the defendant began to provide information to the government. In addition, had the defendant never cooperated with the government, the government nevertheless would have discovered Miranda's criminal conduct and successfully prosecuted him." ecf 53, note 6.

The government also went back on its promise not to oppose a 3-level reduction for acceptance of responsibly as set forth in the cooperation agreement and as communicated to the probation officer assigned to this case. Because the government has breached multiple material provisions in the plea agreement, the defendant has been deprived of the material benefits that he believed he would receive by signing the plea agreement and pleading guilty. Accordingly, the defendant respectfully demands specific performance of the plea agreement or, in the alternative, an order vacating his guilty pleas.

# BACKGROUND

Sometime in late 2010, the government opened an investigation of the defendant, Sassine Razzouk. In late 2010, an employee of Con Edison's auditing department began communicating with an Assistant United States Attorney in the Eastern District of New York. As outlined in an affidavit filed in support of an arrest warrant, Con Edison's Internal Auditing Unit suggested that "irregularities had taken place regarding several contracts between Rudell Engineering and Con Edison," for jobs that were supervised by Con Edison employees within Mr. Razzouk's department (Electrical Design). Arrest Aff. ¶23. And that the auditing department had identified a "pattern." This so-called "pattern" was that "Rudell was often awarded Con Ed contracts by underbidding, in some cases grossly, competitors for these projects. . . ." *Id.* This conclusion went unquestioned by government investigators even though, as Con Edison's records show, it is flat out wrong. In fact, of the 487 projects awarded by Mr. Razzouk's section during the period covered by the audit, Rudell was the low bidder on just 59, a mere 12% of the total expenditures. CE0070168.

The government has embraced this "bid low" theory even though, as described below, an internal multilayered approval process in place at Con Edison made it virtually impossible for it to have occurred without the involvement of numerous other high ranking Con Edison employees.  In short, the scheme alleged by the government did not and could not have taken place. Moreover, whenever Rudell was the successful bidder,

4

the work was done professionally and in accordance with the contract between the parties. Indeed, Rudell was a *preferred vendor* for many of the departments at Con Edison, not just Mr. Razzouk's department, because Rudell got the job done and at a reasonable price. In short, the jobs for which Rudell was the contract vendor *saved* money for Con Edison.

This conclusion is not simply supported by the available evidence; it is something that Mr. Razzouk has explained since his arrest in January of 2011. And he was not the only one to do so. As explained in a letter submitted to this Court by counsel for Mr. Quiambao:

> Mr. Quiambao did not inflate invoices, did not bill for unperformed work, and did not bill more than once for the work he performed. Throughout his career as an electrical engineering contractor working for Con Ed, he never failed to provide anything other than full performance of the highest quality.

ecf 89 at p.4. The sentencing memorandum submitted by Mr. Quiambao on December 1, 2016, expressed the same sentiments about the quality of his work and the value of the services performed by his engineering firm, Rudell:

> Bids for work to Central Engineering were reviewed by ES&H; competing bids were opened simultaneously and reviewed in public, and Razzouk never even saw the financial portion. Razzouk's only influence in the bid process was as to their technical adequacy and completeness, and even then, it was Razzouk's assistants who typically made those determinations for him. Nor did Razzouk have discretion to approve payments; his control over the payment process was only to assess payment progress against the completion level of any particular

5

> project. At no time did Razzouk steer a Rudell bid high or low. Neither did Razzouk ever pad Rudell's projects with change orders. Contrary to the assertions in the PSR (¶16), all additional work Rudell performed was properly justified and processed in accordance with the policies and procedures of Con Ed.

ecf 77. Sadly, this is perhaps the only truthful thing that Mr. Quiambao wrote in his sentencing memorandum.  In another part of his memorandum, the man Mr. Razzouk's children, called "Uncle Rudy," describes Mr. Razzouk as "parasitically" attached to *him.* ecf 77 p.10. Instead of telling the truth about their relationship, "Uncle Rudy" decided to distance himself from Mr. Razzouk shortly after learning of his arrest in January of 2011. Instead of accepting responsibility for his actions, whatever they were, as he has done to Messrs. Matta and Miranda, "Uncle Rudy" depicts Mr. Razzouk, his wife, his children and his deceased wife as rapacious thugs. Mr. Quiambao's narrative now would have the Court believe that because of his "fear of Razzouk's retaliation," Quiambao paid him 120% and more of his profits. *Id.*

The explanation for Mr. Quiambao's unseemly efforts to portray himself as the victim in his decades-long effort to corrupt various Con Edison employees is not fear of retaliation but his survival instinct. Indeed, the childless Mr. Quiambao  and Mr. Razzouk were virtually inseparable away from Con Edison.   Their relationship was so close that Mr. Quiambao was the *executor* of Mr. Razzouk's estate. So close that agents speculated that the two men were lovers. At times asking Mr. Razzouk if Mr. Quiambao  had "touched you" while the men traveled together.  Mr. Razzouk like Mr. Quiambao  was a

tireless worker and believed that the childless Quiambao was grooming him to one day take over Rudell when he retired (a copy of Mr. Razzouk's will, executed in 2007, is attached hereto as Exhibit "A").

While long just a theory, the root of Mr. Quiambao 's betrayal of Mr. Razzouk was confirmed just recently.   According to a confidential source (CS-1), there was an effort to "protect" Mr. Quiambao shortly after Mr. Razzouk's arrest because of concerns at Con Edison that the company was dependent on Rudell and would not be able to replace him.[1] When Mr. Quiambao  learned of this and that he might survive, the metamorphosis began.  It was during this time that Mr. Quiambao created the fictional account of his relationship with Mr. Razzouk transforming from "Uncle Rudy" to "innocent victim" of economic extortion.  CS-1 also confirmed that Mr. Razzouk had communicated to Con Edison management concerns about another Con Edison vendor that was a favorite of a vice president at Con Edison.

Unfortunately for Rudell, once the news that Mr. Quiambao was paying *at least* two other Con Edison employees, senior management at Con Edison decided that Rudell could not be protected, after all.  Nevertheless, Mr. Quiambao  continued to advance the bogus "economic extortion" theory after his arrest and does so even now.   And the government did not pursue any other investigations of Con Edison upper management.

---

[1] CS-1 was employed in an upper level management position at Con Edison during the time period in question.

7

In any event, there are at least a few things that Mr. Razzouk and Mr. Quiambao still agree upon – that at no time did Mr. Razzouk steer a Rudell bid high or low. Neither did Mr. Razzouk ever pad Rudell's projects with change orders and all additional work Rudell performed was properly justified and processed in accordance with the policies and procedures of Con Edison and that Rudell's work was exceptional.  Other senior engineers at Con Edison felt the same way about the quality and the value of the services performed by Rudell. For example, a Senior Engineer, Elizabeth "Betty" Law, recommended Rudell for the relocation of the Elmsford Substation, "*by reason of their experience and proven ability to deliver on time.*" CE0033956.

Nor is this appraisal unique.  Rudell consistently scored higher on "Technical Evaluations" that Con Edison Technical Coordinators ("TCs") and other engineers prepared before opening the bids that were submitted by the vendors.  For example, in a project named "3D Subsurface Drawings," of the vendors that bid for the job, Rudell's score was well above the scores of the other bidders (230 Rudell as compared to 171 & 75 for the other bidders). CE0058776-781. And it should be noted that these are just a few examples of the high regard for Rudell Engineering at Con Edison by engineers that were *outside* of Mr. Razzouk's section, Electrical Design Engineering. *See* CE0065680-681; CE0065530-536; CE0065934-937.

