*DF*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                :

United States of America,                  :      11-CR-430 (ARR)

                Plaintiff,          :

                                  :      STATEMENT OF

    -against-                      :      REASONS CONCERNING
                                  :      RESTITUTION

Sassine Razzouk,                  :

                                  :      (Not for Publication)

                Defendant.      :

                                  :
------------------------------------------------------------------ X

ROSS, United States District Judge:

       On June 10, 2011, Sassine Razzouk, a former employee of Con Edison Co. of New

York, Inc. ("Con Edison" or the "Company") pleaded guilty to accepting bribes in violation of

18 U.S.C. § 666(a)(1)(b) and three counts of tax evasion in violation of 26 U.S.C. § 7201

pursuant to a cooperation agreement.[1] The government seeks an award of restitution under the

Mandatory Victim Restitution Act of 1996 (the "MVRA" or the "Act"), 18 U.S.C. § 3663A, on

behalf of alleged victim Con Edison and its insurance carrier, the National Union Insurance

Company ("National Union"), in the amount of $11,722,714.98.[2] Specifically, the government

seeks restitution for the losses that Con Edison[3] allegedly suffered as a result of the defendant's

bribery scheme, for defendant's dishonest services, and for the costs of Con Edison's

investigation of defendant's misconduct. The government also seeks prejudgment interest on all

---

[1] I presume familiarity with the background of this case.

[2] This amount reflects the government's revised request following its receipt of updated information from
Con Edison. *See* ECF No. 62.

[3] Although both Con Edison and National Union, as Con Edison's subrogee, seek restitution, I refer
primarily to Con Edison throughout this opinion for ease of reading. I distinguish between the two entities
only insofar as I address the issue of allocation, *see infra* Part VII.

of these alleged losses, awarded from the date of Razzouk's arrest. The defendant argues that Con Edison is not entitled to restitution because bribery is not a covered offense under the MVRA and, even if it were, Con Edison did not suffer any loss as a result of Razzouk's illegal conduct. For the reasons below, I grant in part and deny in part the government's request.

## DISCUSSION

### I.   The MVRA

The MVRA requires a defendant convicted of "an offense against property under [Title 18 of the United States Code] . . . including any offense committed by fraud or deceit" to pay "restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). District courts must order restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss." *Id.* §3663A(c)(1)(B). The Act defines a "victim" of a crime as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). Under the MVRA, "the district court's statutory authority to award restitution . . . is limited to awards to victims of the offense of conviction," *United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011) (quoting *In re Local # 46 Metallic Lathers Union*, 568 F.3d 81, 85 (2d Cir. 2009)). "The purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (citing *Hughey v. United States*, 495 U.S. 411, 416 (1990)).

"The basic principles of restitution are well-settled." *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009). "The government bears the burden of proving a victim's actual loss by a preponderance of the evidence." *United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) (citing 18 U.S.C. § 3664(e)). Although "the MVRA requires only a reasonable approximation of losses supported by a sound

methodology," *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013), the Second Circuit has

clarified that "a restitution order must be tied to the victim's actual provable, loss," *Zangari*, 677

F.3d at 91. Accordingly, a sentencing court "may not substitute a defendant's ill-gotten gains for

the victim's actual loss." *Id.* at 93. Nevertheless, "there may be cases where there is a direct

correlation between gain and loss, such that the defendant's gain can act as a *measure* of—as

opposed to a *substitute* for—the victim's loss." *Id.*

## II.    Con Edison is entitled to restitution for the losses it suffered as a result of the defendant's bribery scheme.

The government argues that Con Edison is entitled to restitution from Razzouk because

it suffered substantial losses as a result of his criminal conduct. *See* Gov't Request for Restitution

("Gov't Req.") 2, ECF No. 54; Mem. of Law in Supp. of Con Edison's Request for Restitution

("Con Edison Mem.") 7–8, ECF No. 53-1. Specifically, the government seeks $8,178,184.86 in

restitution, which, it argues, is the amount of bribes that Razzouk received from Rodolfo

Quiambao, the president and CEO of Rudell & Associates Inc. ("Rudell"), an engineering and

design firm, between January 2006 and January 2010. Gov't Req. at 2; Con Edison Mem. at 8.

The government justifies its request as follows. First, it argues that restitution in the amount of

the bribe payments is appropriate because Rudell would have needed to overcharge Con Edison

by at least the amount of the bribe payments to make the bribery scheme profitable. *See* Gov't

Req. at 2; Con Edison Mem. at 8–9. Second, the government argues that two independent

forensic analyses of the work Rudell performed for Con Edison between 2006 and 2011 show

that, on projects Razzouk oversaw or was otherwise involved in, Rudell overcharged Con

Edison by approximately $6 million. Gov't Req. at 3; Con Edison Mem. at 10–13.

