1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,      : 11-CR-00430(ARR)
4                                   :
                                    :
5                                   :
          -against-                 : United States Courthouse
6                                   : Brooklyn, New York
                                    :
7                                   :
                                    : Tuesday, April 3, 2018
8    SASSINE RAZZOUK,               : 11:00 a.m.
                                    :
9            Defendant.             :
                                    :
10   - - - - - - - - - - - - - - X
11
12        TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
          BEFORE THE HONORABLE ALLYNE R. ROSS
13        UNITED STATES SENIOR DISTRICT JUDGE
14                 A P P E A R A N C E S :
15   For the Government:  RICHARD DONOGHUE, ESQ.
                          United States Attorney
16                          Eastern District of New York
                            271 Cadman Plaza East
17                          Brooklyn, New York 11201
                          BY:  PAUL A. TUCHMANN, ESQ.
18                          CLAIRE S. KEDISHIAN, ESQ..
                            Assistant United States Attorneys
19
20    For the Defendant:    STEVE ZISSOU & ASSOCIATES
                            42-40 Bell Boulevard
                            Suite 302
21                          Bayside, New York 11361
                          BY: STEVE ZISSOU, ESQ.
22
23   Court Reporter:  Stacy A. Mace, RMR, CRR
                      Official Court Reporter
24                    E-mail:  SMaceRPR@gmail.com
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

SAM    OCR    RMR    CRR    RPR

1                    (In open court.)

2          THE COURTROOM DEPUTY:  United States of America

3    against Razzouk, docket number is 11-430.

4          Counsel, please state your name for the record.

5          MR. TUCHMANN:  Paul Tuchmann for the United States.

6    Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. TUCHMANN:  With me --

9          MS. KEDESHIAN:  Claire Kedeshian.

10         MR. TUCHMANN:  -- Claire Kedeshian also from our

11   office, and Jaime Turton from the Probation Department is at

12   counsel table as well.

13         MR. ZISSOU:  Mr. Razzouk is present, and the counsel

14   Steve Zissou.  Good morning.

15         I am joined by our third-year law student who has

16   been working on this case.  Her name is Sydney Spinner.  With

17   your permission she is going to assist us this morning.

18         THE COURT:  That's fine.

19         MR. ZISSOU:  Judge, I beg your pardon.  Before we

20   begin I just wanted to give our condolences for the loss of

21   your colleague over the weekend, Judge Wexler, who was a great

22   man.

23         THE COURT:  Before we proceed to sentencing, I want

24   to address defense counsel's motions for specific performance

25   of defendant's plea agreement and to vacate defendant's guilty

1   plea to Count One of the Information.

2          The history of this prosecution is a bizarre and

3   tortured one.  Defendant, a long time section manager at Con

4   Edison's Electrical Control Systems Design Section, pled

5   guilty to acceptance of bribes in violation of 18 United

6   States Code Section 666(a)(1)(B) and three counts of tax

7   evasion in violation of 26 United States Code Section 7201,

8   pursuant to a cooperation agreement.  As part of his

9   cooperation, Razzouk agreed to be debriefed and testify

10  truthfully concerning bribes that he received from Rodolfo

11  Quiambao, the president and CEO of Rudell and Associates,

12  Inc., an engineering and design firm that contracted work from

13  Con Edison.  Only months before the commence of Quiambao's

14  trial, however, Razzouk breached his cooperation agreement by

15  both proposing in a conversation recorded by Quiambao that he

16  would testify falsely at Quiambao's trial and in the same

17  conversation by importuning Quiambao to testify to the same

18  falsehood.  As a result, the Government elected to withhold

19  any 5K letter from Razzouk, and with respect to Razzouk's

20  advisory sentencing guidelines  urges that an obstruction of

21  justice enhancement be imposed and that all points for

22  acceptance of responsibility be withheld.

23          Defense counsel asks that I order specific

24  performance of the plea agreement or, in the alternative,

25  issue an order vacating the defendant's guilty plea on the

1   ground that the Government breached the plea agreement.  I

2   will do neither because the Government did not breach the plea

3   agreement, the defendant did.  The defendant breached his

4   cooperation agreement when he met with Quiambao and offered to

5   perjure himself at Quiambao's trial by violating the terms of

6   the cooperation agreement.  Razzouk, not the Government,

7   caused the breach, thereby freeing the Government from its

8   contingent obligations under the plea agreement.

9           Regardless, and contrary to defendant's assertions,

10  the Government has communicated to me the magnitude of

11  defendant's cooperation and I am fully aware that his

12  cooperation to some extent contributed to the successful

13  prosecution of others.  I view that cooperation as only

14  marginally mitigating, however, given defendant's subsequent

15  acts that eviscerated the value to the Government of the bulk

16  of his cooperation.

17          With regard to defendant's argument that the

18  Government breached its promise not to oppose a three-level

19  reduction for acceptance of responsibility, the Government was

20  not obligated to advocate for a reduction once the defendant

21  breached the agreement.  That's Exhibit F, page 7.

22          In addition, I agree with the Government that it is

23  incomprehensible that the defendant insists on entitlement to

24  reduction for acceptance for responsibility when in his

25  objections to the pre-sentence report and his subsequent

1    submissions he denies responsibility for the very crimes to

2    which he pled guilty.  Defendant's motion for the specific

3    performance of the plea agreement is, therefore, denied.

4              Finally, as recently as two business days ago

5    Razzouk proffered yet another rationale to avoid

6    responsibility for his conduct.  Specifically, he now urges

7    that his guilty plea allocution before Judge Mauskopf to Count

8    One of the Information, the bribery count, lacked factual

9    basis and that his conviction of that count must, therefore,

10   be vacated.  The argument is spurious.  Under Title 18 United

11   States Code Section 666(a)(1)(B) bribery in violation of the

12   statute is the acceptance of money as a quid pro quo with the

13   attempt to be influenced in connection with the business of

14   Con Edison.  At his guilty plea allocution Razzouk attested

15   that during the period Rudell acted as a contractor for

16   Con Ed.  Razzouk, who oversaw the competitive bidding system

17   by which Con Ed awarded certain contracts "accepted United

18   States currency from Rudell" and "received these payments with

19   the intent to influence the awarding of jobs to Rudell."

20             That Razzouk may have attempted to mitigate the

21   degree to which his actions were criminal by qualifying his

22   expressed intent with the phrase "in part" does not undermine

23   his acknowledgement that he accepted money with corrupt intent

24   to favor Rudell in its business with Con Ed in violation of

25   the statute.

1      Specifically, Razzouk explained he "provided

2   benefits to Rudell by, among other things, providing them with

3   additional Con Edison work, assisting them with bids, and

4   approving payment to Rudell for things he was not entitled to

5   approve.  Placed in context, it is plain that his use of the

6   word things refers to aspects of work done by Rudell that

7   Razzouk was not entitled to approve.  It does not refer to

8   things Razzouk received in exchange for benefits he provided

9   Rudell.  It is also clear from his allocution that Razzouk

10  acknowledged acting with the requisite mens rea in violation

11  of the statute.

12      I, therefore, reject Razzouk's challenge to the

13  sufficiency of his guilty plea.

14      Turning to the sentence, I have received, obviously,

15  the pre-sentence report; a September 25th, 2017 letter from

16  you, Mr. Zissou; an October 11, 2017 letter from the

17  Government; a December 6th, 2017 letter from you, with

18  attachments; a February 20th, 2018 letter from the Government

19  with attachments; a March 5th, 2018 letter from you; a

20  March 8th, 2018 letter from the Government with attachments; a

21  March 13th, 2018 letter from the Government; and a March 30th,

22  2018 letter from you, as well as, and I am just going to talk

23  about some of the letters here because the exhibits were too

24  voluminous to go through with you, but all of the exhibits I

25  have; a December 1st, 2017 letter from the Government, this is

1  pertaining to restitution; a memorandum of law in support of

2  Con Edison's request for restitution from Sassine Razzouk;

3  defendant's memorandum of law in connection with restitution;

4  a January 16, 2018 reply from the Government; a reply

5  memorandum of law in further support of Con Edison's request

6  for restitution from Sassine Razzouk; and a letter dated

7  November 30, 2017 from National Union.  And, of course,

8  everything else that came along with that.

9          Mr. Zissou, I am sure you have had ample opportunity

10  to review all of that with your client?

11          MR. ZISSOU:  I have, Your Honor.

12          THE COURT:  Mr. Razzouk, are you satisfied you have

13  had plenty of time to go over with Mr. Zissou the documents to

14  which I have referred and everything else that you believe

15  relates to your sentence?

16          THE DEFENDANT:  (No response.)

17          THE COURT:  Did you not understand me?  Do you want

18  me to repeat that?

19          THE DEFENDANT:  Would you, please?

20          THE COURT:  Okay.  I want to make sure that you have

21  had an opportunity to review with your lawyer the documents

22  that I just listed and everything else that you believe is

23  pertinent to your sentence here.

24          MR. ZISSOU:  Well, I should answer that, Judge.

25  He's had an opportunity to review everything you've just

1   described, but insofar as pertinent to his sentencing, as Your

2   Honor knows we've long made a demand for the job folders from

3   Con Edison and that that request has not been complied with.

4          So I think if Mr. Razzouk were standing here he

5   would be saying to you, Look, we really need those job folders

6   to be able to analyze --

7          THE COURT:  Apart from the job folders, have you had

8   a full opportunity?

9          THE DEFENDANT:  Not really.

10          THE COURT:  I'm sorry?

11          THE DEFENDANT:  Not really, no.

12          THE COURT:  No?

13          THE DEFENDANT:  No.

14          THE COURT:  You have not had time --

15          MR. ZISSOU:  He said no, he doesn't need -- I'm

16   sorry.  What were you saying?  What did you say?

17          THE DEFENDANT:  Not really.

18          MR. ZISSOU:  Not really what?

19          THE DEFENDANT:  I didn't have time.

20          MR. ZISSOU:  The job folders?

21          THE DEFENDANT:  Yes.

22          THE COURT:  I think she said aside from the job

23   folders.

24          THE DEFENDANT:  No, aside from the job folder, I

25   discussed everything with my lawyer.

1        THE COURT:  I have to assume, because I have

2   received so much on this subject that the letters have covered

3   everybody's arguments on the advisory guidelines.  Is that

4   right?

5        MR. TUCHMANN:  Yes, Your Honor.

6        MR. ZISSOU:  Yes, I think that would be so.  I mean

7   I have some ideas, insofar as loss issues, as obviously that's

8   a --

9        THE COURT:  And they are part of the advisory

10  guidelines --

11       MR. ZISSOU:  I beg your pardon?

12       THE COURT:  Are you referring to restitution

13  payments or are you referring to loss for purposes of the

14  guidelines?

15       MR. ZISSOU:  Loss for purposes of the guidelines.

16  It's all --

17       THE COURT:  You haven't covered that in your papers,

18  Mr. Zissou?

19       MR. ZISSOU:  No, they have all been covered, but

20  insofar as where we are with it, there is certainly more I

21  have to say about it.  And I am happy to do that any time Your

22  Honor gets to loss.  I know you are going through --

23       THE COURT:  I am going to get to the advisory

24  guidelines, period.  I would have assumed that over the last

25  year everybody would have had an opportunity to address, at

1  least, the advisory guidelines, but if you feel there is more

2  you want to say, please, go right ahead.