Mr. Razzouk also benefited from their friendship.  He worked on many *non-Con Ed* projects for Rudell over the years and was compensated for his efforts.  He frequently

8

traveled overseas on Mr. Quiambao's behalf and worked tirelessly to prepare presentations for billion-dollar electrical design contracts that the men competed for, among other things.   And although Mr. Quiambao spent lavishly in support of these efforts, they were ultimately unsuccessful.   Insofar as Mr. Razzouk was concerned, he believed that Mr. Quiambao was "like family."   As set forth above, Mr. Razzouk's children called him "Uncle Rudy" and he was *the executor of Mr. Razzouk's estate*.   Not surprisingly, this rather important symbol of the nature of the relationship between the two men did not find its way into any of Mr. Quiambao's submissions to the Court.   Nor was there any mention of the extensive business-related travel to distant lands.   No mention of trips to Dubai and Saudi Arabia, for example.   And the scant mention of the efforts to compete for billion-dollar contracts.   The evidence of these missions, attached hereto as Exhibit "B", is simply irrefutable and includes, for example, a business card that Mr. Quiambao had made for  Mr. Razzouk along with photographs of the two men meeting people while on business trips.[2]

Instead of acknowledging the truth about their relationship, Mr. Quiambao makes the dubious claim that he could not resist Mr. Razzouk's "demand" for 25% of his income from jobs supplied from Mr. Razzouk's section, Electrical Design Engineering. In effect, as we explain below, Mr. Quiambao would have the Court believe that he paid

---

[2] Additional proof will be submitted along with the defendant's sentencing memorandum.

Mr. Razzouk 120% of his *net* income, simply so that he would not lose the right to bid for more Con Ed work.

Mr. Quiambao's efforts to befriend Mr. Razzouk intensified after the untimely death of Mr. Razzouk's wife, Michele LaMagna, in February of 1999. After her death, Mr. Quiambao made himself a fixture in Mr. Razzouk's life, and the life of his daughters, Danielle and Monique, who were just 7 and 9 years old at the time of their mother's death. Mr. Quiambao would show up, often unannounced, at Mr. Razzouk's home with plates of food and gifts for the children. At the time, Mr. Razzouk was an electrical engineer for Con Edison and was not in a management position. His first position as a manager did not come until 2003.

Con Edison's auditing department's advanced a dubious "bid low" theory that government agents embraced with little or no hesitation.  And this is hardly surprising. Indeed, the payments to Mr. Razzouk over the years made it difficult to resist. And the fact that Mr. Quiambao placed Con Edison Project Numbers ("P/Ns") on the checks that he gave to Mr. Razzouk made it simple for investigators to conclude that they were not anything more than bribes.  As far as investigators were concerned, the circle was complete.  The government has chosen to minimize, even to this day, irrefutable evidence that Mr. Razzouk did, in fact, do substantial legitimate work for Mr. Quiambao.

The government stayed with the "bid low" theory of the case and minimized the irrefutable evidence that Mr. Razzouk and Mr. Quiambao were involved in legitimate

business endeavors unrelated to Con Edison.  Mr. Quiambao might have some other motive for adding the numbers to the checks, after all. Such as attempting to *write off* some of these expenses by conflating them with Con Edison contracts.  Or as he eventually did, create an alibi so that he might attempt to advance a sham "economic extortion" defense if the relationships he developed over the years went sour.

As outlined in more detail below, the *available* records do not support the "bid low" theory of this case and, as relevant to this submission, do not support the government's restitution requests.

## I.      CON EDISON HAS NOT SUFFERED A LOSS

Each job that is awarded to a vendor by a Con Edison section is given a Purchase Order Number ("PON"). The job associated with PON 830882 is a particularly revealing example, although hardly the only one, of a contract between Rudell and Con Edison that should have raised red flags with investigators.[3] The following spreadsheet is contained in the government's restitution submission. ecf 54-4.

| Purchase Order Number | Number of Order Releases | Purchase Order Amount Reviewed | Overcharges |
|---|---|---|---|
| 321623 | 36 | $4,739,880.00 | $303,198.00 |
| 519735 | 1 | $825,740.00 | $12,100.00 |
| 519867 | 131 | $9,951,126.00 | $1,305,030.00 |
| 623595 | 1 | $1,950,000.00 | $480,000.00 |
| 629200 | 1 | $750,000.00 | $6,000.00 |
| 829011 | 1 | $95,000.00 | $0 |
| 829012 | 100 | $10,381,915.18 | $3,886,756.00 |
| 829021 | 1 | $209,987.00 | $0 |
| 829043 | 1 | $197,250.00 | $0 |
| 830882 | 1 | $1,450,000.00 | $53,290.00 |
| 942920 | 1 | $1,174,000.00 | $13,427.00 |
| **Totals:** | **275** | **$31,724,898.18** | **$6,059,801.00** |

As outlined in the exhibit, PON 830882, the contract that Rudell and Con Edison negotiated, was for a total of $1,450,000.00.[4] The government claims that $53,290.00 should be included as restitution since it was an "overcharge."  This claim is simply incorrect.  The payment was for extra work requested by Con Edison. As reflected in the attached Con Edison documents, a "Project Change Request" was submitted by the Project Engineer, Richard Okragly. NU-CE-18481. This request was approved by "Relay

---

[3] Additional examples are included below.
[4] Upon information and belief, Rudell's winning bid was for $1,475,000.00.  However, Mr. Razzouk's unit negotiated a reduction to $1,450,000.00.

Protection Engineering" Section Manager, John Vasco and Chief Engineer, Vid Vernakas. *Id.* This request was reviewed by the TC for the job, Aitqur Chowdhury.[5] Once the work was substantially completed the TC would have to certify that the extra work was done before the additional payment would be made to the vendor, Rudell. And there is no evidence to support the conclusion that the work was *not* completed. On the contrary, the available evidence reveals that the job was awarded, conducted and completed in the ordinary course and that no irregularities were involved. NU-CE-02520-526, NU-CE-18479-485, NU-CE-04844-845.

### A. The Con Edison Bidding Process

Ordinarily, bids submitted to Con Edison are secret. And to be clear, section managers, such as Sassine Razzouk, do not get to see the blind bids that are received by Con Edison. The only thing that is known to the various departments is which vendors have been approved to submit proposals. The approval process seeks to identify only those experienced vendors that have demonstrated an ability to perform the work that is sent out for bids. Once this group of vendors is selected, the bids are submitted in secret. The winning bid is approved by Con Edison management, not Sassine Razzouk. Mr. Razzouk's department is part of the process of reviewing which vendors have the

---

[5] Each job awarded to a contract vendor is supervised by a Con Edison "Technical Coordinator." Among other things, the TC is responsible for ensuring that the job is done properly and to request approval for additional work outside the terms of the contract when necessary.

technical capabilities required for the job.  From this position, Mr. Razzouk's section was able to evaluate Rudell's capabilities as a qualified vendor for a particular job.