In response, the defendant primarily argues that Con Edison "suffered no

compensable pecuniary loss." Def.'s Mem. of Law in Opp'n to Gov't's Req. for Restitution 1

("Def.'s Opp'n"), ECF No. 66. Specifically, the defendant contends that the government inappropriately equates the defendant's gains with Con Edison's losses in violation of governing Second Circuit caselaw. *See id.* at 20–21. In addition, the defendant objects to the forensic accountants' methodology and corresponding findings. *See id.* at 23–38.

As to the government's first claimed justification—that it is "basic economic logic" that Rudell must have overcharged Con Edison to make the bribery scheme profitable, *see* Gov't Req. at 2; Con Edison Mem. at 9—the Second Circuit has been clear that I cannot merely assume a direct correlation between Razzouk's gains and Con Edison's losses. *See United States v. Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017). Nor is it necessary to consider the argument; evidence of the bribe checks Quiambao paid to Razzouk coupled with the forensic audits of Rudell's work for Con Edison prove by a preponderance of the evidence that Con Edison did, in fact, suffer a loss as a result of Razzouk's bribery scheme.

## A. The Bribe Checks

On January 24, 2011, Razzouk was arrested for bribery in violation of 18 U.S.C. § 666(a)(1)(B). While investigating "irregularities . . . regarding several contracts between Rudell and Con Ed[ison] . . . that were overseen by the defendant," Arrest Aff. ¶ 23, ECF No. 1, the government uncovered hundreds of checks that Rudell issued to a company called MDM Capital, Inc. ("MDM"), *see* Presentence Investigation Report ("PSR") ¶¶ 13–14, ECF No. 44. Further investigation revealed that Razzouk owned MDM and the company's corporate address was the defendant's residence in Staten Island, New York. Arrest Aff. ¶¶ 9, 17–18. On their memo lines, the checks contained descriptions of projects Rudell was doing for Con Edison that Razzouk oversaw or in which he was involved. PSR ¶ 14; *see also* Decl. of Denis J. McInerney ("McInerney Decl."), Ex. 10 (canceled checks from Rudell); Check Chart, ECF No. 68-1 (listing

checks, memo descriptions, and Con Edison project descriptions). For example, on January 11, 2007, Rudell issued a check to MDM for $87,500 with the description "Ineligible Drawings" on the check's memo line. McInerney Decl. Ex. 10, Rudell 001013 (check number 23462).[4] At that time, Razzouk was the manager on a project awarded to Rudell, which Con Edison described in its internal records as "Redraw illegible dra[w]i[n]gs at ER 69kV Substation." Check Chart at 2.

In January 2009, a number of Con Edison employees were arrested for taking bribes from a contractor. PSR ¶¶ 8, 14. Almost immediately after these arrests, the source of the payments deposited in the MDM account changed. PSR ¶ 14; McInerney Decl. Ex. 11, Rudell 001113 (canceled checks from Rudicon). Instead of originating from Rudell, the checks now came from Rudicon Power Corp. ("Rudicon"), a company that listed Quiambao as its president and had the same corporate address as Rudell. *See* PSR ¶ 6; McInerney Decl. Ex. 11, Rudell 001113. Account records indicate that, beginning in January 2009, checks issued from Rudell to Rudicon referenced a specific project Rudell was performing for Con Edison in which Razzouk was involved. PSR ¶ 14. Days later, corresponding checks from Rudicon to MDM referencing the same Con Edison projects were issued in the same amount. *Id.* All of these checks were signed by Quiambao. *Id.*

Based on MDM records, MDM's sole bank account was funded only by payments from Rudell and Rudicon, and the company had no legitimate business expenditures or employees. Arrest Aff. ¶ 17, 18. All of the disbursements from MDM's bank account were for Razzouk's personal expenses, including paying for two Mercedes-Benz cars, home renovations, and his credit cards, taxes, and mortgage. Arrest Aff. ¶ 18; *see also* Information, ECF No. 16. In total, Quiambao paid Razzouk, through checks issued from Rudell or Rudicon to MDM, close to $8.2

---

[4] The pinpoint citations to Rudell numbers refer to the bates-stamped numbers at the bottom of the page.

million in bribes between 2006 and 2011, as well as more than $3.5 million in bribes between 2002 and 2005. Check Chart, at 1 n.1; *see also* McInerney Decl. Exs. 10-11.

### B. KPMG's Audit

After the announcement of Razzouk's arrest, Con Edison retained the law firm of Davis Polk & Wardwell LLP, which in turn retained the auditing firm of KPMG LLP ("KPMG") to conduct a forensic audit of work performed and invoices submitted by Rudell between 2006 and 2011, the years of the defendant's offense of conviction. *See* Aff. of Michael Doyle, McInerney Decl. Ex. 4 ("Doyle Aff.") ¶ 3. For its review, KPMG investigated eleven contracts, known as Purchase Orders, that Con Edison awarded to Rudell during the relevant time period. *Id.* ¶ 4. The total value of the work allegedly performed under these Purchase Orders was $31,724,898.18. *Id.* "After issuance of the Purchase Orders, [w]ork was assigned through Order Releases," which detail the individual projects under the contract. *Id.* ¶ 5. The Order Releases included the description, scope, and pricing of the work agreed to by Rudell and Con Edison. *Id.*