3             MR. ZISSOU:  Well, I guess the question is loss

4  proven by the Government.  Again, you're right, I have said

5  this in our moving papers that the Government simply has not

6  proved a loss.  And the fundamental issue here is, as the

7  Government has conceded to the pre-sentence report, it's in

8  one of Mr. Tuchmann's letter, Mr. Razzouk did work for

9  Mr. Quiambao.  They established, among other things, a company

10  in a foreign country.  It's registered.  We all know it.  I

11  mean we have the -- it's part of disclosure.  And he did

12  substantial work for him over the years for which he was paid.

13             The Government has never made a distinction between

14  what he earned and what he did not.  I have, in my objection

15  letter and our memorandum I made it clear that I thought the

16  loss, if you will, was in the hundreds of thousands, as

17  opposed to the millions.  The Government has never, other than

18  conceding that he did work for him -- again, it's something

19  one cannot deny, the evidence of it.

20             I am prepared to call live witnesses today if Your

21  Honor has any doubt about it.  I'm prepared to introduce

22  evidence of trips that they made overseas, of video

23  presentations made, of billion-dollar contracts that

24  Mr. Quiambao --

25             THE COURT:  I'm sorry.  I understand that you made

1  those arguments in your papers.  You never proffered any

2  evidence.  You never said I want to call a certain witness to

3  testify.

4         MR. ZISSOU:  Well, sure, I did.  In a number of the

5  memoranda I said:  We are prepared to prove this.  We can

6  introduce evidence of that.  Again, this is no surprise.  The

7  Government has copies of it.  They've had it since 2011 when

8  Mr. --

9         THE COURT:  I'm sorry, there is one point in your

10  papers where you made reference to a Fatico hearing, but you

11  never told me you wanted to call your client, you wanted to

12  call witnesses, you had evidence to adduce.  You never gave me

13  any affidavits.

14         MR. ZISSOU:  I beg your pardon, Judge.  I am

15  prepared to do that, and blame me if I miscommunicated to the

16  Court, but we are prepared to do that.  I have Mr. Razzouk's

17  entire family in the courtroom.  His daughters can testify to

18  the relationship with Uncle Rudy --

19         THE COURT:  I do not care about his relationship

20  with Quiambao, and I will explain that to you.  I do not think

21  it's relevant.

22         MR. ZISSOU:  I am not sure what the Court is

23  concerned about.

24         THE COURT:  Well, what do you propose?  Give me a

25  proffer of what you want to put on.

1        MR. ZISSOU:  I will call Mr. Razzouk.  I can call

2   his wife, as well, to establish the extraordinary efforts that

3   he made on Mr. Rudell's behalf.  Again, no secret here.  There

4   is audio, video.

5        THE COURT:  I don't think anybody has disputed the

6   fact that your client traveled to far-off places on several

7   occasions in connection with work that he was doing with

8   Quiambao.

9        MR. ZISSOU:  It's hardly just that he traveled to

10  far-off locations.  The effort that went into presentations,

11  preparation of proposals, people that --

12       THE COURT:  I just do not want our time wasted.  If

13  you have something specific that you want to put on, I am

14  going to hear it right now.

15       MR. ZISSOU:  Okay, I'm ready.

16       THE COURT:  Go.

17       MR. ZISSOU:  Do you want it through a witness or

18  should we just put it on the audio and it can describe itself?

19       I am entirely at your hands, Judge.  I am happy to

20  call Mr. Razzouk and he will explain them to you, and I am

21  not --

22       THE COURT:  I am actually quite flabbergasted that

23  you did not before indicate that you wanted to call

24  Mr. Razzouk.  I do not really think I want to see a video.  I

25  cannot test a video.  If you want to call your client, that's

1  fine.

2         MR. ZISSOU:  I'm not sure.  You are declining to

3  hear the or view the evidence that we are going to submit?

4         THE COURT:  But I do not know that your video is

5  evidence.  Your video is argument.  In the past when I have

6  received videos, I have gotten them long in advance of

7  sentence.  They are pictorial arguments.

8         MR. ZISSOU:  Right.

9         THE COURT:  They are not testimony.  They cannot be

10  cross-examined.  If you want to call a witness, you can.  If

11  you want to call several witnesses, you can.

12         MR. ZISSOU:  Okay.  Okay, I'm ready.

13         Defense calls Sassine Razzouk.

14         (Defendant takes the stand.)

15         MR. TUCHMANN:  Your Honor, if I might have the case

16  agents that are in the gallery come up.

17         THE COURT:  Yes, have them come to the table.

18         THE COURTROOM DEPUTY:  Please raise your right hand.

19         (Defendant sworn by the Courtroom Deputy.)

20         THE COURTROOM DEPUTY:  Please state your name for

21  the record.

22         THE DEFENDANT:  Sassine Razzouk.

23         THE COURT:  You have to keep your voice up.  Have a

24  seat and speak into the microphone, please.

25         MR. TUCHMANN:  Your Honor, just for the record, I

1   have Pete Maino, M-A-I-N-O, of Port Authority Inspector

2   General; and Madeline Gorra, G-O-R-R-A, of the IRS Criminal

3   Investigations at counsel table with me.

4            THE COURT:  Thank you.

5   **S A S S I N E   R A Z Z O U K,**

6            called as a witness by the Defense, having been

7            first duly sworn/affirmed, was examined and

8            testified as follows:

9   DIRECT EXAMINATION

10  BY MR. ZISSOU:

11  Q     Mr. Razzouk, are you ready?

12  A     Yes.

13  Q     Just pull the microphone closer to you.  You don't have

14  to lean forward.

15            Now, Mr. Razzouk, I am going to get to the point and

16  move this along, if I will.  Do you know a person named Rudy

17  Quiambao?

18  A     Yes.

19  Q     About what year did you first meet, approximately?

20  A     Late '80s or early '90s.

21  Q     Okay.  Did you become friends over the years?

22  A     Yes.

23  Q     And about when did your friendship blossom, if you will?

24  A     After my wife passed away.

25  Q     And what year did your wife pass away?

1   A    1999.

2   Q    Do you also have two children?

3   A    Yes, sir.

4   Q    What are their names?

5   A    Monique and Danielle.

6   Q    How old are they today?

7   A    26 and 28.

8   Q    Are they in the courtroom today?

9   A    Yes.

10  Q    After your first wife died, did you subsequently remarry?

11  A    Yes.

12  Q    And are you currently married to Grace Razzouk?

13  A    Yes.

14  Q    Is she also in the courtroom?

15  A    Yes.

16  Q    Now, there came a point in time after your wife died that

17  you told us that your friendship with Mr. Razzouk blossomed,

18  if you will.

19        Did there come a point in time when you and

20  Mr. Quiambao established a company in a foreign country?

21  A    Two of them.

22  Q    Right.  And looking at --

23        THE COURT:  I'm sorry, I didn't hear.  What did you

24  say?

25        THE DEFENDANT:  Two different companies.

1           THE COURT:  Two different companies.

2           THE WITNESS:  One in Saudi Arabia and one in Abu

3   Dhabi.

4   BY MR. ZISSOU:

5   Q    And looking at the monitor in front of you at --

6           MR. ZISSOU:  Just move it up so we can see the Bates

7   number.

8   Q    Looking at what's marked as Bates numbers ending 347, do

9   you see that in front of you?

10          (Exhibit published.)

11  A    I don't have anything in front of me.

12          THE COURTROOM DEPUTY:  Can you see that up there?

13          THE DEFENDANT:  No, I can't.

14          THE COURTROOM DEPUTY:  It is not showing up on

15  there.

16          THE COURT:  You can continue.  Can you move mine as

17  far as you can?

18          THE COURTROOM DEPUTY:  I will try to.  You can stand

19  up.

20          THE DEFENDANT:  It is going to be very hard.  I

21  can't see that.

22          THE COURTROOM DEPUTY:  Stand up.

23          THE DEFENDANT:  Yes.

24  BY MR. ZISSOU:

25  Q    Mr. Razzouk, do you recognize the document?

1      MR. ZISSOU:  Just move it up a little bit so I can

2  see the Bates Number.

3  A    Yes, I see.

4  Q    And the Bates Number is as we've discussed ending 347.

5  What is that, can you tell the judge what that is?

6  A    This is the company that was registered --

7  Q    You have to speak a little bit louder because you are not

8  by the mic.

9  A    This is the -- this is the company that was registered in

10  Saudi Arabia.

11  Q    All right.  And do you see the line marked directors?

12  A    Yes.

13  Q    Who were the directors of this company?

14  A    Rudell Quiambao, Sassine Razzouk.

15  Q    Is that you, Sassine Razzouk?

16  A    Yes.

17  Q    Who are the others?

18  A    Yong Rhee is a Korean who was living in Saudi Arabia, and

19  Mohammad Sabri ben Abdel-Aziz Ben Sultan Mahmoud, who was a

20  sponsor.

21  Q    Who was that?

22  A    Who is a sponsor.  You need a sponsor in Saudi Arabia in

23  order for you to operate.

24  Q    You can sit down now and pull the microphone close.

25      THE COURTROOM DEPUTY:  I got it.

1  BY MR. ZISSOU:

2  Q    When you say you needed a sponsor to establish a company,

3  what do you mean, to the best of your recollection?

4  A    We had a prince that we had to deal with, in which -- in

5  which he sponsors the business, be part of the business,

6  otherwise you cannot operate in Saudi Arabia just as a foreign

7  company.

8  Q    And what was the point of the establishment of this

9  company, Mr. Razzouk?

10  A    There were a lot of war going on at that time in the

11  Middle East whether it's Saudi Arabia or Dubai and Abu Dhabi,

12  and there were multi-billion-dollar projects which Rudy

13  thought it is an opportunity to actually expand the business

14  and do these multi-billion-dollar projects instead of a

15  thousand or a hundred-thousand projects that we doing in the

16  states.

17  Q    And when you say Rudy, you mean Rudy Quiambao?

18  A    Yes.

19  Q    When did this idea, when did you and Mr. Quiambao start

20  discussing this idea, what year was it?

21  A    It was 2006.

22  Q    And when did you actually start to travel overseas to

23  advance this enterprise?

24  A    Actually, I was sent by Con Edison to go overseas to --

25  as an exchange.  So I went to look --

1    Q    What year was that?

2    A    2006.

3    Q    What happened overseas?

4    A    To just learn about the system in, let's say, Paris,

5    London.  We traveled to Switzerland.  And we got to know the

6    systems, the electrical systems, their reliability, how they

7    operate, the equipment they use, and we tried to improve on

8    our system, maybe by getting ideas from overseas and

9    implementing it.

10           Another -- another group was sent to Tokyo, Japan to

11   do the same thing.  And then we came back and we actually

12   suggested ideas that Con Edison can implement as part of what

13   we called a third generation electrical system.

14   Q    And how did this idea get communicated to Mr. Quiambao?

15   A    Mr. Quiambao knew I was -- I was traveling in -- in

16   Europe and he knew about the whole thing.  As a matter of

17   fact, he visit my family when I was actually in Europe to make

18   sure my family is okay.  He came in to see my wife a couple

19   times and I communicated with him even when I was in Europe,

20   too.

21           And he sent me some work to do when I went there,

22   and I did actually work for him when I came in one weekend on

23   my birthday from Europe.  I flew from London over here in May.