The job that was contracted under PON 830882 was to complete phase II of a job that was awarded as a "*turnkey*" to another vendor.[6]  However, Con Edison was not satisfied with the performance of the original vendor, General Electric Engineering (GE). Thus, Con Edison management decided that Phase II of this project should be completed by another vendor that had been associated with Phase I of the project but was believed to possess the expertise necessary to complete the project.  This vendor, RPS Engineering ("RPS"), submitted a bid proposal of $2,950,000 to complete Phase II.  The RPS bid also had "a lot of exceptions" that would have greatly increased the final cost to Con Edison. NU-CE-02527-528.

After receiving this bid, Con Edison's purchasing department asked for a "bid check." Upon information and belief, a bid check is requested by Con Edison when the purchasing department wants to make sure that the proposal received from a vendor is reasonable.  A bid check is, generally speaking, an exception to the way that Con Edison awards contracts. The normal way of awarding a particular job is to have competitive bidding, as set forth above.  In the normal course of business, an estimate is prepared by the TC or engineer in charge of the project and submitted to Con Edison management

---

[6] Turnkey is a contract comprising Engineering, Procurement, Construction and commissioning; It is such a contract that under which a contractor agrees to complete full designing, constructing and equip a manufacturing/ business/ service facility and turn the project over to the Employer/Owner when it is ready to put into business operation or production. *Understanding Project Delivery Methods*, Find Law, http://corporate.findlaw.com/law-library/understanding-project-delivery-methods.html (last visited Jan. 2, 2018).

before receiving bids. On the other hand, bid checks are requested from Con Edison's purchasing department for work that is awarded to a contractor on a "sole source" basis. That is to say, a non-competitive bid.[7]  In this particular job, RPS was supporting GE, the primary contract vendor. GE and RPS were involved with the project from its inception.

As set forth above, numerous issues arose and Con Edison's management decided to replace GE design responsibilities with another contractor.  Since RPS was familiar with the project and thought to have the necessary expertise to complete Phase II, RPS was given the opportunity to do so.

After the RPS bid was received, Con Edison's purchasing department asked Mr. Razzouk's section, "Electrical Design Engineering," to review the RPS proposal. In other words, this was one of the very, very rare occasions when Mr. Razzouk *knew* the exact amount of the bid *before* the job while the bidding process was still open.

Concerned about the RPS bid, Con Edison asked Rudell, who was also involved in Phase I of the project, to submit a bid.  Rudell's bid was for $1,475,000, less than half as much as the $2,950,000 bid submitted by RPS.  Moreover, during negotiations, the Rudell bid was reduced to $1,450,00 by Mr. Razzouk's unit.  For his work, Rudell earned a total of  $1,784.000 ($1,450.000 + $334,895 for extra work requested by Con Edison).

Besides not supporting the government's restitution request, this job undermines the government's theory of the case.  For example, if Mr. Razzouk and Mr. Quiambao

---

[7] *Procurement and Contracts- Sole Source Purchasing*, Am. U., https://www.american.edu/finance/controller/Sole-Source-Purchasing.cfm (last visited Jan. 2, 2018).

were *consortium culpae* in a scheme to enrich Rudell by inflating the price that Con Edison pays for goods and services, why was Mr. Quiambao's bid so far below the $2,950,000.00 bid submitted by his only competitor? There is only one logical answer: he did not know that the only other bid was for *at least,* twice as much as his bid. Which begs yet another question, if Mr. Razzouk and Mr. Quiambao were involved in the scheme embraced by the government, why didn't Mr. Razzouk share this information with him? More relevant to the restitution issue which is the focus of this submission, what kind of scheme to defraud *saves* money for the victim of the fraud?

And this is hardly the only red flag that should have generated some concern by government investigators. In addition to the competitive bid that Mr. Quiambao was unaware of, he wrote checks to Mr. Razzouk's consulting company, MDM, for almost $800,000.00 that had this job noted on the memo line. Which raises yet another question: why would Mr. Quiambao give Mr. Razzouk more than 50% of his *gross receipts* from this job? Engineering firms operate on a profit margin of 5-20%, and more often far less.[8] And unless Rudell had found a way to defy the laws of physics, the $1,500,000.00 Con Edison paid him yielded a profit of approximately $300,000. Accordingly, the almost $800,000.00 cannot be explained as a bribe. Mr. Quiambao was paying Mr. Razzouk for more than just the privilege of bidding for Con Edison engineering jobs.

---

[8] *Profit Margins in Engineering*, Being Brunel, http://www.beingbrunel.com/profit-margins-engineering/ (last visited Jan. 2, 2018); *Engineering Giants: Profits, Revnue on the Rise at U.S. Engineering Firms as Economy Sputters Back to Life*, BDC Network (Aug. 5, 2015), https://www.bdcnetwork.com/giants-300-report-profits-revenue-rise-us-engineering-firms-economy-sputters-back-life; Aswath Damodaran, *Margins by Sector (US)*, NYU (Jan. 2017), http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html.

The only logical answer is that Mr. Quiambao was paying Mr. Razzouk for the other work that he was doing for Rudell.

In fact, the overall payments made to Rudell for work that Mr. Razzouk's unit supervised between 2003 and 2011 make it unequivocally clear that no such scheme existed. For these years, *according to Con Edison*, Rudell received a total of $45,216,600.39 for work awarded by Mr. Razzouk's section. CE0067005.[9]  During this same period, as outlined in the presentence report, agents claim that Mr. Razzouk received "$13,203,086.12 in payments from Mr. Quiambao  about Con Ed projects." PSR at ¶14. That is, 30% of the *gross* payments Rudell received from Con Edison.  In other words, according to Con Edison, Rudell *lost money* in the "bid low" scheme.

### B. The Con Edison Approval Process

Equally false is the assertion that the success of this "bid low" scheme was aided by "contract amounts substantially increased" by the approval of "change orders" by Mr. Razzouk which "occurred during periods when that authority was delegated to him because his supervisor was absent." Arrest Aff. ¶ 23.  Not only is there scant evidence to support this claim, the notion that the temporary delegation of authority to one of the three section managers (electrical, mechanical and civil) could be used to execute the government's "bid low" theory of the case is extremely unlikely.

---

[9] The PSR also notes that *"[T]he case agent advised that the benefit Rudell received from these illicit payments was $87 million dollars."* There is no support for this ambiguous statement that counsel is aware nor does this figure appear anywhere in the more than 35 thousand pages that counsel has reviewed to date.

Moreover, it is abundantly clear that Rudell's bidding practices were the same regardless of whether the work was going awarded by Mr. Razzouk's section (Electrical Design Engineering) or any other Con Edison section. Rudell was routinely awarded projects outside Mr. Razzouk's section and was often the low bidder, sometimes by wide margins. And Additional Funding Requests ("AFRs") were added to these jobs just like any work done at Con Edison by Rudell or other contractors. As an example, Rudell was the lowest bidder on P/N: 23430-09 related to Jamaica and Corona feeders 18001 and 18002. This project was awarded to Rudell by the "Equipment and Field Engineering" department. Rudell's price proposal was $80,640.00, NU-CE-20388, WGI's price proposal was $265,000.00, NU-CE-20390, NU-CE-20398. Subsequently, Rudell was awarded three AFRs associated with this project. One increase was for $49,405.00, the second for $21,840.00 and the third for $31,765.00. Due to the equipment and field-engineering section's complete satisfaction with Rudell's performance, Rudell was recommended for another job on a non-competitive basis. NU-CE-20537 (noting that Rudell's performance was "commendable").