In total, KPMG reviewed 275 separate Order Releases, which included the orders for specific work under the eleven Purchase Orders, as well as supporting documentation. *Id.* ¶ 6. The supporting documentation included project plans, specifications, contracts, invoices, and correspondence. *Id.* KPMG's process for determining whether Rudell overcharged Con Edison "generally included comparing the payment records to the contract requirements and project records, which included reviewing and analyzing the relevant available project and other business records, payment records, specifications, drawings, and emails and other communication records." *Id.* ¶ 9. In addition, KPMG "utilized subject matter experts to understand the processes and documentation Con Edison used in the normal course of business to open, manage, review and approve work performed by contractors." *Id.*

6

If KPMG found that an additional funding request had been submitted for work for which Con Edison had already paid Rudell or for which Rudell was already obligated to perform, it determined that the second payment was for an overcharge. *Id.* ¶ 9. Alternatively, if KPMG determined that Con Edison paid Rudell for work that Rudell did not perform or that another vendor had performed, it concluded that the payment was for an overcharge. *Id.* Finally, where KPMG found an unexplained overcharge for a particular project, it investigated whether the defendant had received a check from Rudell or Rudicon that noted the project in the check's memo line. *See* Reply Mem. of Law in Further Supp. of Con Edison's Req. for Restitution 9–10 ("Con Edison Reply Mem."), ECF No. 65-1. Where KPMG found such a check, it considered the check evidence that Rudell paid Razzouk for causing overpayments. *Id.* at 10.

Upon completing its review, KPMG found losses to Con Edison of $6,059,801 in the period between 2006 and 2011, based on overbilling by Rudell. Doyle Aff. ¶ 7. Specifically, KMPG found $1,144,866 in charges for work that was not performed, $570,217 in charges for duplicate work, and $4,344,718 in overcharges that included billings for work done by other vendors, work that was double billed, and work that was covered under the original purchase orders and then later resubmitted for payment. *Id.* ¶ 8.

### C. Grassi's Audit

In addition to KPMG's audit, the government relies on a second forensic audit of work that Rudell completed for Con Edison during the relevant years that also found significant unexplained overcharges. *See* Gov't Req. at 3. After Con Edison submitted an insurance claim to National Union seeking recovery for the $6,059,801 that KPMG found the Company had lost as a result of the defendant's bribery scheme, National Union retained its own forensic accounting expert, Grassi & Co., to independently investigate the loss that Con Edison alleged. *See* Gov't

Req. at 3; Nat'l Union Req. for Restitution 5 ("Nat'l Union Req."), ECF No. 53-4. Grassi

analyzed all of the information that KPMG reviewed and provided its own summary of the

materials. Nat'l Union Req. at 5–6. For some projects for which KPMG found overcharges,

Grassi concluded that Con Edison had not incurred a loss. *See, e.g.*, Decl. of Denis J. McInerney

("McInerney Reply Decl."), Ex. 19, ECF No. 65-1. In those cases, National Union refused to

reimburse the supposed loss. *Id.* Ultimately, however, Grassi agreed with more than 97 percent

of KPMG's loss calculations, and National Union reimbursed Con Edison for $5,902,661.[5] *See*

Con Edison Mem. at 6; McInerney Decl. Ex. 5 ("Assignment and Release"), at 1.

### D. Defendant's Objections

In response to the government's request that the court order restitution in favor of Con

Edison and National Union, the defendant argues that the "thousands of pages" of records

provided to support this request "demonstrate that Con Edison did not suffer a loss at all."

Def.'s Opp'n at 1. He levels a general allegation that the government's restitution request is

based on the specious premise that Con Edison "must have lost whatever . . . Mr. Razzouk

gained." *Id.* at 21. He also offers eleven examples of projects for which KPMG found

overcharges that he contends demonstrate that KPMG's analysis is "fatally flawed." *Id.* at 26–38.

Finally, he argues that bribery is not an "offense against property" under the MVRA and,

because there is no evidence or charge of a scheme to defraud in this case, the court may not

award restitution. *Id.* at 19.

First, the defendant's global accusation that the government and Con Edison's

restitution request substitutes the defendant's gain for Con Edison's loss in violation of Second

---

[5] Broken down, this number represents the loss that Grassi determined minus Con Edison's deductible of $250,000 plus $250,000 in investigation costs, the limit for reimbursement for investigation costs under Con Edison's policy. Assignment and Release, at 1.