24   I was still participating in the Con Edison exchange program.

25   I was still over there, technically speaking.  I paid for my

1    own ticket and I came back home and he came over and he had a

2    job for me to do.  And he expected me to take it back with me

3    and then to Fed Ex it to him.  I was able to finish it before

4    I left on Sunday.  I left it with my wife and she actually

5    delivered that.

6    Q    How did this experience get transferred to your effort

7    overseas and we have the commencement of this company, how

8    does that connect?

9    A    So for him one day after I came back, one day he

10   approached me and he told me that he met that Korean

11   individual, which we just went through his name, Mr. Rhee, at

12   one of these, you know, like affairs, fundraising in Manhattan

13   or something similar to that.  And he said this -- this

14   individual has been in Saudi Arabia for over 30 years.  He is

15   a residence of Saudi Arabia.  He have a lot of connection over

16   there and he was talking to him about the opportunity, it is

17   the same thing.  When I came back from Europe I told him, you

18   know, this is like incredible.  All these big projects, like

19   we have electrical project for 4 or $5 billion.

20            So, obviously, Rudy after speaking with the Korean

21   guy came in and he said, You know, now I have a contact over

22   there.  We have a contact, maybe I want to really see what

23   opportunity we could have over there.  And everything started

24   after that, like in the end --

25   Q    So let's cut to the chase a little.

1          What did Mr. Quiambao need you for, I mean why were

2     you an important factor?

3     A     I didn't hear you.  Could you repeat that?

4     Q     In other words, why did Mr. Quiambao bring this to you?

5     What was your influence?  What would you do?  Why did he need

6     you is my question?

7     A     Because I have the technical expertise and he always

8     thought I had the brain as far as technical work and stuff.

9     And he looked up high on me because from all the project he

10    used to give me, I used to give to him very fast.  And I was

11    able to deliver to him a perfect project, quality project.

12    Q     And so what role did he anticipate you to play in this

13    overseas venture?

14    A     I was his main -- the main consultant.  However, he gave

15    me a business card saying I'm a senior VP in his company.

16              MR. ZISSOU:  Can we put the card up, Ms. Spinner?

17              (Exhibit published.)

18    BY MR. ZISSOU:

19    Q     All right, do you see this, this item?  It's been part of

20    our submissions, but is this a business card that has your

21    name on it?

22    A     Yes.

23    Q     You can sit down, Mr. Razzouk, so you can speak into the

24    microphone.

25              How did you come to receive this card?

1  A    This was probably the third type of card he gave me.  It

2  is -- Rudy printed these card and gave them to me prior to our

3  trip together to overseas, Saudi Arabia or

4  Dubai.

5  Q    And did he list your title on this card?

6  A    Yes.

7  Q    And what was that?

8  A    Senior vice president.

9  Q    I notice there is an e-mail address there.  Who created

10  that e-mail address?

11  A    This was at Rudell's office.  This is Rudy gave me that

12  e-mail in which people communicated through his office, then

13  he will actually make hard copies and give them to me to -- to

14  review.

15  Q    So with this as a background, did you and Mr. Quiambao

16  then embark on this overseas venture?

17  A    Yes.

18  Q    And tell us how, what you did to prepare for it and what

19  happened?

20  A    We actually created an actual brochure to -- to try to,

21  let's say, sell the company, about their capability and their

22  expertise in the different areas, especially substation and

23  generations.  We created -- we created a brochure.  We worked

24  on it for maybe a couple of month, and then he have printed

25  these brochure and finalized them to take them with us.  As

1   well as I embarked on putting together presentations and

2   seminars that we actually engaged in for a whole week or so.

3   Sometime I -- I traveled for ten days, that including

4   weekends.

5        MR. ZISSOU:  All right, let's see if we can dig up

6   the brochure.  Do we have it?

7        MS. SPINNER:  We have company profile.

8        MR. ZISSOU:  Okay.

9        (Exhibit published.)

10  BY MR. ZISSOU:

11  Q    Now, can you see that?  It may be bigger on the screen in

12  front of you.  Can you see that?

13       You've got to speak up when you are away from the

14  microphone.  Do you see that?

15  A    It does not show on here.  I don't see it on my --

16  Q    Look on the big screen, it is pretty easy to see.

17  A    Oh, okay.  Yes.

18  Q    Have you ever seen that before?

19  A    Of course.

20  Q    What is it?

21  A    I said this is the brochure we put together as given the

22  indication of what Rudell's capabilities are, the expertise,

23  the different projects that they worked on, their personnel.

24  And we actually took these with us when we traveled overseas

25  and at the presentation or the seminar we distribute them to

1  the individual who were present.

2  Q    And about how long did this venture last, from 2006 to

3  when?

4  A    Well, we start working in 2006 putting the stuff

5  together.  The first trip, it was 2007.

6  Q    Hold the microphone close to you.

7  A    The first trip was 2007, and then the last trip was 2010,

8  and around June of 2010 this is when the -- Rudy Quiambao kind

9  of made a decision to cease the operations overseas because we

10 were not getting jobs from overseas.

11 Q    So despite all of the efforts that you made, the venture

12 was a failure, if you will, is that right?

13 A    We -- we did put a proposal for a lot of jobs.  We bid on

14 a lot of job, but none of them really materialized.

15 Q    To your knowledge, did Mr. Quiambao invest a lot of money

16 in this project?

17 A    Yes, he did.

18 Q    How much do you think he invested in the project?

19 A    Well, I can tell you, and I provided a spreadsheet, he

20 was paying, you know, Korean guy over $30,000 a month.

21 Q    Right.

22 A    And he was just a contact for us, that's all what it was,

23 what he was.

24 Q    And, obviously, he also compensated you for your efforts,

25 is that right?

1  A    Absolutely.

2  Q    Did you, during this time period, 2006 to 2010, also work

3  for Con Edison, obviously?

4  A    Yes, I did.

5  Q    Did you -- withdrawn.

6        There came a point in time when you were arrested in

7  this case, is that right?

8        MR. ZISSOU:  Oh, there we are.  So this is --

9  A    The one before that, the one before.  The Staten Island,

10  New York.  This was really working as satellite office, what

11  meant Staten Island, New York.  I was his satellite office in

12  Staten Island.

13  Q    Right.

14  A    I am the individual that did the work from and that is

15  the presentation we gave overseas.

16  Q    And this is an organizational chart, I take it?

17  A    Yes.

18  Q    And while you were in -- I'm sorry, let me come back a

19  second.  While you were in these foreign countries, did you

20  meet with people?

21  A    Absolutely.

22  Q    Did you give presentations?

23  A    Every day.

24  Q    Did you take photographs, for example, of yourself and

25  Mr. Quiambao when you were there?

1  A    Mr. Quiambao took picture of me.  I never took picture of

2  myself.

3           MR. ZISSOU:  Can we have a couple of those?

4           (Exhibit published.)

5           MR. ZISSOU:  Let's see if we can bring that up.

6  BY MR. ZISSOU:

7  Q    What is this a photograph of, Mr. Razzouk?

8           (Exhibit published.)

9  A    This was --

10 Q    Who is in this photograph?

11 A    This was in Abu Dhabi.  I finish giving a presentation,

12 the individual in the middle he was in charge of the -- this

13 is a government representative for the electricals [sic] --

14 you know, he's in charge.  He's like, maybe, a minister of, I

15 don't know what you call him exactly, what's his title, but he

16 was in like in a higher government position.  As a matter of

17 fact, this is the actual individual who offered me $330,000 a

18 month salary that if I actually go and sign up a contract with

19 him to do some work over there that was going at the time.

20 Q    Are you in this photo as well?

21 A    Excuse me?

22 Q    Are you in the picture as well?

23 A    Yes, I am.

24 Q    Is Mr. Quiambao in the photo?

25 A    Yes, right on the other side of the -- the individual.

1   Q    And who are the folks?

2   A    And that Korean guy is --

3   Q    Mr. Rhee?

4   A    -- Mr. Rhee.  And this is what they call, he's like a

5   doctor at a university.  He used to be like one of the people

6   we dealt with when we went to Saudi Arabia and stuff.

7   Q    All right.  Now, did Mr. Quiambao also establish a

8   relationship with people in your family?

9   A    He was -- I consider him a family member.

10  Q    And did he attend family events with you?

11  A    Yes, sir.

12  Q    Did he meet your children?

13  A    Absolutely.

14  Q    Did your children have a name for him?

15  A    Uncle --

16  Q    What did they call him?

17  A    -- Rudy.

18  Q    Did they meet Uncle Rudy's wife?

19  A    Absolutely.

20  Q    Did they visit him at his place in the Poconos, for

21  example?

22  A    He visited our place and we visited his place.

23  Q    And this relationship went on for almost a decade, am I

24  right?

25  A    Over a decade.

1    Q    Did you ever threaten or promise to hurt him in any way?

2    A    No.

3    Q    Did you, in fact, make him the executor of your estate?

4    A    Yes.

5              MR. ZISSOU:  Can we have the will up, please?

6              (Exhibit published.)

7    BY MR. ZISSOU:

8    Q    And is this your Last Will and Testament?

9    A    Yes.

10   Q    And how did you come to make him the executor of your

11   estate?

12   A    I said I consider he's the only person I really called my

13   best friend.  He was a family to me since I didn't have a

14   family around.  He treated my family very well.  We always --

15   you know, my kids had a great time.  They used to look forward

16   when it is their birthday so they can actually sing with the

17   dog.  His dog used to sing happy birthday to them and they can

18   enjoy that very much, especially my youngest.  And when we

19   were traveling to Saudi Arabia I felt very uncomfortable.  At

20   the hotel we used to go to, there is like tanks outside, there

21   is Army, it's like protected, and and I didn't have a

22   comfortable feeling every time I traveled.

23              And after our first trip, we discussed, I said, You

24   know, I feel very uncomfortable inside.  And in Dubai it was

25   okay, it was fine, except Saudi Arabia I felt very

1    uncomfortable.

2    Q    Unsafe?

3    A    So he actually said, Do you have a will yet.  I said, No.

4    And I said, you know, I want you, of course, to take or look

5    after my family if in the event anything happen to me.  So

6    he's the person who arranged.  He knew the lawyer.  I didn't

7    know any lawyers or anything.  I never did any legal papers.

8    Q    So he referred you to the lawyer?

9    A    He actually was with me.  He went with me.  He met me

10   there.  He gave me the address, whatever it is, and he

11   actually met me at the lawyer's office, and we did that.

12            MR. ZISSOU:  Can we have the photos, the family

13   photos from this point?

14            (Exhibit published.)

15   A    This is my daughter's maybe Sweet 16.

16   Q    That is a photo of your daughter's Sweet 16 you said.

17   And  who is --

18   A    I'm not sure if it's Sweet 16 or something, one of the

19   affairs.  I'm not -- I mean he was in all the affairs, so I

20   don't know which.

21   Q    And is that --

22   A    They would probably know more than I do.

23   Q    Is that Uncle Rudy in the photograph?

24   A    This is Uncle Rudy and his wife Connie.

25   Q    And who were they sitting next to?

1   A     This is my daughter Danielle.

2         MR. ZISSOU:  Let's have another photo.

3         (Exhibit published.)

4   BY MR. ZISSOU:

5   Q     And who is in this photo may I ask?

6   A     This is in my house, and this is the house I live in

7   right now.  This is like in our family room and this is my

8   daughter Monique and his dog, Peachy, and Rudy Quiambao.

9         MR. ZISSOU:  Next.

10        (Exhibit published.)

11  Q     And who are these folks?

12  A     This is -- we were in the house in the Poconos.  This is

13  the au pair.