Another example is when the substation engineering section, a section completely independent from Mr. Razzouk, awarded Rudell P/N: 06542-91, which was to perform an engineering feasibility and cost analysis study for area station reliability phase II. Rudell was the lowest bidder by a wide margin; of the four bidders, Rudell's bid was $502,950,

over $450,000 lower than the next lowest bid. NU-CE-39568. Once again, Rudell earned

the highest score on the technical evaluation. NU-CE-39570-576; NU-CE-39720-726.

## II.   THE MANDATORY VICTIM RESTITUTION ACT

Restitution is strictly a statutory remedy. *United States v. Gushlak*, 728 F.3d 184,

190 (2d Cir. 2013). The MVRA applies only in cases "in which an identifiable victim . . .

has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Under the

MVRA, "restitution may be awarded only in the amount of losses directly and

proximately caused by the defendant's conduct." Gushlak, 728 F.3d at 194-95. A court's

power to order restitution "is limited to actual loss." *Id.* at 195 (emphasis in original)

(quoting United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000)). "The government

bears the burden of establishing loss amount under the MVRA." *Id.* at 195; 18 U.S.C. §

3664(e). A sentencing court "cannot order restitution that 'goes beyond making [the

victim] whole,'" and "cannot award the victim 'a windfall,' i.e., more in restitution than

he actually lost." *Id.* (internal citations omitted). Moreover, Bribery under 18 U.S.C.

§666(a)(2), is not an "offense against property," and where there is no evidence or charge

of a scheme to defraud, restitution under the MVRA is not authorized and should be

denied.

The purpose of the MVRA is to "put the victim in the same position he would have

been in but for the defendant's criminal conduct," not to "put him in a better position."

*Id.* The restitution calculation must, therefore, credit any value received by the victim so

that the victim does not enjoy a double recovery. *Id.* at 121 (vacating order of restitution because it did not properly value the assets recovered by the victim and therefore "award[ed] the victim a windfall").

Of significance here, a "defendant's gain cannot be used as a proxy for actual loss," and a district court ordering restitution under the MVRA "may not substitute a defendant's ill-gotten gains for the victim's actual loss." *United States v. Zan*gari, 677 F.3d 86, 92-93 (2d Cir. 2012) (quoting *United States v. Harvey*, 532 F.3d 326, 340 (4th Cir. 2008)).

In determining how much to award as restitution, a court must determine the victim's "actual, provable loss," *Zangari*, 677 F.3d at 91, although this need not be done to a mathematical certainty. *Gushlak*, 728 F.3d at 195. A reasonable approximation of actual loss is permissible "especially in cases in which an exact dollar amount is inherently incalculable." *Gushlak*, 728 F.3d at 196 (quoting *United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003) ("restitution could be based on a reasonable estimate of losses when it would be impossible to determine the precise amount") (internal citation omitted)).   A reasonable approximation, however, must be based upon a "sound methodology." *Gushlak*, 728 F.3d at 196 ("sound methodology" included the testimony of an expert witness who carefully quantified the victim's actual loss).  And, as the Fifth Circuit noted in *United States v. Sharma*, 703 F.3d 318 (5th Cir. 2012), "excessive

restitution awards cannot be excused as harmless error; every dollar must be supported by record evidence." *Id.* at 323 (footnote omitted).

Here, the government has not met its burden of proving that Con Edison suffered an actual loss. Lacking evidence of actual losses, the government's supporting documents, an analysis prepared by the accounting firm KPMG, seems to assert, without proof and contrary to the evidence, that Con Edison must have lost whatever Mr. Razzouk gained. As set forth below, the methodology employed by KPMG was fatally flawed and simply ignored deficiencies in the supporting documents provided by Con Edison and reached the faulty conclusion demanded by its client, namely, that Con Edison had lost whatever amount that Mr. Razzouk gained.

The statutory remedy of restitution is available only for actual proven loss. The purpose of the MVRA is to restore the victim to the position it would have been in but for the offense - not to put the victim in a better position than that. A victim may therefore not receive a windfall or double recovery. Anything of value received by the victim must be credited toward restitution.

The evidence does not support an order for restitution based upon a "loss" suffered by Con Edison. There is no evidence that Con Edison overpaid Rudell for any goods or services received, a *sine qua non* of actual loss. Since the proof of actual loss is lacking and there is no alternative measure of loss that is justified, Con Edison may not receive a windfall.

While there is dictum in *Zangari*, 677 F.3d at 93, that "there may be cases where there is a direct correlation between [the defendant's] gain and [the victim's] loss, such that the defendant's gain can act as a measure of—as opposed to a substitute for—the victim's loss" that would permit such an approach, it may be considered only where there has been a showing that the defendant's gain is "directly correlated" with the victim's actual loss. *Zangari*, 677 F.3d at 93. Here, Mr. Razzouk's gain is not "directly correlated" with Con Edison's actual loss. *See also*, *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017).   Assuming a court has determined the existence of actual loss, the government must then prove the amount of that loss. A district court may not substitute the amount of a defendant's gain for an amount of loss to the victim that the government has not proved

But prices are not the same thing as losses. Payment for goods and services of comparable value does not result in a loss. Only where there is overpayment - such as payment in an amount greater than the fair market value of the goods and services received, or payment for goods and services available elsewhere at a lower price - can there be a loss. *See, e.g.*, *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) ("The government has offered no evidence to suggest that the [victim] suffered any loss attributable to [the defendant's] receipt of remuneration . . . [The victim] paid [the defendant] a fixed amount for its tests. The amount paid by [the victim] to the [defendant] was not affected by what [the defendant] did with the money it received."); *United States v. Sleight*, 808 F.2d 1012, 1017-18 (3d Cir. 1987) (finding loss to the victim based on the

"undisputed fact" that goods were available "at a price lower than" the price paid by the victim).

Finally, because 18 USCS § 666(c), carves out a safe harbor for "bona fide salary wages, fees, or other compensation paid, or expenses paid or reimbursed, in usual course of business," restitution, if any, for a period of employee disloyalty should be extremely limited since Con Edison did not suffer a loss and, in fact, saved money.

## III.   THE FORENSIC ANALYSIS PREPARED BY KPMG

In response to the defendant's discovery demand, ecf 60, the government provided the defense with a 5-page list that included the specific jobs that were selected by KPMG as ones that supported Con Edison's restitution requests. The list has allowed counsel to cull through the 35,000 that were provided to the defendants in a related civil case pending in New York County Supreme Court and pull the job-related documents for each job. But there are several problems with proceeding in this manner. The first is that the civil documents were part of a discovery dump (approximately 4 gigabytes). That is, the documents were not provided in any cogent fashion. Accordingly, to locate documents that may be relevant to the now 73 jobs that are noted on the government's list we have no alternative but to reexamine all 35,000 pages to find the supporting documents, if any, for each. Moreover, when we do so, we are continuing to encounter the reality that the 35,000 are incomplete.

## A. Con Edison's Record Management System

Con Edison's Central Engineering Department is organized into different sections each with its own section manager (i.e., Design Engineering, Project Engineering, Equipment & Field Engineering, Civil & Mechanical Engineering, Generation Engineering, Substation Engineering and Administration and Support). For each Con Edison job that is awarded by the Central Engineering department to an outside vendor, such as Rudell, a "Job Folder" is created within the appropriate section.  This Job Folder includes every document that is generated by Con Edison and the vendor and includes email messaging.  Once a project is completed, Con Edison employees in each affected section hold a "Close-Out" meeting.  At this meeting, there is a critique offered, among other things. Vendors may, or may not, be invited.  After the meeting, a closeout memo is among the reports included in the Job Folder.