Circuit precedent is simply not supported by the evidence. The government has provided two independent and thorough forensic audits of the work that Rudell did for Con Edison. Both audits, using a "sound methodology," found that Con Edison suffered tremendous losses as a result of overbilling by Rudell. *See Finazzo*, 850 F.3d at 117 (quoting *Gushlak*, 728 F.3d at 196). As already explained, the accounting firms reviewed all of the information available for 275 separate Con Edison projects on which Rudell was the contractor. Contrary to the defendant's arguments, *see* Def.'s Opp'n at 20, the auditors did not conclude that there were overcharges solely—or even primarily—based on the existence of a check or multiple checks from Rudell or Rudicon to the defendant. Rather, the auditors identified suspicious activity related to a given job, such as double-payment for work or payment for work not performed, *and then* considered the existence of a corresponding check from Quiambao to Razzouk that made specific reference to that job as probative of the likelihood that the over-payment constituted a loss to Con Edison attributable to the bribery scheme. *See* Con Edison Reply Mem. at 10. Far from assuming a direct correlation between Razzouk's gains and Con Edison's losses, the auditors properly considered the existence of a check or checks that specifically referred to a project for which they *independently* found unexplained overcharges as *additional* evidence that Quiambao bribed Razzouk and recouped some of his losses by overcharging Con Edison. Such an inference is hardly illogical.

Moreover, the defendant made statements during his proffers with the government and under oath at his plea allocution that indicate that he engaged in a quid pro quo bribery scheme with Quiambao, from which one can infer that Con Edison suffered loss. In one proffer session with the government, for example, Razzouk said that he coached Quiambao to "bid jobs low to guarantee that Rudell would get the project" and then assured Quiambao that he would "take

9

care" of Rudell "to make up for the low bid." Gov't Reply to Def.'s Objs. to the PSR, Ex. B, at

6, ECF No. 50-1. In addition, Razzouk stated under oath during his plea allocution that he

"accepted United State[s] currency from Rudel[l] & Associate[s]" in exchange for "provid[ing]

them with additional Con Edison work, assisting them with bids and approving payments to

Rudel[l] & Associates in contracts with Con Edison for things I was not entitled to." McInerney

Decl. Ex. 9, at 32:11-32:18. If the assistance Razzouk gave Rudell on its bids and the payments

Razzouk approved were all legitimate, it is unclear why he would be referring to them in his plea

allocution. Although Razzouk's statements are somewhat vague and do not shed light on how

much Con Edison lost by virtue of the scheme, the statements nevertheless support the

government's theory that the defendant's actions resulted in a loss to Con Edison in light of the

other evidence that exists. Furthermore, the forensic audits appropriately apply a sound

methodology to identify a reasonable approximation of the losses that Con Edison sustained.

Second, defendant's examples that supposedly demonstrate the flaws in KPMG's

analysis do not undermine the audits or their findings. On the contrary, I agree with Con Edison

that the majority of these examples, which comprise less than 20 percent of the total losses that

KPMG calculated for the relevant period, establish that Con Edison suffered severe economic

harm due to the defendant's bribery scheme. *See* Con Edison Reply Mem. at 4.

As the defendant's first illustration of his criticism of KPMG's audit, for example,

Razzouk argues that KPMG incorrectly included as an overcharge a legitimate request for

additional work on a project. *See* Def.'s Opp'n at 12. According to Razzouk, he should not be

held responsible for this alleged overpayment because (1) other Con Edison employees

requested and approved the change order and (2) "the job was awarded, conducted, and

completed in the ordinary course and . . . no irregularities were involved." *Id.* at 13. Yet, as Con

Edison demonstrates, Razzouk was responsible for the project and those who requested and approved the change orders reported to him. *See* Con Edison Reply Mem. at 5. More damningly, a contemporaneous email from Rudell personnel to Con Edison indicates that Rudell *never performed* the additional work for which it was paid. *See id.*; McInerney Reply Decl. Exs. 17, 18. Con Edison, therefore, correctly included this overpayment in its restitution request.

Other examples that Razzouk contends undermine KPMG's findings are similarly unpersuasive. For one contract, KPMG found overpayments on three projects for $51,707, $99,900, and $26,500, respectively. *See* Def.'s Opp'n at 28–30, 32. The defendant acknowledges that he was the manager on those projects but argues that he was not responsible for the overpayments because Con Edison's Accounts Payable Department (APD) disbursed the money. That is, the APD "may have mistakenly paid Rudell twice for the same work," but the defendant had nothing to do with it. Def.'s Opp'n at 28–29. According to Con Edison, however, it was Razzouk's responsibility both to tell the APD how much money to disburse to Rudell in the first instance and also "to identify and correct" any data entry errors that might result in the APD's remitting too much money before the APD cut the final check. Con Edison Reply Mem. at 9. In addition, KPMG found checks that Rudell issued to Razzouk corresponding to half of the $51,707 overpayment and about one-third of the $99,900 overpayment that included references to work for those projects in the memo lines of the checks. *Id.* Although I do not doubt that human error is a reality at Con Edison, it is hard to imagine that Con Edison's APD routinely remits overpayments that place projects tens of thousands of dollars over budget, of which the manager responsible for overseeing the project is wholly unaware. Such an explanation is even less plausible here, given the existence of the bribe

checks that Rudell and Rudicon paid to Razzouk that specifically refer to the projects for which KPMG found overpayment.