14  Q     Rudy's au pair or your au pair?

15  A     No, this is originally the au pair I tried to get take

16  care of my kids.  This is Monique, my daughter, and again this

17  is Peachy.

18  Q     That is Uncle Rudy's dog?

19  A     Mr. Quiambao's dog.

20        (Exhibit published.)

21  Q     This is you and your daughter, right?

22  A     Yes.

23        (Exhibit published.)

24  Q     And who are these folks?

25  A     This is in the house in the Poconos:  Mr. Quiambao, his

1   wife Connie, and Monique and Danielle.

2   Q    And would it be fair to say that, Mr. Razzouk, you have

3   many of these photos and many of them you have given to the

4   attorney for the Government some years ago?

5   A    Yes.

6            MR. ZISSOU:  I have no other questions.

7            MR. TUCHMANN:  Thank you, Your Honor.

8   CROSS-EXAMINATION

9   BY MR. TUCHMANN:

10  Q    Hello, Mr. Razzouk.  My name is Paul Tuchmann.  I am a

11  federal prosecutor.

12           You and I have never met before, correct?

13  A    Correct.

14  Q    So you just testified under oath about work that you did

15  for Mr. Quiambao, correct?

16  A    Yes.

17  Q    Yourself just said that none of that work led to any

18  contracts or income for Mr. Quiambao's company, correct?

19  A    That's what I know.

20  Q    You don't have any employment agreement with

21  Mr. Quiambao's company for that work, do you?

22  A    No.

23  Q    And you never sent him any invoices for work that you did

24  for that?

25  A    No.

1  Q    And you never got anything like a 1099 from his company

2  for that money?

3  A    No.

4  Q    So you testified that you first went overseas, I think

5  you said in 2006?

6  A    Correct.

7  Q    And that the work started a little more in earnest around

8  2007, is that right?

9  A    Yes, but 2006 I did not start work for Rudell, it was as

10 I said, I was sent by Con Edison.

11 Q    Correct, and so you started doing this work overseas for

12 Rudell in 2007 or was it later?

13 A    No, we start putting the brochures in 2006, like

14 September 2006 and we traveled --

15 Q    Right.

16 A    -- in 2007.

17 Q    You have this company MDM Capital, correct?

18 A    That's correct.

19 Q    You were receiving checks from Mr. Quiambao's companies

20 into MDM Capital since the year 2000, correct?

21 A    Maybe 1999, too.

22 Q    Right.  And so that was long before you began even

23 thinking about doing work overseas with Mr. Quiambao in 2006,

24 correct?

25 A    Yes.

1  Q    And I think you just testified that you -- that

2  Mr. Quiambao kind of, I guess, pulled the plug, to use a

3  phrase, on this work overseas in June of 2010, correct?

4  A    Yes.

5  Q    And you were arrested in January 2011, right?

6  A    Yes.

7  Q    Okay.  But you continued to receive checks from

8  Mr. Quiambao's companies into MDM Capital between June of 2010

9  and your arrest in January of 2011, correct?

10 A    I was doing work.

11 Q    I'm sorry?

12 A    I was doing work for him.

13 Q    You were doing it.  So even though he had pulled the plug

14 on the overseas work, you were doing other work for him?

15 A    We were preparing to go to the Philippine and we started

16 to actually do some work and he gave me the layout or -- or

17 the design criteria for whatever the Filipino electrical

18 system looked like.  And he wanted me to start now because the

19 Aquino son of the late Mr. Aquino became a president of the

20 Philippine and this is why really he pulled the plug from the

21 Middle East because he thought now in the Philippine he knows

22 the Aquino and he will have -- definitely have an opportunity,

23 it is like almost a guarantee, that he will get work there.

24 Q    Okay.

25 A    So yes, I was working for him still.

1  Q    So do you know those checks, the ones that you received

2  in the second half of 2010 into 2011, those had memo notations

3  that were associated with Con Ed jobs, correct?

4  A    I didn't know that.

5  Q    You didn't know that.  You thought those notations were

6  for something related to something else?

7  A    I didn't see the notations.

8  Q    Well, did you have the checks?  Did you see them before

9  you deposited them?

10  A    Well, I used to, as I told the prosecutor before, I used

11  to get an envelope and go home, turn the check around, sign

12  them, give them either to my -- to my wife or to my son and

13  they will actually deposit them.

14  Q    And so you were receiving these checks with these

15  notations for over four years and you never actually looked at

16  them, is that your testimony?

17  A    Exactly.

18  Q    Okay.  So you received approximately between, I think you

19  said, starting in 1999 going until January of 2011,

20  approximately $13 million into the MDM business from

21  Mr. Quiambao's companies, correct?

22  A    I don't know the amount.

23  Q    Does approximately 13 million sound fair to you?

24  A    (No response.)

25  Q    Just call it 12 million, how about that?

1  A    Whatever, okay.

2  Q    And so all of that money you got for other work for

3  Mr. Quiambao, is that what you're saying?

4  A    Yes, sir.

5  Q    And you say that -- well, sir, do you remember when you

6  pleaded guilty before Judge Mauskopf on June 10th, 2011?

7  A    Yes.

8  Q    Do you recall that you were sworn in and placed under

9  oath at that time?  Do you recall that?

10 A    Most likely I did, but I don't remember anything.  Most

11 likely.

12 Q    You don't remember anything that day?

13 A    Most likely I was sworn in, yes.

14 Q    Okay.  And you had an attorney there with you at that

15 time, correct, who was representing you?

16 A    Yes.

17 Q    And you told the judge that you were satisfied with that

18 attorney's representation, correct?

19 A    I don't think it was asked.

20 Q    You don't think it was asked.

21       So if the Court said, Judge Mauskopf said:  Have you

22 been satisfied with the efforts of Mr. Morvillo, that's your

23 attorney then, correct?

24 A    Yes.

25 Q    On the efforts that Mr. Morvillo has made on your behalf

1   to this point; and you said, Yes, I am.

2            Do you remember that?

3   A    You're reading it, so I must have said it.

4   Q    Well, and the Court said:  Do you feel you need any more

5   time to discuss with him the waiver of indictment or guilty

6   plea; and you said, No; and that was all under oath too,

7   right?

8   A    Yes.

9   Q    Okay.  And you were told multiple times during that plea

10  hearing by the judge that you were charged in Count One with

11  bribery, correct, she used the word bribery a number of times?

12           For example on page 19 it says Count One charges you

13  with bribery.  Do you recall generally the judge --

14  A    Yes.

15  Q    -- talking to you, telling you that you were pleading

16  guilty to bribery?

17  A    To my understanding of bribery, yes.

18  Q    And you said during your plea allocution that during this

19  period, I mean the period charged in the Information of 2006

20  through 2011, during this period I accepted United States

21  currency from Rudell and Associates.  I received these

22  payments, in part, with the intent to influence with respect

23  to awarding jobs to Rudell in excess of $5,000.

24           You said that under oath, right?

25  A    Yes.

1  Q    Now, at that time when you said that, you knew all these

2  things that you know now about what you're claiming now about

3  why you received this money from Mr. Quiambao, correct?

4            MR. ZISSOU:  Objection.

5  BY MR. TUCHMANN:

6  Q    Or have you learned it since then?

7            MR. ZISSOU:  I object to the form of the question.

8            THE DEFENDANT:  Excuse me.

9            THE COURT:  Overruled.  Go ahead.

10           Do you understand the question?

11 A    Could you repeat it?

12 Q    At the time that you pleaded guilty in January of 2011 --

13 A    That's correct.

14 Q    -- you knew that you had traveled to the Middle East --

15 A    Of course.

16 Q    -- for Mr. Quiambao --

17 A    Yes.

18 Q    -- in 2007, 2008?

19 A    Yes.

20 Q    Right.  But you didn't say anything about that at the

21 time you pleaded guilty under oath, correct, in January 2011?

22 A    I don't remember, no.  I don't know.

23 Q    Do you think you might have said something to the Court

24 during the plea allocution about the fact that this money was

25 for --

1  A    No, I --

2  Q    -- the --

3  A    No.

4  Q    You didn't say that?

5  A    No.

6  Q    Mr. Razzouk, before you pleaded guilty you had a number

7  of meetings with prosecutors and federal agents, correct?

8  A    Yes.

9  Q    And during those meetings you said that you had

10 instructed Mr. Quiambao to bid low on jobs to guarantee that

11 Rudell would be awarded the project?

12 A    No.

13 Q    You never said that to the agents?

14 A    That could not happen.

15 Q    Well, that is not my question.

16       My question is did you say to the agents that you

17 had instructed Quiambao to bid low on jobs to guarantee that

18 Rudell would be awarded a project?

19 A    No.

20 Q    You never said that to the agents?

21 A    No, sir.

22 Q    And so if that is in multiple reports of the meetings

23 with the agents, it still didn't happen?

24       MR. ZISSOU:  Object to the form of the question,

25 speculative, if it's.

1        THE COURT:  Overruled.  Go ahead, you can answer the

2   question.

3        THE DEFENDANT:  Could you repeat that question?

4        MR. TUCHMANN:  Sure.

5   BY MR. TUCHMANN:

6   Q    If there are reports that the agents made of those

7   meetings they had with you before you pleaded guilty, and

8   those reports said that you stated on multiple occasions that

9   you had instructed Quiambao to bid low on jobs to guarantee

10  that Rudell would be awarded a project, it didn't happen even

11  though it's in the reports, correct, is that what your

12  testimony is?

13  A    Yes.

14       MR. TUCHMANN:  Nothing further, Your Honor.

15  REDIRECT EXAMINATION

16  BY MR. ZISSOU:

17  Q    Mr. Razzouk, did you tell when you were proffering to the

18  Government, did you tell them that you did work for

19  Mr. Quiambao that had nothing to do with Con Ed?

20  A    All the time.

21  Q    Did you tell them that you did lots of work for him

22  overseas on this venture you told the judge about?

23  A    Yes, sir.

24  Q    Is this what you told them literally from the beginning

25  when you started talking to them?

1   A    From day one.

2   Q    Did you also explain that the process at Con Edison made

3   it virtually impossible for the scam the Government alleged

4   happened here to work the way they say it did?

5   A    It could not happen.

6   Q    Correct.  Did you tell them that?

7   A    Yes.

8              MR. ZISSOU:  I have no other questions.

9              MR. TUCHMANN:  Just one moment, Your Honor.

10             THE COURT:  Thank you.

11             (Pause.)

12             MR. TUCHMANN:  Nothing further.

13             THE COURT:  Okay.

14             THE COURT:  Thank you very much.  You are excused.

15             (Witness steps down.)

16             MR. ZISSOU:  May I just have one moment, Judge?

17             THE COURT:  Yes.

18             (Pause.)

19             MR. ZISSOU:  Judge --

20             THE COURT:  I'm sorry, go ahead.

21             MR. ZISSOU:  Judge, what I proffer through Grace

22  Razzouk is that during all of the time that she knew and

23  observed the relationship between Mr. Razzouk and

24  Mr. Quiambao, and I think she met them sometime around 2001,

25  that she never heard a dispute, she never heard any arguments,

1   she never heard anything other than two individuals working on

2   a joint venture and working together.

3             Happy to call her for that, to establish that.

4             THE COURT:  No need.  No need I am sure.

5             MR. ZISSOU:  And, again, the kids would basically be

6   the same.  They would talk about the dog and Uncle Rudy.  That

7   is the proffer, but I understand I think Your Honor has

8   accepted that.