None of the complete Job Folders have been made available to the defense.

## B. The Restitution Disclosure is Insufficient

As set forth above, in response to a discovery demand, ecf 60, the government provided the defense with a 5-page list that included the 73 specific jobs that were selected by KPMG as the ones that supported Con Edison's restitution requests. Inexplicably, this list includes several Order Release ("OR") numbers that relate to jobs that are outside of Mr. Razzouk's section (ORs for work awarded by Mr. Razzouk's section, Electrical Design Engineering, commence with the number "445").   The

restitution request for this work is approximately $350,000.  These were jobs that Mr.

Razzouk had no control over because they were assigned to a different Con Edison

Central Engineering Division Section.  To adequately decipher how KPMG was able to

conclude that there was a loss attributable to employee fraud, we need to review all

35,000 documents disclosed to the defendant in the civil case. These documents were

supplied in individual CDs, some searchable, some not.[10]

As described below in Example #1, we have located a handful of the relevant

documents related to some of the jobs that were not assigned to Mr. Razzouk's section,

OR: 415-05-00053, is one example.  However, we cannot determine *why* KPMG decided

to include jobs that were awarded by sections outside of Mr. Razzouk's section.   And in

any event, the analysis can hardly be supporting the methodology used by KPMG.

The 35,000 pages produced in the civil case included some, but not all, of these

documents.   For example, there are a handful of Mr. Razzouk's email messages and

messages he was copied on but not all.  Mr. Razzouk's email messages are essential to

allow us to prove that Con Edison did not suffer any loss whatsoever in this case.  And

the absence of email correspondence is hardly the only missing items.

Of course, as a long-time employee of Con Edison, Mr. Razzouk is very familiar

with how Con Edison files are maintained.  And he advises that the Job Folders are

maintained according to P/N and should be simple to produce, along with his email. His

---

[10] The material is also subject to a non-disclosure agreement that has not been waived by the plaintiffs in the civil action.

email was maintained in his Con Edison computer, connected to a central server, by each year and each month.  A demand for this information has been made to the government.

Con Edison was first contacted by the United States Probation Department approximately one year ago.  The submission in support of its multi-million-dollar restitution request is woefully inadequate.  Although in the absence of all the relevant Con Edison job folders the review process is tedious and time-consuming, the few examples below will make it clear that the government's restitution request is unsupported by the available evidence and should be rejected by the Court.

### C. Specific Examples of the Inadequacy of the Forensic Analysis

**EXAMPLE #1**
PON: 519867,
OR: 415-05-00053
RESTITUTION AMOUNT CLAIMED: **$38,110.00**
SUPPORTING DOCUMENTS: NU-CE-00124-129 & NU-CE-00190-197

This job was awarded in December of 2005 by the Civil/Mechanical Design Engineering Section and was included in KPMG's analysis of loss (at the time, these engineering sections were combined at Con Edison).  Shortly after the job commenced, Mr. Razzouk was reassigned as section manager of the Electrical Design Engineering Section and the Civil/Mechanical Design Section was split into two sections.  Mr. Kevin Carr became the section manager of the Mechanical Design Engineering Section.   All the work was approved by Mr. Carr's section. And, more importantly, Mr. Razzouk who

had already been reassigned to another section, had nothing whatsoever to do with the job or the additional costs associated with it.

Oddly, KPMG notes this rather salient point (i.e., Mr. Razzouk's absence from the section) in the attached spreadsheet. NU-CE-00124-129.  And, as the spreadsheet shows, the names of the Con Edison employees who approved the payments do not include Mr. Razzouk.  The omission is hardly surprising since he was the section manager of a completely different section.  Inexplicably, KPMG included what they referred to as an "overage" of $38,110.00.  Of course, this so-called "overage" was requested and approved by several Con Edison employees and should not have been included as restitution even if it had been from Mr. Razzouk's section.  The fact that a completely different section supervised the job should raise serious questions for the government about the methodology employed by KPMG and the reliability of its forensic analysis. An analysis that the government has advanced. It also supports the need for additional disclosure because it is either a work of complete negligence or an effort to perpetrate a fraud upon the court.  Indeed, KPMG notes the absence of "supporting documents." NU-CE-00128.  Despite these fatal flaws, KPMG/Con Edison and the National Union/Grassi included the sum of $38,110.00 for this job as restitution.[11]

KPMG decided to advance this dubious claim even though Grassi, the accounting firm retained by Con Edison's insurance carrier, expressed some of the same concerns as

---

[11] Grassi & Co is the forensic accountant National Union used to review KPMG's work.

the defense as raised.  As outlined in NU-CE-00197, Grassi's examiners made their misgivings clear, including the fact that it "[d]oes not appear that Razzouk was involved with this OR at all" and that "[i]t is not clear that there is employee fraud associated with this OR."  Nevertheless, notwithstanding the fact that this is not Mr. Razzouk's project, Con Edison has asked the Court to order restitution of $38,110.00.

**EXAMPLE #2**
PON: 519867
OR: 445-05-00037
RESTITUTION AMOUNT CLAIMED: **$51,707.00**
SUPPORTING DOCUMENTS: NU-CE-00119-123

Another disturbing and simple example of the flawed methodology employed by KPMG is reflected in OR# 445-05-00037 (note that OR#s starting with the "445" refer to jobs supervised by Mr. Razzouk's section).   In this job, KPMG adds the sum of $51,707.00 for restitution. In describing their findings, KPMGs examiners noted that this job "was competitively bid, but 4 of the 9 bidders declined and SEA ("Stratus Engineering") who had a lower bid then Rudell failed the tech evaluation" and that the "[w]ork appears to be complete" and that "[a]dditional funding appears to be supported and complete." NU-CE-00121.

Nevertheless, KPMG adds the sum of $51,707.00 in restitution because "Invoice 25040-7A appears to have been paid twice for $51,707." And that it "matched an MGM payment for exactly ½ this amount to this invoice."   In other words, because Con Edison's Accounts Payable Department ("APD") may have mistakenly paid Rudell twice

for the same work, Mr. Razzouk should be responsible for it even though there is no evidence to support the notion that he somehow was able to orchestrate such a double payment.  Indeed, Mr. Razzouk had nothing whatsoever to do with Con Edison's APD and has no idea how Rudell may have come to be paid twice for the same work.

Instead, KPMGs decision to include this double payment in its analysis and the government's decision to include it as restitution is based upon the fact that a Rudell check to MDM (Mr. Razzouk's company) included the P/N on the memo line. This inclusion reveals the fatal flaw in KPMGs methodology.  If there was a memo line on a check that referenced a P/N, KPMG looked for a way to include any "overage" in its analysis even when the available evidence suggested otherwise.  In short, it appears that no one ever informed KPMG that Mr. Razzouk did outside consulting work for Rudell and that it might be, in fairness, considered as part of the methodology used in analyzing the loss attributable to Mr. Razzouk. A fact that has been acknowledged by the Probation Department. *See* PSR ¶12.

In any event, all additional work Rudell performed was properly justified and processed in accordance with the policies and procedures of Con Ed.  There was no padding of invoices and no loss to Con Edison. Instead, this is simply another example of how KPMG substituted the defendant's gain as a proxy for actual loss.