For another set of projects for which KPMG found overcharges, the defendant argues that KPMG's findings demonstrate KPMG's "inability to grasp" how Con Edison works. Def.'s Opp'n at 33. Again, defendant's objections are unconvincing. On one project, KPMG found that Con Edison paid Rudell for an engineering drawing that Rudell never completed. Con Edison Reply Mem. at 12. Razzouk argues that, for this project, Rudell had to submit only a sketch, not a formal drawing, which is why KPMG did not find a formal drawing in the project file. *See* Def.'s Opp'n at 36. KPMG concluded, however, that Con Edison had overpaid Rudell because "KPMG found no evidence that an engineering drawing or a sketch was ever submitted," not because the auditors did not understand what the project required or because they could not "grasp" the differences between a sketch and a formal drawing. Con Edison Reply Mem. at 12. As demonstrated by Con Edison's request for additional funding, both sketches and drawings cost money. Yet KPMG found that Con Edison received neither work product. *See* Con Edison Reply Mem. at 12.

The defendant also argues, in somewhat cursory fashion, that the MVRA does not apply to his offense of conviction because bribery under 18 U.S.C. § 666(a)(2) is not an "offense against property" and "there is no evidence or charge of a scheme to defraud." Def.'s Opp'n, at 19. According to the defendant, therefore, I am not authorized to order restitution. *Id.*

I reject the defendant's argument that bribery is not an "offense against property" under the MVRA. Where a "victim has been deprived of money to which [it] is entitled by law," the victim's pecuniary losses "may be considered lost 'property'" for purposes of awarding mandatory restitution. *United States v. Skowron*, 529 F. App'x 73 (2d Cir. 2013) (alteration in

12

original) (summary order); *see also United States v. Ritchie*, 858 F.3d 201, 210 (4th Cir. 2017) ("Congress could not have intended to exclude from the broad, mandatory reach of the MVRA those unfortunate victims who suffer property loss as a result of an offense that doesn't contain as an element a reference to 'property.'"); *United States v. Collins*, 854 F.3d 1324, 1334–35 (11th Cir. 2017) (holding that whether an "offense" is "against property" is determined based "on the conduct underlying the offense of conviction instead of the elements of the crime"). It may be possible for someone to accept or solicit bribes without depriving the alleged victim "of money to which it is entitled by law," thereby rendering the MVRA inapplicable. *See, e.g., United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013). But that is not the case here. Razzouk's bribery scheme *did* cause Con Edison pecuniary harm because Razzouk caused Con Edison to overpay Rudell. Under these circumstances, the defendant's bribery offense qualifies as an offense against property for purposes of the MVRA.

I also reject the defendant's assertion that "there is no evidence or charge of a scheme to defraud" in this case. Def.'s Opp'n at 19. It is true that the Second Circuit has not yet decided "whether the language 'committed by fraud or deceit' in § 3663A(C)(1)(A)(ii) refers to the *elements* of an offense or the *manner* in which the defendant *commits* the offense." *Adorno*, 950 F. Supp. 2d at 429. If the former, the defendant would be correct that the MVRA does not apply to his offense. *Donaghy*, 570 F. Supp. 2d at 421 (E.D.N.Y. 2008). Numerous courts, however, have examined the manner in which the defendant commits the offense, rather than the offense's elements, to determine whether it was "committed by fraud or deceit." *See, e.g., Collins*, 854 F.3d at 1334–35; *United States v. Coffin*, No. 09-CR-452, 2011 WL 4962395, at *1 (E.D.N.Y. Oct. 18, 2011) (Ross, J.) ("To determine whether an offense was 'committed by fraud or deceit,' the court examines 'the way in which a particular offense was carried out rather than its

elements.'" (quoting *Donaghy*, 570 F. Supp. 2d at 421)); *see also Zangari*, 677 F.3d at 93 (endorsing an award of restitution under the MVRA for an offense that lacked a fraud or deceit element). Finding these authorities persuasive, I adopt the same approach.

Based on "the manner" in which Razzouk carried out his offense, Con Edison is clearly entitled to restitution under the MVRA. While employed by Con Edison, Razzouk accepted bribes in exchange for giving favorable treatment to Rudell in violation of Con Edison's policies. As discussed above, a preponderance of evidence establishes that, as part of this favorable treatment, Razzouk caused Con Edison to pay Rudell twice for the same work as well as for work that Rudell never performed. A preponderance of evidence also shows that Razzouk approved, whether directly or through his subordinates, unnecessary change orders to inflate the costs of projects. The evidence also demonstrates that Razzouk engaged in deceitful conduct to prevent Con Edison from discovering the nature of his relationship with Quiambao. For example, on four separate occasions, Razzouk falsely certified to Con Edison that he had no known conflicts of interest. *See* McInerney Decl. Ex. 3. In addition, contrary to the defendant's assertions, Quiambao's circuitous payments to Razzouk were not consistent with payments for legitimate work. Rather, Quiambao routed his payments to Razzouk through either Rudell or Rudicon to MDM, a bank account under Razzouk's control, the sole purpose of which was to receive Quiambao's bribe payments. All of this evidence, viewed cumulatively, establishes by a preponderance that Razzouk not only engaged in a bribery scheme from which he benefitted but also that he defrauded Con Edison of millions of dollars. For these reasons, the MVRA applies to the defendant's offense of conviction, not only authorizing but mandating an award of restitution to Con Edison.