9             THE COURT:  Let me next turn just to the advisory

10  guidelines.

11            As to the advisory guidelines, it is apparent from

12  defense counsel's objections to the pre-sentence report that

13  virtually every aspect of defendant's guidelines calculation

14  is now disputed.  More specifically, counsel contests the base

15  offense level of the crime of conviction characterizing his

16  client's plea as one to receipt of gratuities rather than

17  receipt of bribes.  He also disputes the loss enhancement

18  directed by Section 2C1.1 of the guidelines, which is

19  determined by the value of the benefits his client received in

20  the bribery scheme.

21            Moreover, by omitting the enhancement from his own

22  calculations, counsel objects to the propriety of imposing on

23  his client an obstruction enhancement.  Similarly, by

24  including the deduction in his calculation he disputes the

25  propriety of withholding from his client an acceptance of

1   responsibility deduction.

2          Turning first to the base offense level.  It is

3   indisputable, both from the charge in the Information to which

4   the defendant pled guilty and the defendant's plea allocution

5   as corroborated by statements the defendant made in his

6   various proffers to the Government, that defendant entered a

7   guilty plea to acceptance of bribes in violation of 18 U.S.C.

8   Section 666(a)(1)(B), not acceptance of mere gratuities.

9          For example, at his allocution when Judge Mauskopf

10  asked him what conduct he engaged in that established his

11  guilt of "the bribery charge under Count One," Razzouk

12  attested that in his managerial job at Con Ed, which involved

13  overseeing the design of the electrical control systems in New

14  York City and Westchester for Con Ed, he oversaw competitive

15  bidding system by which Con Edison, essentially, awarded

16  contracts to private contractors.  In that capacity he

17  allocuted he "accepted United States currency from Rudell and

18  Associates, in part, with the intent to influence the awarding

19  of jobs to Rudell."  Moreover, he averred that he

20  "specifically provided to Rudell" by, among other things,

21  "providing Rudell with additional Con Edison work, assisting

22  Rudell with bids, and approving payment to Rudell on contracts

23  with Con Edison for things he was not entitled to approve.

24          During his proffers Razzouk further elaborated that

25  he "agreed to take part in a kickback scheme with Quiambao" in

1   which, among other things he "invited Rudell to make more

2   bids" than any other contractors, "which increased Rudell's

3   chances of getting more work" from Con Ed; that he reviewed

4   and edited Con Ed's bids prior to their formal submission and

5   "warned Quiambao when there was a problem" to enable Rudell

6   "to straighten it out before it was too late," presumably

7   ensuring that Quiambao not lose the contract; that he would

8   give Quiambao advance information about projects, further

9   advantaging Rudell's opportunity to be awarded Con Ed work;

10  that he coached Quiambao "to bid jobs low to guarantee that

11  Rudell would secure the project" assuring Quiambao that his

12  group would take steps "to make up for the low bid" to ensure

13  that Rudell would make profit from the job.

14          That is Exhibit B pages 5 to 8.

15          In fact, although Razzouk claimed not to have

16  initially noticed the notations in the memo section of the

17  checks Quiambao paid him, he acknowledged during his 2011

18  proffers that he "now knows that the memo section did list Con

19  Ed jobs that he had helped Rudell on."  Exhibit B, page 7.

20          In a subsequent proffer section, Exhibit C, Razzouk

21  similarly stated that he assisted Quiambao to secure more Con

22  Ed contracts by inviting Quiambao to bid on every job; that he

23  also assisted Rudell by adding more work onto existing

24  contracts for which Rudell would be paid at an increased rate.

25  That's Exhibit C, page 3.  In this proffer session Razzouk

1    admitted unambiguously that he did these favors for Quiambao

2    "because Quiambao was giving him a lot of money" and because

3    he "knew the more extras he gave to Rudell, the more money

4    Quiambao would give him."  That's Exhibit C, page 3.

5          This record of evidence consisting of Razzouk's own

6    admissions, both under oath at his guilty plea and in proffers

7    to the Government, amply proves by a preponderance that

8    Razzouk accepted money from Quiambao as a quid pro quo with

9    the intent to be influenced in connection with the business of

10   Con Ed.  Moreover, it is well settled that bribery "can be

11   accomplished through an ongoing course of conduct, so long as

12   evidence shows that the favor and gifts flowing to a public

13   official are in exchange for a pattern of official actions

14   favorable to the donor.  That is United States versus Bahel,

15   B-A-H-E-L, 662 Fed. 3d 610 at 635 to 36, Second Circuit 2011.

16   Accordingly, the guideline determining the base offense level

17   for Count One is Section 2C1.2, fixing the base offense level

18   at 12.

19         Turning to the only enhancement with respect to

20   which there is no dispute, defense counsel, although

21   inaccurately characterizing each payment to Razzouk as a

22   gratuity in lieu of a bribe, acknowledges that there was more

23   than one payment to his client resulting in a two-level

24   offense characteristic enhancement.  The enhancement based on

25   the value of payment under Section 2C1.1(e)(2) is, by

1   contrast, hotly contested.  Without record citation or

2   reasoning, defense counsel simply asserts in his objections to

3   the pre-sentence report that the amount Quiambao paid his

4   client "was more than $95,000, but not more than $150,000."

5   An assertion that under guideline 2B1.1(b)(1) calls for an

6   eight -level enhancement.  Nothing in the present record,

7   however, supports such a conclusion or assertion.  On the

8   contrary, the existing evidence establishes by a preponderance

9   that an extremely conservative estimate of Quiambao's bribery

10  payments to Razzouk substantially exceeds $3-1.2 million

11  requiring an enhancement of at least 18 levels.  Powerful

12  support for this loss amount is found not only in the

13  statements Razzouk made in his proffers to the Government,

14  referring now to Exhibits B and C, but also in statements and

15  estimates Quiambao made to the Government, Exhibit H.

16          Quiambao's pre-arrest statements and Razzouk's

17  post-arrest admissions corroborate each other concerning the

18  general magnitude of the payments, that is many millions of

19  dollars; the duration of time over which the payments were

20  made, that is over many years; and the purpose of the

21  payments, that is bribes to induce increased business from Con

22  Ed.

23          More conclusively, however, voluminous documentary

24  evidence of the payments, the checks by which the payments

25  were made, identify with specificity the amount paid and the

purpose for which they were made.  These checks record that a

total of, at least, $8 million in checks from Quiambao's

entities to Razzouk's company MDM Capital compensated Razzouk

for his assistance to Rudell in connection with specific

identifiable Con Edison jobs on which Rudell was the

contractor.  For example, Rudell issued a check to MDM Capital

on April 30, 2007 for $40,075 with the phrase "various

projects asterisk" in the memo line of the check.  According

to Con Ed's business records, the defendant oversaw a project

which requires "review of shop and GE drawings at Astor."

That's at page 3 of the Government's supplemental submission.

Rudell issued a check to MDM Capital on June 29, 2007 for

$45,000 with the phrase "subcontractor Cherry and E 13 Street"

written in the memo line.  According to Con Ed's records, the

defendant oversaw a project which required "removal of

transformer 3 at Cherry Street" page 4.

On February 28, 2008 Rudell issued a number of

checks to MDM Capital for various amounts, including one for

$7,740; another for $19,435; and another for $11,000.  All of

these checks had descriptions in their respective memo lines

that corresponded to projects the defendant awarded to Rudell

and that Con Ed had similarly described in their internal

records.

The same is true for the checks issued by Quiambao's

shell corporation Rudicon to MDM after 2009 when, as both

1   parties acknowledge, there was a crackdown on corruption at

2   Con Edison.  On November 28th, 2009 Rudicon issued a check to

3   MDM for $53,000 that had the phrase "subcontractors' fee-PST

4   Manhattan" in the memo line.  In its internal records Con Ed

5   has a record of a project Razzouk oversaw at that time that

6   was awarded to Rudell, which Con Ed described as "provide

7   engineering and design drafting services to scan, print and

8   prepare PST redline markup drawings packages Manhattan

9   substation."  And the list goes on.  There are hundreds of

10  checks, some for as little as $4,700 and others for over a

11  hundred-thousand dollars.  Not all of the checks reference

12  specific projects, but there are an overwhelming number that

13  do.  The pattern is clear, it simply strains credulity that

14  these checks were not bribes for projects that Con Ed

15  ultimately awarded Rudell and that the defendant either worked

16  on or oversaw.

17          I give no credence to defense counsel's most recent

18  argument that Quiambao referenced Con Ed projects in the memo

19  lines of the checks he wrote to MDM to set Razzouk up in the

20  future, nor do I find credible the defendant's testimony

21  before me today that the money he received from Quiambao was

22  entirely or even to any significant extent as a result of

23  legitimate work he did for Quiambao's companies.

24          Defense counsel's extremely low estimation of the

25  amount of money his client accepted in bribes is also belied

1    by the defendant's consent to a forfeiture money judgment in

2    the amount of $6,515,809, money that his plea agreement

3    described as "property, real or personal, constituting or

4    derived from proceeds traceable to a violation of 18 U.S.C.

5    Section 666(a)(1)(B).  That's Exhibit F, paragraph 13.

6    Defendant's willingness to forfeit over $6 million strongly

7    corroborates the conclusion that he unlawfully received at

8    least that amount.

9              Given the abundance of evidence that Razzouk

10   received over $3.5 million in bribes during the period of time

11   covered by his conviction, I conclude that the offense level

12   should be increased by 18 levels.

13             A two-level enhancement for obstruction of justice

14   under guideline 3C1.1 is also well supported by a

15   preponderance of the evidence in the record.  On December 17,

16   2015 after he pled guilty, the defendant arranged to meet with

17   Quiambao in Atlantic City.  Unbeknownst to the defendant,

18   Quiambao was wearing a recording device.  In the conversation

19   that ensued, Razzouk assured Quiambao that he would lie at

20   Quiambao's trial evincing his intent to give perjured

21   testimony, and tried to persuade Quiambao to testify

22   perjuriously in the same matter.  Much as defendant does now,

23   Razzouk sought in that conversation to persuade Quiambao to

24   confirm his story that all of the money Quiambao paid Razzouk

25   was for legitimate overseas work, not for unlawful influence.

1    Each time Quiambao protested "that's not true," Razzouk

2    implored Quiambao to make sure their stories were consistent

3    with the aim, as identified by Razzouk, to "destroy" the

4    Government's case.  Razzouk's willful breach of his

5    cooperation agreement with the Government by his determination

6    to commit and suborn perjury at Quiambao's trial warrants an

7    obstruction of justice enhancement under 3C1.1.  Under that

8    guideline, the obstructive conduct related to the defendant's

9    own offense of conviction, in that had he succeeded in

10   committing the suborning perjury, the perjury intended as

11   falsehoods would have been relevant to his own sentencing.

12   See United States versus Cassiliano, C-A-S-S-I-L-I-A-N-O, 137

13   Fed. 3d 742 at 746 to 47, Second Circuit 1998.  Finding that

14   an obstruction of justice enhancement was warranted where

15   defendant's conduct not only impeded another person's case,

16   but could have affected the Government's investigation into

17   her own.

18        The obstructive conduct also related to a "closely-

19   related offense" within the meaning of the guideline, in that

20   Quiambao and Razzouk were, in effect, co-conspirators in the

21   same bribery scheme.  See United States versus McKay, 183 Fed.