**EXAMPLE #3**
PON: 519867
OR:445-07-00142
RESTITUTION AMOUNT CLAIMED: **$99,900.00**
SUPPORTING DOCUMENTS: NU-CE-00201-202, NU-CE-00330-332.


Job 519867 provides another glaring example of the lack of due diligence employed by KPMG and Grassi. The winning bid for OR#: 445-07-00142 was $74,100. Derrek Hammet, who generates the payments from Con Edison's APD, paid Rudell $174,000. Upon review, KPMG noted that: "The project was bid at $74,100 and subsequently approved for $174,000. Rudell was paid the full 174K for the original scope of work laid out in the proposal. *This appears to be an error and an overage.*" NU-CE-00330.

In a second level review, KPMG noted that "Rudell is awarded this OR for $74,100 and the OR is opened for $174,00; appears to b[e] a typo." NU-CE-00332. While this was obviously an accounting error by a department completely unrelated to Mr. Razzouk, KPMG included this as an "overage" simply because Rudell issued a check to MDM for $36,000.

Grassi had the opportunity to review this job and recognized that "[t]his appears to be an error" and concluded that "[i]f the change from $74,000 to $174,000 was an error/typo, then the overage would not be considered employee fraud." NU-CE-00202. Both levels of review by KPMG and Grassi recognized that this was an accounting error. And yet, inexplicably, it has been included as part of the government's restitution request.

**EXAMPLE#4**
OR#s: 415-04-00026, 345-04-00034, 415-04-00049, 856-05-00026, 345-05-00023, 415-05-00053, 342-07-000122
RESTITUTION AMOUNT CLAIMED: **$300,000.00** (approximately)
SUPPORTING DOCUMENTS: Loss Calculations Chart received from govt on December 26, 2017, NU-CE-CF-00397-410, NU-CE-00434-445, NU-CE-00489-492, CE-00664-669, NU-CE-00671-674, NU-CE-00723-734, NU-CE-00767-770, NU-CE-00777-780, NU-CE-00848-852, NU-CE-00884-889, NU-CE-00961-964, NU-CE-01103-1106, NU-CE-01153-1156, NU-CE-01271-1274, NU-CE-01323-1326, NU-CE-01446-1449, NU-CE-05032-5037

As set forth above, these were jobs that Mr. Razzouk had no control over because they were assigned to a different Con Edison Central Engineering Division Section.  The restitution requests should not under any circumstances be considered by the Court.

**EXAMPLE# 5**
PON: 519867
OR: 445-05-00008
RESTITUTION AMOUNT CLAIMED: **$7,745.00**
SUPPORTING DOCUMENTS: NU-CE-00539-545

This is another example of the arbitrary and capricious method that KPMG used to support Con Edison's restitution request. The only documents related to this job that we have located thus far are KPMG spreadsheets. As noted therein, there was nothing unusual about his job or the bidding process (ironically, Rudell's winning bid was the highest bid received by Con Edison for this job notwithstanding the government's "bid low" theory of criminal liability).  However, KPMG found that Rudell was paid slightly more than the amount on the OR.  The approval amount was for $458,785.00, and Rudell

was paid $466,530.00. Without any evidence in support, the government has advanced

Con Edison's restitution claim for the difference of $7,745.00.

## EXAMPLE #6

PON: 519867
OR:445-07-00139
RESTITUTION AMOUNT CLAIMED: **$26,500.00**
SUPPORTING DOCUMENTS: NU-CE-00697- NU-CE-00700

    Here again, KPMG took a double payment made by Con Edison's APD and

turned it into a restitution request.   The fact remains Mr. Razzouk did not handle

payments to Rudell; payments were handled by Con Edison's APD. In OR# 445-07-139,

KPMG notes that there was an invoice that was amended, and both the original and

amended invoices were paid.  KPMG claims, "this results in an overage paid of $26,500."

NU-CE-00697. This double payment was simply another accounting error where

accounts payable paid an invoice twice. Never is it alleged that work was not done, in

fact, "all work on the project appears complete and legitimate." NU-CE-00698.

## EXAMPLE #7

PON: 623595
RESTITUTION AMOUNT CLAIMED: **$480,000.00**
SUPPORTING DOCUMENTS: CE0044299-44328, NU-CE-00113-118, NU-CE-00284-
294, NU-CE-04693-4717, NU-CE-18992-19002.

    Another noteworthy example is the "East River 69KV Substation Automation &

Protection System." This job commenced in 2006, and "[b]y 9/25/07, vendor RPS/GE

submitted the complete set (all 4 packages inclusive) to Con Edison totaling 305 wiring

drawings." CE0044320. It is at this point, Rudell submitted an AFR for $490,000, it included, "[r]eview the submitted vendor wiring drawings (305) and determine impact to the physical drawings (84)." CE004319-CE004325. This request was submitted after Aitqur Chowdhury requested Rudell "review and reprocess all the Phase 1 drawings (305) in metaphase," and noted this "recent change request is not a PCR; nor Design is requesting one." CE0044315. This figure of $490,000 was reduced after Mr. Razzouk got involved, "we are reducing our price by $10,000.00 which brings our cost to $480,000.00." CE0044318. Mr. Kadakia submitted a Request for Additional Funding to Maureen Cullen and Derek Hammett detailing the new work to be completed. NU-CE-04694-4695. This request for $480,000 was then approved by Vice President of Engineering Ronald Bozgo. CE0044300-301. The work was completed, based on the Release Memos ("RMs") that contain these drawings. NU-CE-18992-19002.

The drawings in these memos show that they are at revision 2. *Id.* It is important to note that drawings begin at revision 0, so the second round of work that was requested had to have been completed since the drawings now appear as revision 2. *Id.*

Both KPMG and Grassi demonstrate their inability to grasp the content of the documents in front of them, and simply draw conclusions based on checks to MDM. NU-CE-00117; NU-CE-00285. KPMG concludes: "$309,711 of MDM payments is exactly 1/2 of 8 invoices," NU-CE-00117, and Grassi agrees "8 MDM Payments = each appear to be approx. 50% of corresponding ConEd payment." NU-CE-00285. Both groups of

examiners claim: "This will be considered an overage because all requested work was paid for under prior AFRs/PCRs. Per the proposal, Rudell requested additional funding because "all original tasks and approved addtl work for this project have been completed by Rudell as scheduled." NU-CE-00115; NU-CE-00285.  It seems as if it did not occur to the examiners that for the drawings to be up to revision 2, there had to have been – 2 revisions. NU-CE-18992-19002. Moreover, both KPMG and Grassi claim that Mr. Razzouk had the authority to approve this AFR, but the documents show that Vice President Ronald Bozgo approved this AFR. *See* NU-CE-00115;  NU-CE-00285; CE0044300-301.

**EXAMPLE #8**
PON: 519867
OR:445-07-00089
RESTITUTION AMOUNT CLAIMED: **$720.00**
SUPPORTING DOCUMENTS: NU-CE-00639-643

In OR# 445-07-00089, KPMG demonstrates a clear lack of understanding of the process by which Con Edison operates. When as-built drawings are issued to the vendor, whether changes are made, the vendor is paid for each drawing. In this job, 38 drawings were reviewed as requested, but only 36 had to have work done on them. KPMG correctly notes the "dwg release memo lists 36 and 1 WARS . . . not 38 dwgs. . . ." NU-CE-00641. The problem occurs when KPMG says "[p]rice of two dwgs is an overage." *Id.* Drawings only appear on a RM when work had to be done on them. If a drawing were looked at and did not need to be amended, it would not appear on a drawing RM, but the

34

vendor is always paid for the drawings they checked and evaluated for accuracy, which is why these two drawings do not appear as done in Metaphase. Stating that there is an "overage," when in the same paragraph they show proof that this is not an overage and the work was completed proves that KPMG simply does not understand the Con Edison process.