Although I find that KPMG's analysis provides persuasive evidence that Con Edison suffered a $6,059,801 loss due to Razzouk's bribery scheme, in an abundance of caution, I award restitution in the loss amount that National Union determined: $5,902,661. *See* Con Edison Mem. at 6; Assignment and Release at 1. As Con Edison's insurer, National Union had every incentive to perform a rigorous audit to avoid overestimating the losses for which it was required to reimburse Con Edison. Its bias, if any, would lead it to underestimate Con Edison's losses.

### III.    Con Edison is entitled to restitution for the defendant's dishonest services.

The government also seeks restitution for $484,170.03[6] plus prejudgment interest as recovery of what it describes as "an appropriate portion" of the salary that Con Edison paid the defendant during the pendency of his bribery offense. Gov't Req. at 2; Con Edison Mem. at 13. This amount constitutes half of the defendant's total compensation—$968,340.06—during the period charged in the indictment from January 2006 to January 2011.[7] *See* McInerney Decl. Revised Ex. 13, ECF No. 62-2. The government and Con Edison submit that this percentage is warranted in light of the magnitude and longevity of the defendant's bribery scheme, as well as other factors. *See* Gov't Req. at 1–2; Con Edison Mem. at 15–19 (discussing the five factors articulated in *Coffin*). The defendant objects to government's request in passing, arguing only that

---

[6] After the government submitted its request for restitution on behalf of Con Edison, which sought $487,751.96 as recovery for Razzouk's dishonest services, *see* Gov't Req. at 2; Con Edison Mem. at 13, Con Edison revised its request based on an accounting error and now seeks $484,170.03, *see* ECF No. 62-1, 62-2.

[7] Although the government refers to the defendant's "salary" in its letter seeking restitution, *see* Gov't Req. at 1, the government's request is in fact based on Con Edison's calculation of the total *compensation* that the Company paid to Razzouk, which includes "gross wages, employer FICA match, employer contributions to 401(k) plan, employer contributions to discount stock plan, and employer contributions to group life insurance and health insurance plans." Con Edison Mem. at 14.

any restitution "for a period of employee disloyalty should be extremely limited because Con

Edison did not suffer a loss and, in fact, saved money." Def.'s Opp'n at 23.

Under the MVRA, an employer is entitled to the compensation that it paid an employee

when the "employer pa[id] for honest services but receive[d] something less." *Skowron*, 529 F.

App'x at 73 (quoting *United States v. Bahel*, 662 F.3d 610, 649 (2d Cir. 2011)). "[T]he appropriate

measure of 'loss' is the difference in the value of the services that [the disloyal employee]

rendered and the value of the services that an honest employee would have rendered." *Coffin*,

2011 WL 4962395, at *2. In *Coffin*, I sought to deduce a reasonable estimate of the difference by

considering, among other factors, the amount of bribes the employee received, the amount of

intended loss his scheme created, the length of time the scheme lasted, and the employee's level

of participation in the scheme. *See id.* at *4. Notably, the MVRA "requires only a reasonable

approximation of losses supported by a sound methodology." *Finazzo*, 850 F.3d at 117.

Using the *Coffin* factors, Con Edison compares the present case with the situation of the

defendant employees in *Coffin* to argue that Con Edison is entitled to a far greater percentage of

Razzouk's compensation than the ten to twenty-five percent that I awarded in *Coffin*. Con

Edison urges that, here, the circumstances warrant forfeiture of at least fifty percent of

Razzouk's compensation. Con Edison Mem. at 15–19. But in light of the available information

in this case, I cannot conclude that *half* of everything that Razzouk did for Con Edison between

2006 and 2011 is attributable to or tainted by his bribery scheme with Quiambao.

To begin with, the monetary value of the work that Razzouk did with Rudell comprised

less than a third of the total value of the contracts for which Razzouk was responsible during the

relevant time period. *See* Con Edison Mem. at 3 (explaining that Razzouk oversaw over $100

million in payments by Con Edison during the period of his disloyalty); Doyle Aff. ¶ 4 (stating

16

that the monetary value of the contracts issued to Rudell between 2006 and 2011 which KPMG
reviewed totaled $31,724,898.18); Assignment and Release, at 1 (confirming that Con Edison's
submission to National Union requested recovery for all of the "dishonest conduct of Razzouk
that may be covered by the Policy"). Based on that fact alone, it would be inappropriate to
attribute half of Razzouk's salary to disloyal service.

Moreover, the Rudell contracts that resulted in some loss to Con Edison were not wholly
devoid of value, even if many were obtained through fraudulent means. Of the almost $32
million that Con Edison paid Rudell, I have determined above that Con Edison's losses from
the defendant's bribery scheme approximate $6 million. While a loss of $6 million is
undoubtedly significant, it constitutes about twenty percent of the Rudell contract payments, not
half. As in *Coffin*, I decline to assume that the defendant's work relating to the other 80 percent
of services Rudell provided was also dishonest. *See* 2011 WL 4962395, at *3.