22   3d 89 at 95 to 96 (Second Circuit 1999) explaining that the

23   Sentencing Commission's November 1, 1998 amendment to 3C1.1

24   "instructs that the instruction must relate either to the

25   defendant's offense of conviction, including any relevant

1  conduct, or to a closely-related case." Moreover, Razzouk's

2  conduct eviscerated the Government's case against Quiambao.

3  The Government could not proceed to trial against Quiambao on

4  the counts for which Razzouk was the necessary witness, which

5  involved the bulk of the bribes that Quiambao made. For the

6  same reasons, I find that defendant does not deserve a two-

7  point downward adjustment for acceptance of responsibility.

8  Although Razzouk pled guilty, he subsequently engaged in

9  obstructive conduct that rendered his cooperation, in large

10 measure, valueless and undermined the Government's prosecution

11 of Quiambao.

12        His prior acceptance of responsibility is further

13 undercut by the positions he has taken at sentencing that are

14 wholly inconsistent with his representations of his guilt at

15 proffer sessions with the Government and under oath at his

16 guilty plea allocution. By denying without explanation all of

17 the criminal conduct that he previously admitted, which has

18 also been overwhelmingly established by the evidence in the

19 record, defendant has demonstrated that far from being

20 remorseful for his criminal actions, he has repudiated any

21 prior expression of acceptance of responsibility. As is well

22 within its discretion, the Government has determined that a

23 potential third point downward adjustment for acceptance of

24 responsibility should not be awarded.

25        Given these determinations, I calculate defendant's

1   advisory guidelines as follows:

2           As to Count One, the base offense level is 12.  The

3   existence of more than one bribe adds two levels.  The loss

4   enhancement corresponds with 18 levels, and there is a

5   two-level enhancement for obstruction of justice.  The offense

6   level is, therefore, 34.

7           As to the three tax evasion counts, Counts Two

8   through Four, defendant and the Government agree that the

9   adjusted offense level is 24.

10          Given the application of the grouping guidelines, I

11  conclude that defendant's advisory guidelines imprisonment

12  range is 151 to 188 months.

13          Finally, let me simply conclude that is my finding

14  with respect to the advisory guidelines, and I am sure you

15  have a great deal more to say.  Go ahead.

16          MR. ZISSOU:  Well, Judge, just a couple things, if I

17  might.  I am not sure it's appropriate.  It might be within

18  your discretion to credit the agents' notes of proffer

19  statements without an opportunity to cross-examine.  I think

20  we made it --

21          THE COURT:  You did not ask for the agents'

22  testimony.  I can consider at sentencing pretty much anything

23  and I can make up my own mind as to the probative value.

24          MR. ZISSOU:  I am sure you can, but earlier you

25  remarked about documents, submissions not being sufficient

1   without --

2          THE COURT:  No, what I was remarking was that I did

3   not want to see a video that was purely an argument.  I do

4   understand that the agents' notes are not under oath, but for

5   purposes of sentencing not everything I consider has to be

6   under oath.  I do not consider it argument.  I considered your

7   video argument.

8          MR. ZISSOU:  Well, nor were the notes ever shown to

9   Mr. Razzouk to confirm or not they are the agents' recollections

10  of what happened.  Much of the information is not included.  I

11  mean Mr. Razzouk has repeatedly --

12         THE COURT:  You know what, your exception is noted.

13  Go on.

14         MR. ZISSOU:  All right.  Well, that's all I'll add

15  in so far as the advisory guidelines.

16         THE COURT:  No, no, I assume you want to make a

17  statement as to the statutory sentencing guideline.

18         MR. ZISSOU:  Yes, I do.

19         Well, look, I think we put this in our sentencing

20  memorandum too, but the man sitting before you is not simply

21  the person who was engaged in the conduct that Your Honor has

22  found to be whatever it is you found it to be.  He has been

23  through an extraordinary amount in his life.  His background,

24  his upbringing, he's overcome a lot.  Much of that has been

25  provided to you.  Your Honor knows that there are mental

1  health issues here that I am not going to elaborate.  I know

2  that they were directed by the Court and Pretrial recommended

3  them.  I am not going to discuss them in the courtroom.  He

4  has gone through some events in his lifetime with the loss of

5  his first wife.  He is a man who often sees the world

6  differently from the way others see it.  He is the kind of

7  man, I've noticed myself that he makes strong attachments to

8  certain individuals, and that was the case with Mr. Quiambao.

9  Mr. Razzouk, his belief in the strength of their relationship,

10  best friends Mr. Razzouk called him his best friend, his only

11  best friend, does in many ways cause him to sometimes fail to

12  see things that other people might find obvious.  That

13  relationship that they shared, his extraordinary commitment to

14  him, the part, the manner in which Mr. Quiambao made himself a

15  part of Mr. Razzouk's family really did affect the way

16  Mr. Razzouk sees and saw the world.

17          What other person has a -- what else can be said

18  about making the executor of your estate in whose trust you

19  place the lives of your family, your children?  It really to

20  me reflects the fact that some folks see things one way and

21  ten other people may see them a different way.  And

22  Mr. Razzouk's extraordinary commitment to Mr. Quiambao can

23  only been explained in this way. .  He was in every way, and I

24  know Your Honor has heard this before, but he was every way a

25  part of their family.  And Mr. Razzouk on many levels felt a

1  level of friendship and connection that he never felt in his

2  life.  This was at a time when, of course, as you know, his

3  first wife, the mother of his children, died at a very young

4  age after what turned out to be a brief illness, dying in his

5  arms.  His family members when he was younger, saw them killed

6  as he grew up under circumstances that the rest of us growing

7  up in the United States for the most part can't even

8  contemplate in the middle of a civil war.

9         Look, I have to tell you he is a caring, generous,

10  committed person, even to the point where, frankly, he looked

11  forward to our weekly meetings.  He would come to my office

12  and we would spend Saturday together and his wife Grace would

13  be there.  He'd buy lunch for everybody and talk about things

14  that happened in a way that -- well, let's just say, logically

15  one might see differently.  Numbers on checks, that has always

16  been from the beginning what the Government's view of this

17  case was, numbers on checks meant everything.  Nothing ever

18  changed after that.  Whatever Mr. Razzouk said, whatever he --

19  whatever recollection he had, it wasn't what theirs was.

20         Now, look, I don't know.  I wasn't there.  I don't

21  know what went on between these two men.  I don't know why

22  they traveled so often together.  I do know that they planned

23  great things, and even Mr. Razzouk will tell you that.  And if

24  he was asked I guess he would tell you that Mr. Quiambao was

25  too generous, paid him too much, but he did an extraordinary

1  amount of work.

2          As I said, his wife would testify as to all the

3  conversations they had of Mr. Razzouk constantly doing work

4  for Mr. Quiambao.  This is not a man who went about an effort

5  to undermine his employer.  His recollection of what happened

6  was, despite the relationship that he had with Mr. Quiambao,

7  he always made sure to protect his employer.  He gave more --

8  I thought I put this in my objection letter, I acknowledged

9  it, that what he did was he allowed, because of their

10 relationship, because of their friendship, he allowed

11 Mr. Rudell [sic] more opportunities to bid.  But in his mind,

12 the actual quid pre quo was Con Ed was properly served.  They

13 didn't lose money.  Mr. Quiambao did the work.  And we've gone

14 on and on about this insofar as the restitution submissions, I

15 know you are not to that yet, but that's what it looks like.

16 It looks abundantly clear that Con Ed suffered no loss.  And

17 that's because, again, as we submitted and Mr. Razzouk has

18 said from the beginning, he made sure that that was so.

19         And while it's true, and Your Honor has found that

20 Mr. Quiambao improperly paid Mr. Razzouk in whole or in part,

21 that's really entirely up to the Court, Con Ed didn't suffer a

22 loss.  They just didn't.  And they have, despite their

23 efforts, not proven any loss in my view, and that's in large

24 part because Mr. Quiambao did the work.  And Mr. Razzouk,

25 among other people at Con Ed, favored Mr. Quiambao because of

1   the work that he did.

2          And so in Mr. Razzouk's mind, whatever intent he

3   formed or did not form, he was able to keep the relationship

4   separate by ensuring that his employer was protected.

5          Was it inappropriate for him to betray his employer?

6   Absolutely.

7          Was it something he should have communicated to them

8   that he was having this relationship with Mr. Quiambao?  No

9   question about it.

10         But in his mind, he genuinely believes that is how

11  this played out.  He is not, as Your Honor might otherwise

12  conclude without this understanding of him, of the kind of man

13  that he really is, Your Honor might otherwise conclude that

14  this was just an act of greed, and it was not.  Simple as

15  that.  And that's why I've said in the submission from the

16  beginning that the loss to Con Ed is a fundamental sentencing

17  factor.  It's fundamental 3553(a) factor, which is why we

18  spent so much time on that focus alone because, obviously, I

19  understand that reasonable people may differ about the

20  interpretation of notations on the check, and I understood the

21  difficulty of proving how much was legitimately earned and how

22  much was not, if anything.

23         The guidelines here are wildly overstated.  He's a

24  first-time non-violent offender.  He is 62 years old.  And the

25  likelihood of recidivating at his age is non-existent

1   according to the numbers that the Sentencing Commission keeps.

2   A lengthy jail sentence is hardly necessary in this case.

3   Although I understand Your Honor has to consider all of the

4   factors set forth in 3553(a), I do not think a lengthy jail

5   sentence is appropriate here.  Indeed, I think a period of

6   probation with a long period of house arrest would be

7   appropriate.  He has never seen the inside of a jail.  He has

8   been through an extraordinary amount.  The acts that form the

9   basis of this Indictment, you know, I know you might look at

10  me in this, but I am only responsible for the last eighteen

11  months.  The first five or six years or seven years was all on

12  the Government.  The tax events were '7, '8 and '9, it's 2018.

13  The arrest was in January of 2011.  We are talking about

14  almost a decade since the acts that gave rise to the charges

15  in this case have occurred.  Clearly, absent more, the

16  imposition of a lengthy jail sentence under those

17  circumstances seems to me resulting in a sentence greater than

18  necessary and would violate Section 3553(a) of Title 18.

19          So for all of those reasons, Judge, notwithstanding

20  the rather litigious circumstances of this case and, frankly,

21  it's not like I wanted to be in this position.  When I first

22  took over this case it was August of 2016 or so, the first

23  thing I did was try to, okay, let's see if we can fix this.

24  And along the way, you know, there were discussions about,

25  well, you know, he really did provide substantial assistance

1  and that's how the sentencing memorandum is going to read and

2  we are not going to object to acceptance of responsibility.

3  But things changed, whether it was my fault or Mr. Tuchmann's

4  fault that we ended up litigating, and it got out of hand.

5  But it's not as if I wanted to end up where we are now, nor

6  did Mr. Razzouk.  There could have been an opportunity to

7  resolve this without the extensive litigation, but frankly,

8  Judge, no one on that side was ever inclined, after

9  Mr. Tuchmann's predecessor, to do so.  No one ever -- no one

10  ever suggested after she left that there were issues that we

11  could resolve.  And, of course, Your Honor knows that along

12  the way I was trying to get status conferences so I could get

13  a sense of how could we resolve some of these issues, rather

14  than having to preserve every single legal issue that I could

15  imagine.  And it was only, frankly, as you know, recently when

16  based on a third-party request that the Government even

17  suggested that they -- that the Asset Forfeiture Unit might be

18  willing go along with the rescission.  It's something I've

19  been suggesting for years, and no one listened.  As soon as

20  the third-party application made just last week, and now

21  they're willing to be open-minded.  That was always a no.  So

22  there is a reason we got to this position.