**EXAMPLE #9**
PON: 519867
OR: 445-05-00041
P/N: 20762-03
RESTITUTION AMOUNT CLAIMED: **$4,550.00**
SUPPORTING DOCUMENTS: NU-CE-00655-658 and NU-CE-07960-7999.

This project is related to the relocation of feeders 38W01 and 38W31 at the Elmsford substation. This Elmsford Substation job is listed as an overage of $4,550.00 for work not performed. The engineer Elizabeth "Betty" Law had requested Rudell to perform additional work and highlight measurements and test pits on an existing drawing 349859 as well as other modifications. "[w]e wish to have Drawing 349859 show the distance from the energized Elmsford-2 equipment to the new construction road." NU-CE-07964. Further, the PCR request for additional funding was submitted by Maureen Cullen. NU-CE-07983. The examiner stated that drawing was not submitted under P/N:20762-03 per Metaphase and when KPMG checked Metaphase for drawing 349859 there was only revision 0.

The examiner's findings are directly contradicted by the three submittal memos from Rudell to Ms. Law indicating that work was complete. NU-CE-07966-968. There is even a transmittal that states: "Per your request, we are submitting two (2) sets of drawing 349859-00 for the above-mentioned project showing the distance of the existing energized pothead to the proposed access road." NU-CE-07968. The examiner failed to understand that test pit locations or measurements on drawings for transportation purposes do not require a revision of the drawing. Therefore, the drawing does not need to be revised in Metaphase. The test pit and measurements on drawings highlighted are done as a copy of an existing drawing and considered like a "sketch."  The purpose of these "sketches" is to make sure there are no environmental issues in specific locations and for clearances for transportation purposes. These drawings were "sketches" which is why drawing 349859 still appeared as revision 0 in Metaphase. The examiner completely misunderstood the entire process of this part of the job.

**EXAMPLE #10**
PON: 829012
OR: 445-08-00023
P/N: 69911-CR
RESTITUTION AMOUNT CLAIMED: **$115,000.00**
SUPPORTING DOCUMENTS: NU-CE-003497-3566, NU-CE-29360-361.

This job was competitively bid and awarded to Rudell to perform work on 500 "as-built" drawings on 7/17/08. Rudell's price proposal was for $250,000.00, and MSE Engineering's price proposal was $650,000.00. NU-CE-03513. An OR was generated and

approved by Mr. Razzouk and the design engineering chief Robert Sanchez. NU-CE-03499. The technical evaluation and the OR request were submitted by the TC Mr. S. Kadakia. NU-CE-03500. An additional fund request was submitted by the TC, NU-CE-03516-3517, to perform work on additional 230 affected as-built drawings. The increase was for $115,000.00 which was approved by Mr. Razzouk and the design engineering chief Robert Sanchez. KPMG states that Rudell prepared less than 500 drawings and Rudell did not work on an additional 230 affected PST redline drawings. Again this shows KPMG's misunderstanding of the process. Rudell submitted their final invoice on Marc 3, 2009 indicating that additional work was completed, and listed it all on the transmittal. NU-CE-03537. In addition, the RM clearly shows that work was performed and justifies the original request as the additional work shown. NU-CE-003497-3566, NU-CE-29360-361. Please note that all the RMs clearly state the number of drawings in the original scope and the number of affected drawings related to the AFR.

### D. The Forensic Analysis is Fatally Flawed

As explained above, after conferring with the attorney for the government to identify the actual jobs that Con Edison claims there was a loss related to the offense of conviction, we were provided a list that included 73 jobs. Since we received this list on December 20, 2017, we have been able to review the ten jobs listed above. This effort is extremely time-consuming, as we have explained because the 35,000 pages of discovery in the civil case were provided indiscriminately on multiple compact disks. Each

number, therefore, requires us to review *all 35,000 pages anew* searching for documents related to each job.

Nevertheless, for the ten jobs that we have reviewed as set forth above, we have identified $1,124,232.00 in claims that are not supported by the available evidence. We do not doubt that this sample size is sufficient to conclude that remaining restitution requests will also demonstrate that Con Edison suffered no loss and, accordingly, restitution is not legally authorized.

As we have explained, the methodology employed by KPMG was fatally flawed. In short, while it is certainly not the only flaw, the analysis prepared by KPMG does precisely what the Second Circuit held was forbidden in *Zangari*; substituted the defendant's gain "*as a proxy for actual loss.*" 677 F.3d at 92-3.  In this case there was no actual loss to Con Edison and, accordingly, an award of restitution to Con Edison, and National Union cannot be supported.  Moreover, since there is no basis in law or fact to award restitution, in this case, KPMG's claim for restitution must also fail, even assuming, arguendo, that it could reasonably be determined.

## IV.   THE RESTITUTION CLAIM FOR THE TAX COUNTS

The government has also asked the Court to order restitution to the IRS for $4,118,288.01.  This request should also be denied. The basis of the request is set forth the government's reply to the defendant's objection letter, as set forth, in pertinent part, below:

> Specifically, when the defendant filed these amended returns, he claimed a loan of $6.5 million related to the funds he forfeited in 2011 about this case, spread over all of those tax years. By claiming this loan in this fashion, the defendant took the position that notwithstanding his guilty pleas, he owed no additional taxes to the unreported income for any of the years for which he refiled. It is the IRS's position that the defendant may not claim this $6.5 million in forfeiture payments as loans spread across these tax years. Therefore, the defendant has not complied with his obligations, under the cooperation agreement or as a taxpayer, to file accurate returns and pay all tax due and owing. Rather, the defendant owes the IRS approximately $1.7 million, plus interest and penalties.

Government letter dated 10/11/2017 p.5. The government's claim that the defendant owes the IRS approximately $1,700.000.00 in its letter dated October 11, 2017, is inflated by interest and penalties to the $4,118,288.01 figure in its restitution letter dated December 8, 2017.

As set forth in the defendant's objection letter, Mr. Razzouk filed amended returns for all the relevant years and had paid the full tax owed.  Moreover, at the time that the amended returns were prepared, the tax strategy that was utilized was suggested by an accountant hired by counsel to prepare the amended return.  In addition, the government was informed that the defendant intended to use the forfeited funds to reduce the overall tax that was owed.  Finally, while the government claims that it is "the IRS's position that the defendant may not claim this $6,500.000.00 in forfeiture payments," the amended returns were filed more than *five years* ago, and the IRS had not voiced any objection whatsoever until the government's letter was filed on October 11, 2017.

While we disagree with the position of the IRS regarding the legality of a taxpayer using forfeited funds to reduce taxable income, this Court need not reach the merits of this belated claim advanced by the government since the objection was abandoned long ago.  The government and the IRS were on notice and failed – until now – to voice a timely objection.  Rather, knowing full well that the defendant had filed amended returns, the government said, and did, nothing, year after year after year, while interest and penalties accrued.

Although cases sometimes use the words "forfeiture" and "waiver" interchangeably, the two words embody very different legal concepts. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (citation and internal quotation marks omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)).