Using the amount of Con Edison's loss as a guide to determining a reasonable estimate
of the percentage of defendant's work that was faithless, I conclude that it is appropriate to
award Con Edison restitution in an amount equaling twenty percent of the defendant's total
compensation during the period of his disloyalty charged in the indictment, totaling $193,668.01.
This represents "a conservative estimate of the cost of the fraud with respect to" Razzouk's
compensation. *Bahel*, 662 F.3d at 650.

## IV.   Con Edison is entitled to restitution for the costs of its investigation of the defendant's misconduct.

In addition, the government seeks $3,060,360.09 in restitution to reimburse Con Edison
for the expenses that it incurred in investigating and mitigating the defendant's crime. *See* Gov't
Req. at 3; Con Edison Mem. at 19, 21. The defendant does not address this request.

Under the MVRA, a victim is entitled to restitution for "necessary . . . expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). The Second Circuit "takes a broad view of what expenses are 'necessary.'" *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (citing *United States v. Papagno*, 639 F.3d 1093, 1101 (D.C. Cir. 2011)). And it has affirmed restitution for attorney's fees and accounting costs incurred by an internal investigation that uncovered fraud. *See, e.g., United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008). Nevertheless, there are limits to what is recoverable, as all expenses must be "related to the offense." 18 U.S.C. § 3663A(b)(4); *see also Maynard*, 743 F.3d at 382.

Con Edison contends that it is entitled to $3,060,360.09 as restitution for the cost of investigating Razzouk's misconduct. Con Ed. Mem. at 21. According to Con Edison, however, this amount includes not just the cost of investigating Razzouk's wrongdoing but also the cost of investigating Quiambao's misconduct after Razzouk pleaded guilty. *Id.* Con Edison appears to justify its request by arguing that Razzouk's and Quiambao's misconduct were the "same" and, therefore, that "Razzouk should bear the full . . . cost of investigating his own misconduct." *Id.* That is, according to Con Edison's argument, because KPMG continued to assist the government after Razzouk pleaded guilty, and because this assistance involved educating the government about the "Quiambao-Razzouk scheme," Razzouk is liable for the total amount of Con Edison's investigative costs. *Id.*

While I find that Con Edison is entitled to restitution for the cost of investigating Razzouk's misconduct, I decline to award it restitution for expenses that were not necessary to investigating or prosecuting his offenses of conviction. It may be true that KPMG's assistance to the government was instrumental to its cases against Quiambao and others, but there is a "crucial distinction between actions that merely 'helped' . . . the prosecution and actions deemed

truly necessary." *United States v. Cuti*, 708 F. App'x 21, 25 (2d Cir. 2017) (summary order). "The latter are compensable, and the former are not." *Id.* Therefore, Con Edison is entitled to restitution only for the costs that it incurred in investigating the wrongdoing of Razzouk.

Con Edison states that the cost of KPMG's work up to April 2012 was $1,671,179. Con Edison Mem. at 20. Its explanation for identifying this date is that, "by [that] time," the defendant had pleaded guilty and National Union had agreed to reimburse Con Edison for a portion of its losses. *Id.* Con Edison does not clarify, however, whether April 2012 was when KPMG stopped investigating the defendant. [8] Presumably, KMPG finished its investigation of Razzouk before April because Con Edison needed KPMG's findings to support its insurance request. *See* Con Ed Mem. at 20. Without more specific information, I cannot award Con Edison restitution for KPMG's work up to April 2012.

In choosing the cut-off date for reimbursement, I am again mindful that the MVRA requires only a "reasonable approximation" of losses. Nevertheless, I must choose a date for which there is a preponderance of evidence that Con Edison's expenses were "necessary" for the investigation or prosecution of the defendant. I therefore award Con Edison restitution for KPMG's auditing expenses incurred until June 10, 2011, the date the defendant pleaded guilty pursuant to a cooperation agreement. Based on KPMG's invoices, the defendant must pay Con Edison $771,021.50.[9] *See* McInerney Decl. Ex. 7, at 1.

---

[8] The KPMG invoices that Con Edison submitted as evidence do not provide sufficient detail to determine the precise date on which KPMG concluded its investigation of Razzouk. *See* McInerney Decl. Ex. 7. All of KPMG's invoices include the same description of the work completed, save the dates covered. *See, e.g., id.* at 2 ("Internal investigation services provided to Con Edison from period February 18, 2011 – March 31, 2011. Services are specific to the Central Engineering investigation.").