23          THE COURT:  The application was actually made a long

24  time ago, many, many years ago, long before I became

25  associated with the case.

1          MR. ZISSOU:  I beg your pardon, Judge?

2          THE COURT:  Many years ago, many years before I

3    became associated with the case.  It was over five years ago

4    that the application was made.  I just wanted you to

5    understand it did not just happen.

6          MR. ZISSOU:  Oh, and I wasn't in there.  I can only

7    tell you --

8          THE COURT:  It was on the docket.

9          MR. ZISSOU:  Oh, yes, I understand, the request for

10   the ancillary proceeding.  But the willingness of the

11   Government to consider it, that's a new event as far as I am

12   concerned and it was only -- it was only based on

13   Mr. Tuchmann's letter filed last week that the folks at the

14   DOJ are willing to give it some consideration before Your

15   Honor makes whatever rulings are appropriate in this case.  So

16   it's not as if we weren't there.  It's not as if we've

17   purposely got into the weeds and tried to litigate every

18   conceivable issue.  We did this because in the end there

19   really was nothing in the way of alternative.  And

20   notwithstanding anything, and even if Your Honor does not take

21   into consideration that as a 3553(a) factor, there is more

22   than enough here to justify or I should say there is simply

23   not enough here to justify a lengthy custodial sentence, given

24   the circumstances; his age, lack of prior criminal history,

25   and the matters that I discussed and I would urge Your Honor

1   not to impose such a sentence.

2           THE COURT:  Thank you.

3           Mr. Razzouk, is there anything that you would like

4   to say?

5           THE DEFENDANT:  No, Your Honor.

6           MR. ZISSOU:  He said no, Your Honor.

7           THE COURT:  Mr. Tuchmann.

8           MR. TUCHMANN:  Thank you, Your Honor.

9           Where to begin in this case?  Well, may I stay

10  seated?

11          THE COURT:  Certainly.

12          MR. TUCHMANN:  Thank you, Your Honor.

13          Before we even kind of get to the sentencing, just

14  one note with respect to the sealing of submissions.  I think

15  there were a couple of submissions that were filed under seal

16  by the defense.  While the Government has no objection to

17  redacting them to --

18          THE COURT:  That's fine.

19          MR. TUCHMANN:  -- keep personal information out.

20          THE COURT:  That is something I forgot to address,

21  but those should be unsealed.  If there is something

22  particular that you want redacted --

23          MR. ZISSOU:  I will take care of it.

24          THE COURT:  -- let me know.

25          MR. TUCHMANN:  I would just like to respond to a

1    couple of points that were just made by counsel.

2            The idea that this is somehow on the Government

3    because the defendant can't tell the truth and that,

4    therefore, he has to litigate everything, it's absurd.  It is

5    absolutely absurd.  The defendant is in this position because

6    he is taking positions that are contrary to the truth and to

7    the evidence.  There is no one else responsible for the

8    litigious nature of how this process has gone than him.  He

9    submitted objections to the PSR in which he denied that he

10   committed the crime that he allocuted to so clearly under

11   oath, and then has the nerve to complain that he is not

12   getting acceptance points after he's now denying that he

13   committed that crime.  It boggles the mind, really.  That's

14   why we are here and in this position.  Once the defendant took

15   those positions, of course the Government is going to respond

16   with the truth as corroborated by the evidence of which, as

17   Your Honor noted, it's not just the numbers on the checks,

18   notations on the checks.  Obviously, devastating evidence that

19   they are, there is a lot more evidence than that.  I won't go

20   through it, Your Honor already has done that, but I just

21   wanted to make those points to begin.

22            With respect to the sentence, I guess the first

23   thing is I want to make sure I don't need to, I feel the Court

24   is obviously aware in considering it, before we get to the

25   sort of post-plea conduct, the underlying offense conduct is

1    egregious:  $13 million in bribes over the course of a decade

2    as part of the relevant conduct, over a decade.  It is an

3    enormous amount of money, a long-standing scheme.  It harmed

4    Con Ed and its rate payers and stakeholders.  It's a very

5    serious crime.  So, obviously, we can't lose, shouldn't lose

6    site of that, but also what makes this case so uniquely

7    egregious is the nature of the obstructive conduct.

8          I have been here for ten years in the office and

9    never heard of anything quite like it in its -- and just so

10   damaging.  The Government's process of using cooperating

11   witnesses to make important cases.  We talk about general

12   deterrence.  It's important for there to be general deterrence

13   with respect to the underlying criminal conduct, but it's as

14   important, if not more, in this case that there would be

15   general deterrence considered for this sentence and

16   considering what the defendant did in connection with his

17   cooperation and his obstruction.

18         The Government indicted someone on serious felony

19   charges because of his information and because of what he did

20   by going behind the Government's back to try and suborn

21   perjury, to propose perjury, to propose obstructing Quiambao's

22   case, the level of interference and obstruction of the

23   criminal justice process is just hard to overstate what he

24   attempted to do, and then lie about it to the Government when

25   he first came back after the meeting at the hotel and to tell

1   the Government that this meeting was not his idea, that it was

2   Quiambao's idea.  It was only because, only because

3   Mr. Quiambao recorded the conversation that the Government is

4   able to truly understand what happened.  The breach of trust

5   is so egregious it needs to be punished and it needs to be

6   deterred.

7           The other thing which is so egregious about this

8   case is the willful denial of responsibility in the face of

9   such overwhelming evidence.  After a guilty plea it's unheard

10  of in my experience and it just, again, demonstrates a

11  disrespect for the whole process.  He just perjured himself

12  again today before Your Honor.  It cannot be countless.  It

13  cannot.  You know, Mr. Zissou just talked about how there

14  wouldn't be recidivism.  I mean I think we know that those

15  studies are really about kinds of violent crime, mostly that's

16  what most of those studies are about.  Mr. Razzouk was already

17  a middle-aged person when he was committing these crimes.

18  It's not like he can't commit them again in the sense that

19  he's out and doing things, but when a person comes in and lies

20  at his own sentencing hearing about having not committed the

21  crime, who knows what he's capable of in terms of what other

22  kinds of frauds and deceptions he will work afterwards if he

23  has the opportunity.

24          It's astounding, and for those reasons and the

25  extraordinary circumstances of this defendant's conduct the

1  Government submits that a very severe guidelines sentence is

2  appropriate in this case.

3          Your Honor, I would just note that there are

4  representatives of the victims here if Your Honor wishes to

5  give them opportunities to speak at some point.

6          THE COURT:  They may be entitled to.

7          MR. TUCHMANN:  I'm sorry, I meant when Your Honor

8  wishes to give them an opportunity.

9          THE COURT:  Yes, now would be appropriate.

10          MR. TUCHMANN:  I am not sure if they wish to.

11          THE COURT:  I know.

12          MR. McINERNEY:  Judge, Dennis McInerney for Con

13  Edison.  I think we've fully submitted our costs.

14          THE COURT:  There have been enormous compendiums of

15  submissions, and I think you can tell that I have reviewed

16  them very closely, but if anyone has anything to add.

17          MR. McINERNEY:  No, Your Honor, we totally see that

18  and we rest on our papers at this point.  Certainly if you

19  have any questions, we are happy to answer them.

20          THE COURT:  Is that it?  Okay.

21          Well, as indicated, I have calculated and considered

22  the advisory sentencing guideline range.

23          Turning to the remaining statutory factors, the

24  crimes that Razzouk committed are undoubtedly of an extremely

25  serious nature warranting a severe punishment.  Razzouk

1    engaged in a bribery scheme of staggering proportions over a

2    lengthy period of time, likely depriving his employer Con

3    Edison and, ultimately, taxpayers of a substantial amount of

4    money.  In this regard there is evidence that Quiambao paid

5    Razzouk in excess of $13 million over a period of more than

6    ten years.  More to the point, it has been amply established

7    in the record of this sentencing proceeding that within the

8    six-year timeframe of the bribery charged, Quiambao and his

9    companies paid Razzouk over $8 million in exchange for

10   Razzouk's corrupt assistance to Quiambao in securing for

11   Rudell profitable contracts from Con Edison.

12           Further, as charged in the tax evasion counts to

13   which Razzouk also entered guilty pleas, he failed to report

14   income in an amount exceeding the $5 million over a three-year

15   period, depriving the Government of approximately $1.7 million

16   in taxes owed over those years, not including interest and

17   penalties.

18           Defense counsel asserts, and I have absolutely no

19   reason to doubt, that there existed a lengthy and complicated

20   personal relationship between Razzouk and Quiambao.  Whatever

21   the nature and reasons for their unusual power dynamic,

22   however, I view the two actors as mutually dependent upon one

23   another.  Of particular relevance to the illegal elements of

24   their relationship, both participants reaped substantial

25   financial benefit from their elicit venture and neither

1   repudiated or in any way sought to limit, much less terminate,

2   their lucrative scheme.  Whatever the other aspects of their

3   relationship, therefore, I do not consider the association

4   between Razzouk and Quiambao as a factor that either

5   aggravates or mitigates the seriousness of Razzouk's offenses.

6           Given the nature and seriousness of defendant's

7   crimes, the statutory sentencing goals of just punishment, and

8   the need for general deterrence, require a sentence of

9   considerable severity.  As to general deterrence, it is true

10  as the Government has argued that crimes of this nature do not

11  often come to light and that because of the likely victims,

12  the taxpayers are often unaware of any misconduct, these cases

13  are difficult to prosecute.  Moreover, while the the defendant

14  may have faced difficulties during his life, the extraordinary

15  extent to which the bribery scheme escalated is plainly

16  attributable to greed.  In such a case it is important to

17  impose a sentence that sends a clear message deterring others

18  in a position to be subject to similar temptations.

19          Turning to the history and characteristics of the

20  defendants, a number of facts may be viewed as somewhat

21  mitigating.  These include the following:  Razzouk is now 60

22  years old and has had no prior involvement in the criminal

23  justice system.  Born in Lebanon, he resided there with his

24  family during the civil war when, as described in detail in

25  the pre-sentence report and defense counsel's sentencing

1   submission, he and his family experienced immense suffering

2   and the defendant witnessed many atrocities first-hand.

3          In 1976 the defendant emigrated to the United States

4   and subsequently became a naturalized citizen.  He married in

5   1987 and became a father of two children.  Tragically, the

6   defendant's wife developed cancer and died at a young age,

7   leaving the defendant to raise his two daughters by himself.

8   He has since remarried in 2004, and in 2011 he retired from

9   Con Edison after approximately 34 years of employment there.

10  It is in connection with that employment that he committed the

11  instant crimes.

12         The defendant suffers from various medical ailments,

13  including GERD, a bleeding ulcer, herniated disks and other

14  severe arthritic degenerative changes in his neck and back,

15  rheumatoid arthritis and enlarged prostate.  He has been

16  diagnosed with adjustment disorder with mixed anxiety and

17  depressed mood.

18         There are two other matters that the Probation

19  Department has identified as mitigating.  The first is the

20  relationship between defendant and Quiambao, and the second is

21  the defendant's initial cooperation with the Government.