Since the government and the IRS waited more than five years to advance an objection, it has been forfeited. *PPG Industries, Inc. v. Webster Auto Parts, Inc*., 128 F.3d 103, 108 (2d Cir. 1997) (delay in demanding arbitration); *Grammenos v. Lemos*, 457 F.2d 1067, 1071 (2d Cir. 1972) (delay in making effective service). As the Second Circuit has said:

> In assessing whether forfeiture in this case not only occurred
> but was so clear that the District Judge exceeded his allowable

discretion in ruling that forfeiture had not occurred, we consider all of the relevant circumstances. We start with the considerable length of time – four years – between the assertion of the defense in the answer and the litigation of the defense in a motion . . .

*Hamilton v. Atlas Turner, Inc*., 197 F.3d 58 (2d Cir. 1999). Moreover, since the government was on notice of the filing of the tax returns, the Court could also conclude that the argument, now advanced by the IRS, was waived by failing to raise an objection when the tax returns were filed.

Accordingly, the government's request for an additional payment of $4,118,288.01 should be denied.

## V.   THE GOVERNMENT HAS BREACHED THE PLEA AGREEMENT

In this case, a review of the plea agreement executed by the defendant and government discloses that the government explicitly agreed that "[b]ased on information known to it now, the Office will not oppose a downward adjustment of three levels for acceptance of responsibility under U.S.S.G. § 3El.1." Plea Agreement ¶ 3.  In addition, the government also promised that:

> If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion pursuant to U.S.S.G. § 5Kl.l with the sentencing Court setting forth the nature and extent of his cooperation. Such a motion will allow the Court, in applying the advisory Guidelines, to consider a range below the Guidelines range that would otherwise apply. In this connection, it is understood that a good faith determination by

41

> the Office as to whether the defendant has cooperated fully and
> provided substantial assistance and has otherwise complied
> with the terms of this agreement, and the Office's good faith
> assessment of the value, truthfulness, completeness and
> accuracy of the cooperation, shall be binding upon him. The
> defendant agrees that, in making this determination, the Office
> may consider facts known to it at this time.

Plea Agreement ¶6. As the Court is aware, on or about January of 2016, the government

advised then counsel for Mr. Razzouk that in its view, Mr. Razzouk had breached the

terms of his cooperation agreement and that it does not intend to file a motion pursuant to

U.S.S.G. § 5K1.1 at the time of the defendant's sentencing.  Because this issue arguably

raised a conflict with counsel, Mr. Razzouk hired current counsel on or about August 16,

2016. After discussing the issue with then counsel for the government, Lan Nguyen, with

the advice of his new lawyer, Mr. Razzouk decided not to demand specific performance

of the agreement between the parties. Counsel's advice was based, in substantial part,

upon the representation from the government acknowledging that Mr. Razzouk had, in

fact, provided substantial assistance to the government and had otherwise earned a 5K

letter.  The "breach," according to the attorney for the government, was based upon her

office's interpretation of the meeting between Mr. Razzouk and Mr. Quiambao that had

taken place in December of 2015.  However, the attorney for the government also

represented that Mr. Razzouk's substantial assistance would be made clear to the Court at

sentencing.  With this assurance, counsel provided Mr. Razzouk with what he thought

was sound advice.

The defense was, therefore, surprised to learn that the government would eventually take a far less generous posture in its sentencing submission to the Court dated October 11, 2017. Instead, the government sought to minimize the substantial assistance to the government that Mr. Razzouk had provided adding in a footnote that "[a]gents were already investigating Mr. Quiambao  when the defendant began to provide information to the government. In addition, had the defendant never cooperated with the government, the government nevertheless would have discovered Miranda's criminal conduct and successfully prosecuted him." ecf 53, note 6.

And if this were not bad enough, the government also went back on its promise not to oppose a 3 - level reduction for acceptance of responsibly as set forth in the cooperation agreement and as communicated to the probation officer well *after* the breach letter was filed with the court. "Notably, despite Razzouk having willfully obstructed justice, the Government intends to make a motion stating that it was notified in a timely manner of the defendant's intention to enter a plea of guilty." PSR ¶27. Accordingly, the defendant would receive a 3-level reduction of his offense level per USSG §3El.l(a) and (b). *Id.* Having reneged on the representations to counsel and the probation department, the defendant is left with little or no alternative but to ask the court to vacate his guilty pleas.

## A. The Applicable Legal Principles

The Supreme Court has held that if a plea accepted by the court "rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled*." Santobello v. New York*, 404 U.S. 257, 262 (1971); s*ee also Puckett v. United States*, 556 U.S. 129, 143 (2009) ("when the Government reneges on a plea deal, the integrity of the system may be called into question"); *Mabry v. Johnson*, 467 U.S. 504, 509 (1984) (holding that a broken government promise that induced a guilty plea implicates the due process clause since it draws into question the voluntariness of the plea).

It is well settled that plea agreements are interpreted under principles of contract law. *United States v. Rogers*, 101 F.3d 247, 253 (2d Cir. 1996). However, the Second Circuit has recognized that such agreements "are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (quoting *Carmine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992)).

Given the awesome advantages ordinarily enjoyed by the government in drafting plea agreements, the provisions in such agreements must be construed strictly against the government and the court should not "hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005) (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir.

1999)). And "[t]o determines whether a plea agreement has been breached, a court must look to what the parties reasonably understood to be the terms of the agreement." *Id.* at 636. "[A]ny ambiguity should be resolved against the government." *United States v. Miller*, 993 F.2d 16, 20 (2d Cir. 1993). Moreover, since "plea bargaining requires defendants to waive fundamental constitutional rights," prosecutors must be held to "the most meticulous standards of both promise and performance." *United States v. Velez Carrero*, 77 F.3d 11 (1st Cir. 1996) (quoting *United States v. Clark*, 55 F.3d 9, 12 (1st Cir. 1995)). In addition, since "[a] plea agreement is a binding promise by the government and is an inducement for the guilty plea[,] a failure to support that promise is a breach of the plea agreement, whether done deliberately or not." *United States v. Gonczy*, 357 F.3d 50, 53 (1st Cir. 2004); *United States v. Yanez-Rodriguez*, 555 F.3d 931, 940 (10th Cir. 2009). And a breach may be found even where the government's failure to support its plea agreement promise was merely implied by its sentencing argument. *United States v. Lawlor*, 168 F.3d at 637. As the Tenth Circuit has stated, "the government cannot rely upon a 'rigidly literal construction of the language' of the agreement, not may it accomplish 'through indirect means what it promised not to do directly." *United States v. Hand*, 913 F.2d 854, 856 (10th Cir. 1990) (quoting *United States v. Shorteeth*, 887 F.2d 253, 256 (10th Cir. 1989)).

In short, because the government has breached multiple material provisions in the plea agreement, the defendant has been deprived of the material benefits that he believed he would receive by signing the plea agreement and pleading guilty.

Accordingly, the defendant respectfully demands specific performance of the plea agreement or, in the alternative, an order vacating his guilty pleas.

## CONCLUSION

For the reasons set forth herein, the defendant, Sassine Razzouk, respectfully requests that the Court grants all the relief requested and for whatever other relief that the Court deems just.

Dated: February 15, 2018
      Bayside, New York

                                   Respectfully submitted by

                                      /S/
                                  Steve Zissou, Esq.
                                  Sydney Spinner,
                                  JD Candidate, Class of 2018