[9] This number reflects the costs of KPMG's investigation through the end of June 2011. *See* McInerney Decl. Ex. 7, at 1. KPMG's invoices are monthly and, therefore, do not make clear when expenses were incurred during that month, i.e., it is not clear what expenses were incurred before June 10, 2011. Because the MVRA requires me to order restitution to Con Edison for the "full amount" of losses caused by Razzouk's criminal

## V.     Con Edison is entitled to prejudgment interest.

Finally, the government seeks prejudgment interest on all of the aforementioned losses since the date of Razzouk's arrest. Under the MVRA, a victim is entitled to prejudgment interest "unless evidence indicates that the victim would not have put the funds to productive use." *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *see also Coffin*, 2011 WL 4962395, at *5. As the Second Circuit made clear in *Qurashi*, "Money is not static, and companies do not store their reserves under mattresses for safekeeping." 634 F.3d at 703. Because the defendant has failed to demonstrate that Con Edison would not have put the money it lost as a result of the defendant's bribery scheme and disloyal service to "productive use," I award pre-judgment interest, calculated from the date of the defendant's arrest. *See Coffin*, 2011 WL 4962395, at *5.

## VI.    Payment Schedule

The MVRA requires me to establish a schedule according to which Razzouk must pay Con Edison the restitution that he owes. *See* 18 U.S.C. § 3664(f)(2). To determine an appropriate payment schedule, I must consider the defendant's financial resources and other assets, his projected earnings and other income, and any financial obligations that he has, including obligations to dependents. *Id.*

Despite repeated requests from the Probation Department, the defendant has refused to provide a completed Personal Financial Statement. PSR ¶ 17. Nevertheless, I am aware that the defendant received significantly more bribe payments than are accounted for by the forfeiture money judgment that he paid to the government. *Compare* Consent Prelim. Order of Forfeiture at 1, ECF No. 27 (requiring Razzouk to forfeit $6,515,809 to the government) *with* McInerney

---

conduct, 18 U.S.C. § 3664(f)(1)(A), and because I need only make a "reasonable approximation" of losses, I exercise my discretion to include the June invoice in its entirety.

Decl. Exs. 10–11 (canceled checks evidencing approximately $8.2 million in bribes between 2006 and 2011 and an additional $3.5 million in bribes between 2002 and 2005). In light of the aforementioned statutory considerations and the limited information before me, I order the defendant to pay $500,000 in the next thirty days, $25 per month while incarcerated, and the remainder of his restitution obligation by the conclusion of his period of supervised release on a schedule to be determined by the Probation Department.

## VII.    Summary and Allocation of Restitution

Based on the above, I award restitution as follows:

- $5,902,661.00 for losses attributable to the defendant's bribery scheme;

- $193,668.01 for losses attributable to the defendant's faithless work;

- $771,021.50 for Con Edison's investigation costs; and

- Prejudgment interest on all of the above losses.

The government asks that the defendant pay the total restitution award to "Con Ed, with $5,902,661 of this amount to be paid to National Union, following the payment to Con Ed of [the] difference between the total restitution award and the amount National Union paid Con Ed." Gov't Req. at 3–4. In its supporting memorandum, Con Edison similarly implies that it should receive payment before National Union. *See* Con Edison Mem. at 23 (citing 18 U.S.C. § 3664(j)(1)). According to National Union, however, I should not determine how to allocate the restitution award because "National Union and Con Edison have already agreed to a contractual allocation of the recoveries in its Assignment and Release." Nat'l Union Req. at 7.

The MVRA sets out a default rule that "[if] a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation." 18 U.S.C. §

3664(j)(1). However, the MVRA continues, "the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation." *Id.* Nevertheless, where a victim and their insurer have agreed by contract to an alternate method of allocating restitution payments, particularly in cases where both are sophisticated parties, a court "will not disrupt the agreement." *United States v. Lara*, No. CRIM. 3:08-CR-00169V, 2009 WL 3754069, at *2 (D. Conn. Nov. 6, 2009).

As previously stated, National Union, as Con Edison's insurer, reimbursed Con Edison for $5,902,661 in losses sustained as a result of the defendant's conduct. *See* Assignment and Release, at 1. Specifically, after application of the $250,000 deductible provided for by Con Edison's policy, National Union paid Con Edison $5,652,661 related to the defendant's bribery scheme and $250,000 for the costs of KPMG's investigation, the policy's limit for reimbursement of investigative expenses. *See id.* Upon receiving payment from National Union, Con Edison agreed to "sell, assign, transfer, and convey" its right of recovery relating to Razzouk's bribery scheme to National Union in the amount for which it was reimbursed. *Id.* at 2. Con Edison also agreed that "[a]ll recoveries received from whatever source, and whether received by [Con Edison] or [National Union] shall be shared on a percentage basis," computed based on a formula described in the Assignment and Release form. *Id.* at 3.

In light of the written agreement that Con Edison and National Union have made part of the record and to which Con Edison raises no objections, the terms of that agreement shall govern the allocation of the restitution between Con Edison and National Union.

## VIII.  Conclusion

For the foregoing reasons, I award restitution to Con Edison and National Union in the total amount of $6,867,350.51 plus prejudgment interest, to be allocated between them as determined by their written agreement.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:        April 3, 2018
              Brooklyn, New York