22         As indicated, I am unpersuaded that either matter is

23  of any significant value in mitigating the seriousness of

24  defendant's crimes.  To reiterate, whether or not Razzouk was

25  initially vulnerable to accepting money from Quiambao, it is

1  clear that there came a time when Razzouk accepted Quiambao's

2  bribes on the understanding that they were given to secure his

3  assistance in the awarding of Con Ed contracts.  From that

4  time on, Razzouk was a willing and full-fledged participant in

5  the bribery scheme, which reaped him at least $8 million in

6  bribes.

7           As to Razzouk's initial cooperation with the

8  Government, much of its value to the Government evaporated

9  when Razzouk advised Quiambao that he intended to lie at

10  Quiambao's trial by testifying that all of the money Quiambao

11  had given him was for services unrelated to the business of

12  Con Ed and importuned Quiambao to testify falsely to the same

13  untruths.  As previously indicated, however, I have considered

14  as mitigating Razzouk's cooperation against two other

15  defendants.

16           Balancing the various pertinent sentencing factors

17  enumerated in the sentencing statute at Section 3553(a), I

18  conclude that an incarceratory sentence of 78 months, together

19  with the other aspects of his sentence to impose is

20  sufficient, but not unduly severe, to accomplish the goals of

21  sentencing.  Six-and-a-half years imprisonment is undeniably a

22  severe sentence, that in my view both reflects the seriousness

23  of defendant's offenses and serves the goal of general

24  deterrence.  At the same time I believe it accommodates the

25  mitigating factors noted above.

1          Accordingly, I sentence the defendant on Count One

2    to the custody of the Attorney General for a period of 78

3    months; and on Counts Two through Four to the custody of the

4    Attorney General for the period of 60 months.  The sentences

5    on each count to run concurrently.

6          I also sentence Mr. Razzouk to a three-year period

7    of supervised release, with the following special conditions:

8          That he make restitution to Con Ed and National

9    Union in an amount of $6,867,350.51 plus prejudgment interest.

10   The rationale for which is set forth in the Statement of

11   Reasons that I will supply in a moment; that he comply with

12   the $6,515,809 forfeiture money judgment, which I gather he

13   has already done; that he cooperate with the IRS in the

14   assessment and payment of all tax owed, subject to my ruling

15   on the outstanding dispute, which I will address in a moment;

16   that he make full financial disclosure to the Probation

17   Department to the extent that he has not yet done so.  In that

18   regard, the defendant shall provide the U.S. Probation

19   Department with full disclosure of his financial records,

20   including comingled income, expenses, assets and liabilities,

21   to include yearly income tax returns.

22          The defendant is prohibited from maintaining and/or

23   opening any individual and/or joint checking, savings or other

24   financial accounts for either personal or business purposes

25   without the knowledge and approval of the United States

1    Probation Department.  The defendant shall cooperate with the

2    probation officer in the investigation of his financial

3    dealings and should provide truthful monthly statements of his

4    income and expenses.  The defendant shall cooperate in the

5    signing of any necessary authorization to release information

6    forms permitting the Probation Department access to his

7    financial information and records.

8              And I prohibit possession of a firearm, ammunition

9    or other destructive device.

10             Given the forfeiture and restitution orders, I find

11   that defendant is unable to pay a fine, but will impose the

12   mandatory $400 special assessment.

13             Finally, I will address the issue of the defendant's

14   restitution beginning with what he owes to the Internal

15   Revenue Service.  As part of his plea agreement, Razzouk was

16   obligated to recalculate the federal income tax owed for the

17   years 2006 to 2010 and to prepare and file accurate amended

18   returns for those years.  The amended returns he subsequently

19   proffered, however, adopted a strategy of characterizing as

20   loans the entire $6.5 million he was required to forfeit by

21   his cooperation agreement and deducting that amount from

22   taxable income as if it constituted legitimate business

23   expenses.  By this manipulation, he sought to avoid paying

24   taxes on his criminal forfeiture obligation.

25             As the Government correctly asserts, however, the

1   Internal Revenue Code and regulations expressly forbid the

2   defendant from using a "fine or similar penalty" to reduce his

3   taxable income.  26 United States Code Section 162(f), 26 CFR

4   Section 1.162-21(b)(1).  As the Government also correctly

5   urges, caselaw construing the quoted provision of the code and

6   regulations holds that criminal forfeiture payments identical

7   in nature to those at issue in this case fall squarely within

8   that provision and, thus, cannot be deducted from income

9   taxes.  See, for example, <u>United States versus Nacchio</u>,

10  N-A-C-C-H-I-O, 824 Fed. 3d 1370, Federal Circuit 2016.  Put

11  another way, because Razzouk, in fact, acquired monies

12  constituting ill-gotten gains over multiple tax years, he

13  remained liable for payment of taxes on those monies.  Nothing

14  justified nonpayment of the taxes.

15        In a subsequent letter, defense counsel retreats

16  from his characterization of defendant's criminal forfeiture

17  as a loan, urging instead that the proposed unorthodox tax

18  treatment of his client's criminal forfeiture arises via

19  operation of Title 21 United States Code Section 853(c).

20  Invoking this section he reasons that because pursuant to that

21  provision titled to forfeited assets covered by the provision

22  vest in the United States "at the time of the criminal act

23  giving rise to the forfeiture," the assets that his client

24  forfeited by his cooperation agreement was income that never

25  actually vested in Razzouk.  As a result, he concludes the

1  subsequent deduction of the forfeited funds from taxable

2  income was proper.

3          The flaw in counsel's argument is that it is

4  predicated on a statutory provision that he has ripped from

5  its limited, unambiguous context and is, therefore, wholly in

6  apposite.  Section 853(c), which references Section 853(n),

7  addressing issues of title to forfeited assets solely in the

8  context of the interests of potential third-parties.  That is,

9  it concerns those forfeitures where a third-party may have an

10 interest in forfeited assets that may be superior to that of

11 the Government.  No such third-party issues are present in

12 this case.  Defendant's forfeiture obligation runs solely to

13 the Government and 853(c) provides no basis to eliminate it.

14          As a final justification for eliminating his

15 client's restitution obligation, counsel asserts that a prior

16 prosecutor, who is no longer associated with the United States

17 Attorney's office, sanctioned the tax manipulations that

18 accomplished that end.  As a result, defense counsel contends

19 the Government's current "belated objection" constitutes "a

20 waiver of the argument it now advances."  The contention is

21 meritless.  An initial flaw in counsel's argument is that it

22 is based on counsel's mere hearsay assertion and is,

23 therefore, of no probative value in this proceeding.  More

24 importantly, it is undercut by the explicit language of

25 defendant's cooperation agreement.  Paragraph 19 of that

1    agreement states that:  "The defendant agrees that the

2    forfeiture of the above sum of money is not to be considered

3    payment on any income taxes that may be due."

4            As the Government aptly notes, "This provision makes

5    clear that the defendant understood that his forfeiture

6    payment was neither the kind of expense that is deductible

7    from his income tax liability, nor a payment towards his

8    income tax liability."  That is at the Government's response,

9    ECF number 71 at page 2.  Rendering hollow any subsequent

10   claim by the defendant of unfair surprise.  Pertinent, too,

11   was the provision of the agreement that:  "Apart from stated

12   written proffer agreements, no promises, agreements or

13   conditions have been entered into other than those set forth

14   this agreement, and none will be entered into unless

15   memorialized in writing and signed by all parties."  That is

16   from the plea agreement at paragraph 21.

17           Thus, the language of the agreement explicitly

18   barred reliance on oral understandings such as the one defense

19   counsel advances here.  In addition, the fact that the

20   defendant may have told a former prosecutor that he was filing

21   amended returns claiming unsupportable deductions does not

22   mean that the IRS accepted the amended returns.  As the

23   Government explains, the IRS can acknowledge receipt of the

24   amended returns without agreeing to the defense counsel's

25   calculation of the taxes set forth therein.

1        Given that the defendant pled guilty to a tax crime,

2   it was completely appropriate of the IRS to await the

3   conclusion of defendant's criminal case to reject the

4   calculations defendant made in the amended returns he filed.

5        More importantly, even assuming the defendant was

6   misled by an oral statement purportedly made by the prior

7   prosecutor after execution of the cooperation agreement and

8   that some five years passed before defendant was disabused of

9   the misconception, there is simply no prejudice to the

10  defendant warranting blank waiver of the IRS's right to

11  restitution.  Certainly, the Government did not knowingly

12  relinquish a known right to restitution on behalf of the IRS

13  explicitly established by the cooperation agreement.  At

14  worst, defendant was prejudiced by incurring interest and late

15  fees from the date in 2012 when he filed the inaccurate

16  amended returns.  Since the Government has withdrawn any

17  request that restitution include penalties for late payment of

18  the defendant's tax obligations, that's at the Government's

19  tax response at Note 1 on page 3, and because I intend to

20  limit the interest that accrued on the restitution owed, any

21  possible prejudice to the defendant will be wholly

22  ameliorated.

23        As to interest, the Government has requested that I

24  include in defendant's tax restitution the interest accrued on

25  the restitution owed to the IRS between the time he filed his

1    amended returns on October 2, 2012 to December 1, 2017.  In

2    the alternative, the Government asks that I order that he pay

3    restitution in the amount of tax and interest owed as of

4    October 2, 2012, the date the defendant filed his amended

5    returns.  That is in the same document at page 3, Note 2.

6            Over five years has passed since the defendant filed

7    his amended returns, and until his meeting with Quiambao on

8    December 18 of 2015 he was acting as a cooperator for the

9    Government.  In response to the Government's request to hold

10   the PSR in abeyance, see ECF number 18, neither Judge Mauskopf

11   nor I proceeded to sentence the defendant or calculate the

12   amount of tax restitution he owed.  Given the delays in

13   sentencing, some occasioned by the defendant, and others

14   beyond the defendant's control, I exercised my discretion, see

15   United States v. Qurashi, Q-U-R-A-S-H-I, 634 Fed. 3d, 699 at

16   704, Second Circuit 2011, to order that the defendant pay

17   restitution to the IRS in the total amount of $1,982,238.34,

18   which reflects the amount of tax and interest owed as of

19   October 2, 2012, the date defendant filed his amended returns.

20           As I indicated as to restitution to Con Ed and

21   National Union, I award $6,867,350.51, plus pre-judgment

22   interest as further explained in the written opinion that I am

23   now giving you.

24           (Pause.)

25           THE COURT:  Mr. Razzouk, as you know there are

1  circumstances in which you may appeal the sentence.  You can

2  discuss that with your lawyer.  If you choose to appeal, a

3  notice of appeal must be filed within 14 days.  If you could

4  not afford counsel, a lawyer would be appointed to represent

5  you.

6           Is there any particular requested designation?

7           MR. ZISSOU:  Judge, would you kindly recommend

8  northeast region, Otisville actually I think it would be?

9           THE COURT:  I will recommend Otisville.

10          MR. ZISSOU:  And would you give time until he's

11 designated to surrender?

12          THE COURT:  Yes.

13          MR. TUCHMANN:  I'm sorry, when you say time, is

14 there a time for a report date?

15          THE COURT:  Dennis is calculating the date right now.

16          MR. TUCHMANN:  I see.  Thank you, Your Honor.

17          THE COURTROOM DEPUTY:  May 21st at 12 noon.

18

19          (Matter concluded.)

20

21                        ooo0ooo

22 I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

23

24    /s/ Stacy A. Mace                   April 3, 2018
   _____    _____
25    STACY A. MACE                       DATE